JOHN J. SHAEFFER (SBN 138331)
  JShaeffer@FoxRothschild.com
JEFFREY H. GRANT (SBN 218974)
  JGrant@FoxRothschild.com
CARLY KLEIN (SBN 340691)
  CKlein@Foxrothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:  310.598.4150
Facsimile:   310.556.9828

Attorneys for Defendant and Cross-
Claimant Cymbiotika, LLC and
Defendants Chervin Jafarieh and
Shahab Elmi

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| VIRUN, INC.,<br><br>          Plaintiff,<br><br>     v.<br><br>CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an individual; SHAHAB ELMI, an individual; and DOES 1 through 10, inclusive,<br>          Defendants. | Case No. 8:22-CV-00325-SSS<br><br>Hon. Sunshine S. Sykes<br><br>**CYMBIOTIKA'S COUNTERCLAIMS AGAINST VIRUN, INC. AND PHILIP BROMLEY FOR:** |
| CYMBIOTIKA LLC, a limited liability company;<br><br>          Counterclaimant,<br><br>     v.<br><br>VIRUN, INC. a California Corporation, and PHILIP BROMLEY, an individual, and Roes 1 to 10 inclusive.<br><br>          Counterclaim Defendants. | **1.  FRAUD IN THE INDUCEMENT**<br>**2.  NEGLIGENT MISREPRESENTATION**<br>**3.  BREACH OF CONTRACT**<br>**4.  BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING**<br>**5.  TRADE LIBEL**<br>**6.  FALSE ADVERTISING**<br>**7.  INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS**<br>**8.  INTENTIONAL INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**<br>**9.  UNFAIR COMPETITION**<br><br>**DEMAND FOR JURY TRIAL** |

1

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

## INTRODUCTION

1.    When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was unable to meet its contractual obligations to Defendant and Counterclaimant Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult decision to move the manufacturing of Cymbiotika's dietary supplements from Virun to another manufacturer.  This decision was particularly frustrating because Cymbiotika had spent more than a year working hand-in-hand with Virun to develop a line of unique products after being induced by Virun's representation that the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas, would be Cymbiotika's intellectual property.  Had Virun and its President Counterclaim Defendant Phillip Bromley ("Bromley") not made such representations to Jafarieh and Elmi, Cymbiotika would have never done business with Virun.

2.    Embarrassed by their own ineptitude and jilted as a result of losing Cymbiotika's business and the friendship of Jafarieh, Virun, and Bromley lashed out when Cymbiotika took its growing business elsewhere.  Bromley first took to social media to engage in an anonymous, weeks' long smear campaign to disparage Cymbiotika and its products by publishing social media posts – that specifically targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new formulations were dangerous.  Bromley's outlandish and vicious accusations included allegations that Cymbiotika's products contained cancer-causing ingredients.

3.    After Bromley's identity surfaced following what Virun and Bromley believed was a clandestine social media campaign to tarnish Cymbiotika's reputation, they revised their approach.  Virun began systematically sabotaging the production and delivery of Cymbiotika products that Virun remained contractually obligated to deliver.  Specifically, Virun purposefully slowed or outright prevented

2

CYMBIOTIKA'S COUNTERCLAIMS

1   the production of Cymbiotika products knowing that the delay would cause
2   Cymbiotika's customers to cancel their orders and subscriptions.  Cymbiotika
3   suspicions of Virun's systematic sabotage were confirmed when it caught Virun in
4   several lies, including that Virun was unable to complete Cymbiotika Purchase
5   Orders because raw materials were not available to Virun, when in fact, they were.

6       4.    Months after Bromley's smear campaign and Virun's systematic
7   sabotage, Virun changed strategy and claimed for the first time that Cymbiotika's
8   new formulations were not in fact new and carcinogenic, but were instead actually
9   Virun's proprietary formulations.  From this narrative stemmed Virun's far-fetched
10  allegation that Cymbiotika's use of those formulations constitutes a
11  misappropriation of Virun's trade secrets.  Of course, Virun's original ruse to
12  mount baseless accusations that Cymbiotika's new formulations cause cancer is
13  wholly incompatible with their second scheme to assert that Virun owns those same
14  formulations.

15      5.    Virun makes these spurious claims despite its own website
16  representing to potential and current clients that Virun does not make private label
17  products but instead, works with each client to develop unique formulations.
18  Virun's website emphatically represents to Virun's prospective clients that Virun
19  does not own the formulations it creates in their collaborations with clients.  While
20  Virun now disavows these representations, such a bait-and-switch is not tolerated
21  under the law and constitutes, at the very least, unfair competition.

22  **THE PARTIES**

23      6.    Cymbiotika is a limited liability company organized and existing under
24  the laws of the State of Nevada, with its principal place of business in San Diego,
25  California.

26      7.    Upon information and belief, Virun is a corporation organized and
27  existing under the laws of the State of Delaware, with its principal place of business
28  in this District.

CYMBIOTIKA'S COUNTERCLAIMS
138028081.1

1    8.    Upon information and belief, Bromley is the Co-Founder and Chief

2 Executive Officer of Virun and has served in this capacity at all relevant times.

3    9.    Cymbiotika is ignorant of the true names and capacities, whether

4 individual, corporate, partnership, association, or otherwise, of Counterclaim

5 Defendants Roes 1 through 10, inclusive, and therefore sues such defendants by

6 their fictitious names.  Cymbiotika is informed and believes, and thereupon alleges,

7 that each of the fictitiously named Counterclaim Defendants is responsible in some

8 manner for the injuries and damages alleged by Cymbiotika.  Cymbiotika will seek

9 leave of the Court to amend this Counterclaim to show the true names and

10 capacities of the fictitiously named Counterclaim Defendants when they have been

11 ascertained.

12    10.    Cymbiotika is informed and believes, and on that basis alleges, that at

13 all times relevant herein, Virun, Bromley, and Roes 1-10 (collectively

14 "Counterclaim Defendants"), inclusive, were the alter ego of each other and each of

15 them, and that such a unity of interest and ownership existed between them that

16 separate personalities have not in reality existed; and there would be an inequitable

17 result if the acts and omissions at issue in this case were treated as those of any of

18 the Counterclaim Defendants alone.  Cymbiotika is further informed and believes

19 that Counterclaim Defendants commingle funds and assets among themselves, that

20 Counterclaim Defendants have identical, nearly identical. or effectively identical

21 owners, that the Counterclaim Defendants have the same offices, directors, and

22 officers and that the Counterclaim Defendants use one another as a mere shell or

23 conduit for the affairs of one another.  In addition, Cymbiotika is informed and

24 believes that each of the Counterclaim Defendants disregard corporate formalities,

25 shares employees and each transfers assets or properties away and/or creates or

26 shifts liabilities so that each may be left with insufficient capital to meet the needs

27 of each entity's business and its liabilities and without consideration to the

28 detriment of the entity's creditors.

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

11.     Cymbiotika is informed and believes, and on that basis alleges that, each of the Counterclaim Defendants were the agents, servants, employees, or in some other legal relationship to the others, whereby legal liability is imputed from one party to the other, and at all relevant times, each of the Counterclaim Defendants were acting within the course and scope of their agency, servant, or employment relationship.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the matter pursuant to Virun's First Amended Complaint ("FAC") (Dkt. No. 92)., to which this Counterclaim relates, which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq*.  This court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

13.     This Court has personal jurisdiction over Counterclaim Defendants, and venue is proper in this Judicial District, because Virun has invoked the jurisdiction of this Court by filing its FAC in this Court.

14.     Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## NATURE OF THE ACTION

15.     Cymbiotika seeks damages and injunctive relief for acts of fraud, breach of contract, tortious interference, and unfair competition engaged in by Counterclaim Defendants in violation of the laws of the United States and the State of California.  In particular, this case concerns Counterclaim Defendants' breaches of contractual obligations to Cymbiotika, willful and deliberate acts of false advertising, and related claims.

## FACTUAL BACKGROUND

### Preliminary Discussions Between Cymbiotika and Virun

16.     Cymbiotika is a popular health supplement company that designs high-end, industry-leading, organic, and original formulations for direct-to-consumer sales, predominantly driven by an online subscription model.  Chervin Jafarieh is a

5

138028081.1

founder and member of Cymbiotika.  Shahab Elmi is a co-founder, member, and
CEO of Cymbiotika.

17.     Elmi and Jafarieh, as agents of Cymbiotika, approached Bromley in
late 2018 in his capacity as a principal of Virun to commence discussions about a
possible vendor-manufacturer relationship between Cymbiotika and Virun
(together, Cymbiotika and Virun will sometimes be referred to as the "Parties").

18.     Elmi and Jafarieh expressed Cymbiotika's interest in utilizing Virun's
manufacturing services to expand Cymbiotika's product line.  At the time,
Cymbiotika had one product on the market; however, Jafarieh had product
concepts, formula ideas, and ingredient lists ready for development.  Cymbiotika
knew that creating a scalable product line from concept to consumer would require
the utilization of a capable third-party manufacturer.

19.     Cymbiotika sought a manufacturer who would encourage collaboration
and ultimately permit Cymbiotika ownership of finished products.  Cymbiotika
relied on the express representations set forth on Virun's website regarding Virun's
policy regarding the ownership of formulas in deciding to enter into discussion with
Virun.

20.     In late 2018, and at all relevant times, Virun's website contained the
following representation regarding formula ownership in its frequently asked
questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns
that formulation. This is the most common scenario. However, in
some instances companies have asked to private label a formula
already owned by Virun, and in those cases, Virun retains ownership.[1]

21.     Virun also represented on its website, in its FAQ section, that it does
not sell private-label products:

_____

[1] https://virun.com/faq/, last accessed September 12, 2022.

CYMBIOTIKA'S COUNTERCLAIMS

1   [Q.]  Does Virun sell private-label products?

2   [A.] No. Every product we create is a custom formulation based on

3   collaboration with our client. Our products are developed on a project-

4   by-project basis. Therefore, we do not sell private-label products.[2]

5   22.   Cymbiotika's industry leading reputation, high-end price points, and

6   unique formulation line are all antithetical to entering into private label

7   arrangements with manufacturers.  Virun was no exception, as the products that

8   Virun had ready to go on its shelves for private labeling arrangements were not

9   organic, lacked organic flavors, had preservatives, and were not what ultimately

10  became Cymbiotika's products.

11  23.   Noting these considerations, and relying on Virun's express

12  representations regarding formulation ownership, Cymbiotika felt Virun would be

13  an ideal partner and engaged in preliminary discussions with Bromley.

14  **Confidentiality Agreement and Conception of Formal Business Relationship**

15  24.   To facilitate frank discussions about commencing a potential vendor-

16  manufacturer relationship, the Parties executed the Confidentiality Agreement in

17  January 2019.  A copy of the Confidentiality Agreement is attached hereto as

18  Exhibit A.

19  25.   By its express terms, the Confidentiality Agreement was limited to

20  "discussions concerning a possible future business or research relationship."  To the

21  extent a relationship was forged, and the Parties believed there was a need to cloak

22  an actual business relationship in confidentiality, such a term would be negotiated

23  and included in any subsequent manufacturing and/or supply agreement.  In fact,

24  Virun provided Cymbiotika with drafts of precisely such agreements during these

25  negotiations that included confidentiality language.  This and many other

26  circumstances demonstrate conclusively that Virun itself knew that the exploratory

27  Confidentiality Agreement was limited to pre-business discussions.

28
---
[2]  https://virun.com/faq/, last accessed September 12, 2022.

CYMBIOTIKA'S COUNTERCLAIMS

26.     While Virun represented to Cymbiotika that it has some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product.  Instead, Cymbiotika needed a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's innovative and market leading strategy.  Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

### Cymbiotika's Vendor-Manufacturer Relationship with Virun

27.     Following candid discussions governed by the Confidentiality Agreement, the Parties thereafter entered into a vendor-customer relationship in early 2019 whereby Cymbiotika hired Virun to manufacture dietary supplement products for Cymbiotika based on Cymbiotika's ideas, strategies, needs and goals.

28.     Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement of the type Virun had presented in draft to Cymbiotika.  Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret.  One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also have addressed the ownership of any formulations forged under that relationship.  Cymbiotika expected that it would and did own the various formulations it developed with Virun consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

29.     Cymbiotika is informed and believes, and on that basis alleges, that Virun did not insist on entering into a manufacturing agreement, which would have further clarified the ownership of the formulations, because Virun desired the ability to make spurious legal claims if and when Cymbiotika decided to take its

8

138028081.1

business elsewhere.  Cymbiotika is informed and believes, and on that basis alleges, that both Virun and Bromley knew from the outset that they intended to assert ownership over any formulation Virun developed with Cymbiotika despite Virun's express representations to the contrary.  Had Cymbiotika known that Virun and Bromley were reserving the right to assert ownership over formulation developed with Cymbiotika, Cymbiotika would have never entered a business relationship with Virun.

30.    Founded upon an expressed understanding that Cymbiotika owned the product formulations that it developed or that were jointly-developed based on Cymbiotika's ideas, a working relationship eventually formed, as did a friendship between Bromley and Jafarieh.

31.    Cymbiotika provided Virun with its product concepts and the Parties executed Cymbiotika's plans together.  When these extended efforts proved successful, resulting in a finished product, Cymbiotika contracted with Virun to manufacture that product based on Cymbiotika's specifications.

32.    Virun has stock formulations for supplements already widely available on the marketplace, including formulation for a Vitamin C supplement and a Vitamin B12 supplement.  Cymbiotika, however, had no interest in simply repackaging generic formulations of supplements already widely available in the marketplace.  While Virun and Cymbiotika may have started with Virun's generic formulations, Cymbiotika insisted upon significant modifications to ensure the formulations sold under Cymbiotika's name were consistent with Cymbiotika's own ideas, strategies, and reputation for innovative products supporting premium prices.

33.    Cymbiotika's team consistently communicated with Virun's team to bring Cymbiotika's ideas to the table and to collaborate on Cymbiotika's product formulation development.  Cymbiotika's team provided and confirmed exact

138028081.1

specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.

34.    Each of the products that Cymbiotika would eventually hire Virun to manufacture took months to develop and went through numerous revisions before meeting Cymbiotika's exacting standards.  The products that Cymbiotika hired Virun to manufacture were entirely distinct from any generic supplement formula that Virun may have possessed.

35.    While the Parties never entered into a formal manufacturing arrangement, the Parties utilized a purchase order system whereby Cymbiotika would place an order with Virun for a specific quantity of products to be delivered pursuant to an agreed-upon timeline.  Utilizing this system, Cymbiotika placed a series of Purchase Orders ("Purchase Orders" or "POs") with Virun from mid-2019 until late 2021.

36.    One of the most important attributes of any supplement formulation is bioavailability, *i.e.* ensuring that the nutritional value of the supplement itself is digested by the consumer in a manner that will achieve maximum benefit for the consumer.  Cymbiotika understood Virun had innovative technology for optimizing bioavailability, which was an additional reason for seeking out Virun as a manufacturing partner.  In fact, Virun owns a number of patents claiming various aspects of its different manufacturing techniques.  Throughout its working relationship and collaborative processes, Virun never materially disclosed nor demonstrated any of these proprietary technical processes or manufacturing techniques.  Virun also never suggested that any of these techniques or processes were being protected as trade secrets rather than as claims made in issued patents.  Cymbiotika lacks usable knowledge of Virun's manufacturing procedures and/or chemical methodology, which it frankly had no need to learn.

CYMBIOTIKA'S COUNTERCLAIMS
138028081.1

**Virun's Breaches of Purchase Orders Cause Damage to Cymbiotika's Business**

37.    After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was mismanaged, disorganized, and had severe supply chain difficulties.

38.    Virun consistently delayed fulfilling Purchase Orders and would frequently underdeliver.  Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.

39.    Since Cymbiotia utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.  Virun's constant delays and inability to deliver on Purchase Orders timely and in full, caused Cymbiotika's business to suffer greatly.  Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding Purchase Orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

40.    Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

41.    Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on Purchase Orders constituted an existential threat to Cymbiotika.  Cymbiotika had to transition to a manufacturer who could meet its rising demand.

**Virun's Social Media Smear Campaign**

42.    Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

11

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

43.     Shortly after Cymbiotika began distributing products based on new
formulations with an alternative manufacturer, Cymbiotika fell victim to an
anonymous social media campaign in which multiple anonymous accounts across
social media platforms asserted – falsely – that Cymbiotika's new formulations
were carcinogenic.  These accounts tagged Cymbiotika customers in the posts and
communicated with those customers, publishing further falsehoods in comments
and replies to comments from concerned customers.  The baseless and damaging
lies spread by the anonymous assailant resulted in numerous customer complaints
and lasting damage to Cymbiotika's business and reputation.

44.     Cymbiotika is informed and believes, and on that basis alleges, that
Bromley himself was behind some, if not all, of these clandestine attacks, and that
he intentionally disparaged the quality of Cymbiotika's new product formulations.
On behalf of Virun, Bromley knowingly published these falsehoods about
Cymbiotika's products out of spite following the failed partnership between the
Parties.

45.     Bromley had once again created an existential threat to Cymbiotika.
Cymbiotika was forced to involve its litigation counsel and deliver Bromley a
cease-and-desist letter in order to stop the attacks.

46.     Attached hereto as Exhibit B is a copy of the cease-and-desist letter
that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering
him to cease-and-desist from continuing his "campaign to defame, disparage, and
harm Cymbiotika by knowingly making false claims about Cymbiotika products
and its business via social media."

47.     Following the delivery of the cease-and-desist letter, Bromley ceased
the social media smear campaign.  However, the damage to Cymbiotika's
reputation remained.

48.     Cymbiotika is informed and believes, and on that basis alleges, that in
addition to its social media campaign, Virun and Bromley continue to engage in an

12

138028081.1

active campaign to tarnish Cymbiotika's reputation and continue to seek means to otherwise harm Cymbiotika.  For example, Cymbiotika is informed and believes, and on that basis alleges, that Virun hired Cymbiotika's former head of information technology for the sole purposes of "digging up dirt" on Cymbiotika.  Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika.  Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment.  Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

## CLAIMS

## FIRST CLAIM FOR FRAUD IN THE INDUCEMENT

## (Against All Counterclaim Defendants)

49.    Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

50.    When exploring potential manufacturing partners, Elmi and Jafarieh, as principals of Cymbiotika, approached Bromley in his capacity as a principal of Virun and expressed Cymbiotika's interest in utilizing Virun's manufacturing services.

51.    Counterclaim Defendants made a series of false representation to Cymbiotika in order to induce Cymbiotika to select Virun as the manufacturer for its supplement line.  These misrepresentations include, but are not limited to, assertions that Cymbiotika, and not Virun, would own any and all formulations that

13

the Parties jointly developed or were developed from Cymbiotika's ideas. Counterclaim Defendants reiterated the representations that Virun makes to all prospective customers as reflected on its website including that Virun does not produce private label products, but collabulary develops unique products with its customers and that those formulations made with a customer's ideas are the customer's intellectual property.

52.    Reasonably relying on Counterclaim Defendants' representations, including that "[w]hen a client brings us an idea for development, the client owns that formulation," Cymbiotika entered into a business relationship with Virun, whereby Cymbiotika would bring product development concepts to Virun, Virun would manufacture dietary supplement products for Cymbiotika based on those concepts, and Cymbiotika was induced to believe it would retain intellectual property ownership of the completed product formulations.

53.    These representations made by Counter Defendants to Cymbiotika were false when made.  In particular, since Virun now contend that Virun, and not Cymbiotika, own the formulations that Virun developed with Cymbiotika, Counterclaim Defendants now contend that the representations Virun made to Cymbiotika were false when made and to the extent Virun prevails on its claim that it owns such formulations the representations were false when made.

54.    Counterclaim Defendant knew that these representations they made to Cymbiotika were false when made or were in reckless disregard for their truth at the time they were made.

55.    Counterclaim Defendants intended that Cymbiotika rely on these representations.

56.    Cymbiotika reasonably relied on the representations of Counterclaim Defendants in entering a business relationship with Virun.

57.    Cymbiotika has been harmed by its reliance on these representations in an amount to be proved at trial.  Additionally, Cymbiotika will be irreparably

14

138028081.1

1  harmed to the extent that Virun prevails on its claim that it owns any protectable

2  trade secret in any formulation developed with Cymbiotika, such that money

3  damages could not compensate such harm warranting the imposition of injunctive

4  relief.

5      58.   Cymbiotika's reliance on Counterclaim Defendants' representations

6  were a substantial factor in causes Cymbiotika's harm.

7      59.   In making these false representations, Counterclaim Defendants acted

8  with fraud, malice, and oppression, entitling Cymbiotika to an award of punitive

9  damages.

10  **SECOND CLAIM FOR NEGLIGENT MISREPRESENTATION**

11  **(Against All Counterclaim Defendants)**

12      60.   Cymbiotika repeats and realleges the allegations of the preceding

13  paragraphs as if fully set forth herein.

14      61.   Counterclaim Defendants made a series of representations of fact,

15  including that Cymbiotika would be the owner of any formulations that Cymbiotika

16  developed with the Counterclaim Defendants, or any one of them.

17      62.   These representations made by Counter Defendants to Cymbiotika

18  were false when made.  In particular, since Virun now contend that Virun, and not

19  Cymbiotika, own the formulations that Virun developed with Cymbiotika,

20  Counterclaim Defendants now contend that the representations Virun made to

21  Cymbiotika were false when made and to the extent Virun prevails on its claim that

22  it owns such formulations the representations were false when made.

23      63.   Although Counterclaim Defendants, or any one of them, may have

24  honestly believed that their representations were true when made, Counterclaim

25  Defendants had no reasonable grounds for believing that representation was true

26  when made.

27      64.   Counterclaim Defendants intended that Cymbiotika rely on these

28  representations.

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

1       65.    Cymbiotika did in fact rely on the Counterclaim Defendants

2 representations in deciding to enter into a business relationship with Virun and such

3 reliance was reasonable.

4       66.    Cymbiotika has suffered damages in an amount to be proven at trial.

5       67.    Cymbiotika's reliance on Counterclaim Defendants' representations

6 were a substantial factor in causes Cymbiotika harm

7 ### THIRD CLAIM FOR BREACH OF CONTRACT

8 ### (Against Virun)

9       68.    Cymbiotika repeats and realleges the allegations of the preceding

10 paragraphs 1-48 as if fully set forth herein.

11      69.    Cymbiotika and Virun entered into a contract whereby, after

12 formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika

13 would own the formulation and agreed to purchase product manufactured based on

14 that formulation and packaged consistent with Cymbiotika's specifications from

15 Virun.  While there is no writing reflecting all of the terms of this development and

16 manufacturing arrangement, each order for a specific formulation is reflected in

17 Purchase Orders and similar ancillary documentation reflecting such orders and

18 satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its

19 own separate subsidiary contract to this overall contractual relationship.

20      70.    Cymbiotika did all, or substantially, all, of the significant things that

21 the contract and each subsidiary contract required it to do, unless it was otherwise

22 excused from having to do.

23      71.    Virun breached this contract and one or more of the subsidiary

24 contracts by, among other things, repeatedly failing to deliver paid-for product in

25 full, on time, and in the agreed-upon lead times, resulting in financial and

26 reputational damages to Cymbiotika.

27      72.    Virun's breaches of the contract and one or more of the subsidiary

28 contracts proximately and actually damaged Cymbiotika because without timely

16

1  delivery from Virun, Cymbiotika was unable to fulfill outstanding product orders
2  from its paying customers.

3      73.    As a direct and proximate result of Virun's breaches of Purchase
4  Orders, Cymbiotika has suffered damages in an amount to be proven at trial.

5  **FOURTH CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND**
6  **FAIR DEALING**
7  **(Against Virun)**

8      74.    Cymbiotika repeats and realleges the allegations of the preceding
9  paragraphs 1-48 and 68-73 as if fully set forth herein.

10     75.    Cymbiotika and Virun entered into a contract, whereby after
11  formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika
12  would own the formulation and agreed to purchase product manufactured based on
13  that formulation and packaged consistent with Cymbiotika's specifications from
14  Virun.  While there is no writing reflecting all of the terms of this development and
15  manufacturing arrangement, each order for a specific formulation is reflected in
16  Purchase Orders and similar ancillary documentation reflecting such orders and
17  satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its
18  own separate subsidiary contract to this overall contractual relationship.

19     76.    Cymbiotika performed all conditions precedent to demanding
20  performance from Virun on the contract and any subsidiary contract, except for
21  those obligations waived, excused, or prevented by Virun.

22     77.    The contract and the subsidiary contracts include an implied covenant
23  of good faith and fair dealing.

24     78.    Virun breached this covenant by, among other things, acting in bad
25  faith and engaging in conduct that frustrated Cymbiotika's rights with respect to the
26  intended benefits and purpose of the contract and subsidiary contracts.

27     79.    Virun's repeated inabilities to fulfill Purchase Orders in a timely and
28  complete manner, as well as frequent refusals to respond to reasonable requests for

17

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

1    order fulfillment statuses, frustrated Cymbiotika's enjoyment of the benefits of the

2    underlying Purchase Orders.  Additionally, Virun's assertion that it now owns the

3    formulations developed with Cymbiotika interferes with an intended benefit of this

4    contract.

5         80.    As a direct and proximate result of Virun's breaches of the implied

6    covenant of good faith and fair dealing, Cymbiotika has suffered damages in an

7    amount to be proven at trial.

8                    **FIFTH CLAIM FOR TRADE LIBEL**

9                 **(Against All Counterclaim Defendants)**

10        81.    Cymbiotika repeats and realleges the allegations of the preceding

11   paragraphs as if fully set forth herein.

12        82.    Beginning no later than November 2021, Counterclaim Defendants

13   have engaged in a campaign of making false statements concerning the safety and

14   efficacy of products sold by Cymbiotika since it ceased purchasing products from

15   Virun, including posting on social media.

16        83.    Counterclaim Defendants' conduct is independently wrongful and

17   unrelated to any contract Cymbiotika has or may have had with any Counterclaim

18   Defendants, or any one of them.

19        84.    Counterclaim Defendants' conduct, including their social media

20   campaign, was, and continues to be, designed to discourage customers and potential

21   customers from purchasing products from Cymbiotika.

22        85.    Counterclaim Defendants' conduct has resulted in pecuniary damage

23   to Cymbiotika due to the resultant loss of sales and goodwill from customers who

24   have seen or heard Counterclaim Defendants false messaging about Cymbiotika's

25   products.

26        86.    As a direct and proximate result of Counterclaim Defendants' acts,

27   Cymbiotika has suffered damages in an amount to be proven at trial.  Additionally,

28   Counterclaim Defendants' continued publication of false and misleading

18

138028081.1

1   information about the safety and efficacy of Cymbiotika's products will cause

2   Cymbiotika irreparable harm entitling it to injunctive relief.

3        87.    Counterclaim Defendants acted volitionally with fraud, oppression,

4   and malice in the act of publishing libelous and disparaging misinformation about

5   Cymbiotika's products, and as such, Cymbiotika is entitled to an award of punitive

6   damages.

7   **SIXTH CLAIM FOR FALSE ADVERTISING UNDER THE LANHAM ACT**

8   **15 U.S.C. § 1125(a)**

9   **(Against All Counterclaim Defendants)**

10       88.    Cymbiotika repeats and realleges the allegations of the preceding

11  paragraphs as if fully set forth herein.

12       89.    Beginning no later than November 2021, Counterclaim Defendants

13  have engaged in a campaign of making false statement concerning the safety and

14  efficacy of products sold by Cymbiotika since it ceased purchasing products from

15  Virun, including posting on social media.

16       90.    Counterclaim Defendants' assertions about the safety and efficacy of

17  Cymbiotika's products are false and plainly untrue.  Counterclaim Defendants were

18  each aware of the falsity of the statements at the time of their publication.

19       91.    Counterclaim Defendants made these false assertions about

20  Cymbiotika's products as part of commercial advertisements, including social

21  media posts, for the purpose of influencing consumers to refrain from purchasing

22  Cymbiotika's products and were disseminated sufficiently to the relevant

23  purchasing public on social media.

24       92.    Counterclaim Defendants made all such statements in commercial

25  advertising in interstate commerce, including in California, in order to misrepresent

26  the nature, characteristics, and qualities of Cymbiotika's goods and services.

27       93.    Counterclaim Defendants' false statements regarding Cymbiotika's

28  products are deceptive and are likely to influence consumers' purchasing decisions.

CYMBIOTIKA'S COUNTERCLAIMS

94.     Given their intimate knowledge of Cymbiotika's ingredients and high standards for same, Counterclaim Defendants knew that Cymbiotika's new products did not lack the safety and efficacy Counterclaim Defendants publicly asserted.  Counterclaim Defendants therefore made the false and disparaging statements willfully and with an intent to deceive consumers.

95.     As a direct and proximate result of Counterclaim Defendants' false and disparaging publications, Cymbiotika has suffered damages in an amount to be proven at trial.  Additionally, any continued false advertising by Counterclaim Defendants of the safety or efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm warranting injunctive relief.

96.     Counterclaim Defendants acted here in a willful and wanton manner and as a result, Cymbiotika is entitled to enhanced damages.

97.     Cymbiotika is entitled to an award of attorneys' fees because of the exceptional nature of Counterclaim Defendants' conduct.

## SEVENTH CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
## (Against All Counterclaim Defendants)

98.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

99.     Cymbiotika has subscription contract with its customers whereby Cymbiotika supplies such customers with products on a recuring basis.

100.    Counterclaim Defendants knew of Cymbiotika's subscription-based relationship with its customers.

101.    Counterclaim Defendants have interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

CYMBIOTIKA'S COUNTERCLAIMS
138028081.1

102.   Counterclaim Defendants intended their conduct to disrupt these subscription contracts or knew that it was substantially certain that their conduct would disrupt these contracts.

103.   As a direct and proximate result of Counterclaim Defendants' interference, Cymbiotika has suffered damages in an amount to be proven at trial.

104.   Counterclaim Defendants acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

**EIGHTH CLAIM FOR TORTIOUS INTERFERENCE WITH
PROSPECTIVE ECONOMIC ADVANTAGE**

**(Against All Counterclaim Defendants)**

105.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

106.   Cymbiotika has an economic relationship with its non-subscription based customers, as well as potential customers who would be interested in the products that it sells that probably would have resulted in an economic benefit Cymbiotika.

107.   Counterclaim Defendants knew of Cymbiotika's customers, as well as potential customers who may be interested in Cymbiotika's products.

108.   Counterclaim Defendants have interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products, and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.  This interference is independently wrongful because the statement made were false and independently support a claim for trade liable and false advertising.

109.   Counterclaim Defendants intended their conduct to disrupt these economic relationships or knew that it was substantially certain that their conduct would disrupt these relationships.

21

138028081.1

110.   As a direct and proximate result of Counterclaim Defendants'
interference, Cymbiotika has suffered damages in an amount to be proven at trial.

111.   Counterclaim Defendants acted volitionally with fraud, oppression,
and malice entitling Cymbiotika to an award of punitive damage.

### NINTH CLAIM FOR UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200
### (Against All Counterclaim Defendants)

112.   Cymbiotika repeats and realleges the allegations of the preceding
paragraphs as if fully set forth herein.

113.   Virun engaged in unlawful, unfair, or fraudulent business practices in
violation of Section 17200 of the California Business and Professions Code
("Section 17200"), by among other things, affirmatively misrepresenting on its
website that "when a client brings us an idea for development, the client owns that
formulation" while knowingly intending to retain intellectual property ownership of
any product development it formulated with Cymbiotika, and by making false
statements about Cymbiotika's products.

114.   Counterclaim Defendants' unlawful, unfair, or fraudulent business
practices in violation of Section 17200 proximately caused actual injury to
Cymbiotika by harming its competitive standing and hindering its prospective
contractual relations.

115.   As a direct and proximate result of Counterclaim Defendants unlawful,
unfair, or fraudulent business practices in violation of Section 17200, Cymbiotika
has been harmed in an amount to be proven at trial.  Additionally, Counterclaim
Defendants' conduct, to the extent it continues, will cause irreparable harm
warranting injunctive relief.

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

# **PRAYER FOR RELIEF**

WHEREFORE, Cymbiotika respectfully request that this Court enter judgment in their favor and against Counterclaim Defendants and provide the following relief:

a.   Compensatory damages, incidental damages and consequential damages;

b.   Costs of suit, interest, and reasonable attorneys' fees;

c.   Pre and post-judgment interest;

d.   Punitive damages;

e.   Such other relief as this Court deems just and equitable.

Dated:      September 14, 2022        **FOX ROTHSCHILD LLP**

*/s/ John Shaeffer*

John Shaeffer
Jeffrey H. Grant
Carly Klein
Attorneys for Defendants and
Counterclaimant

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1

# **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by jury on all issues so triable.

Dated:         September 14, 2022                    FOX ROTHSCHILD LLP


                                                     */s/ John Shaeffer*
                                                     John Shaeffer
                                                     Jeffrey H. Grant
                                                     Carly Klein
                                                     Attorneys for Defendants and
                                                     Counterclaimant

24

CYMBIOTIKA'S COUNTERCLAIMS

138028081.1