1  JOHN J. SHAEFFER (SBN 138331)
      JShaeffer@FoxRothschild.com
2  JEFFREY H. GRANT (SBN 218974)
      JGrant@FoxRothschild.com
3  CARLY KLEIN (SBN 340691)
      CKlein@Foxrothschild.com
4  FOX ROTHSCHILD LLP
   Constellation Place
5  10250 Constellation Blvd, Suite 900
   Los Angeles, CA 90067
6  Telephone:   310.598.4150
   Facsimile:   310.556.9828
7
   Attorneys for Defendant and Cross-
8  Claimant Cymbiotika, LLC and
   Defendants Chervin Jafarieh and
9  Shahab Elmi

10                UNITED STATES DISTRICT COURT

11        CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12

| 13 | VIRUN, INC., | Case No. 8:22-CV-00325-SSS |
|---|---|---|
| 14 | Plaintiff, | Hon. Sunshine S. Sykes |
| 15 | v. | **CYMBIOTIKA'S AMENDED COUNTERCLAIMS AGAINST VIRUN, INC.** |
| 16 | CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an | |
| 17 | individual; SHAHAB ELMI, an individual; and DOES 1 through 10, | **DEMAND FOR JURY TRIAL** |
| 18 | inclusive, | |
| 19 | Defendants. | |
| 20 | CYMBIOTIKA LLC, a limited liability company, | |
| 21 | | |
| 22 | Counterclaimant, | |
| 23 | v. | |
| 24 | VIRUN, INC. a California Corporation, and Roes 1 to 10 inclusive. | |
| 25 | | |
| 26 | Counterclaim Defendants. | |
| 27 | CONTINUED ON NEXT PAGE | |
| 28 | | |

1

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

1  CYMBIOTIKA LLC, a limited liability
2  company,

3              Third-Party Complainant,

4  v.

5  PHILLIP BROMLEY, an individual,

6              Third-Party Defendant.

7

8

## INTRODUCTION

9

10      1.      When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was

unable to meet its contractual obligations to Defendant and Counterclaimant

Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and

Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult

decision to move the manufacturing of Cymbiotika's dietary supplements from

Virun to another manufacturer.  This decision was particularly frustrating because

Cymbiotika had spent more than a year working hand-in-hand with Virun to

develop a line of unique products after being induced by Virun's representation that

the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas,

would be Cymbiotika's intellectual property.  Had Virun and its President Third-

Party Defendant Phillip Bromley ("Bromley") not made such representations to

Jafarieh and Elmi, Cymbiotika would have never done business with Virun.

      2.      Embarrassed by their own ineptitude and jilted as a result of losing

Cymbiotika's business and the friendship of Jafarieh, Virun and Bromley lashed out

when Cymbiotika took its growing business elsewhere.  Bromley first took to social

media to engage in an anonymous, weeks' long smear campaign to disparage

Cymbiotika and its products by publishing social media posts – that specifically

targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new

formulations were dangerous.  Bromley's outlandish and vicious accusations

2

138298879.1

included allegations that Cymbiotika's products contained cancer-causing ingredients.

3.      After Bromley's identity surfaced following what Virun and Bromley believed was a clandestine social media campaign to tarnish Cymbiotika's reputation, they revised their approach.  Virun began systematically sabotaging the production and delivery of Cymbiotika products that Virun remained contractually obligated to deliver.  Specifically, Virun purposefully slowed or outright prevented the production of Cymbiotika products knowing that the delay would cause Cymbiotika's customers to cancel their orders and subscriptions.  Cymbiotika suspicions of Virun's systematic sabotage were confirmed when it caught Virun in several lies, including that Virun was unable to complete Cymbiotika purchase orders because raw materials were not available to Virun when, in fact, they were.

4.      Months after Bromley's smear campaign and Virun's systematic sabotage, Virun changed strategy and claimed for the first time that Cymbiotika's new formulations were not in fact new and carcinogenic, but were instead actually Virun's proprietary formulations.  From this narrative stemmed Virun's far-fetched allegation that Cymbiotika's use of those formulations constitutes a misappropriation of Virun's trade secrets.  Of course, Virun's original ruse to mount baseless accusations that Cymbiotika's new formulations cause cancer is wholly incompatible with their second scheme to assert that Virun owns those same formulations.

5.      Virun makes these spurious claims despite its own website representing to potential and current clients that Virun does not make private label products but instead works with each client to develop unique formulations.  Virun's website emphatically represents to Virun's prospective clients that Virun does not own the formulations it creates in their collaborations with clients.  While Virun now disavows these representations, such a bait-and-switch is not tolerated under the law and constitutes, at the very least, unfair competition.

3

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

1

## **THE PARTIES**

2    6.    Cymbiotika is a limited liability company organized and existing under

3  the laws of the State of Nevada, with its principal place of business in San Diego,

4  California.

5    7.    Upon information and belief, Virun is a corporation organized and

6  existing under the laws of the State of Delaware, with its principal place of business

7  in this District.

8    8.    Cymbiotika is ignorant of the true names and capacities, whether

9  individual, corporate, partnership, association, or otherwise, of Counterclaim

10  Defendants Roes 1 through 10, inclusive, and therefore sues such defendants by

11  their fictitious names.  Cymbiotika is informed and believes, and thereupon alleges,

12  that each of the fictitiously named Counterclaim Defendants is responsible in some

13  manner for the injuries and damages alleged by Cymbiotika.  Cymbiotika will seek

14  leave of the Court to amend this Counterclaim to show the true names and

15  capacities of the fictitiously named Counterclaim Defendants when they have been

16  ascertained.

17    9.    Cymbiotika is informed and believes, and on that basis alleges, that at

18  all times relevant herein, Virun and Roes 1-10 (collectively "Counterclaim

19  Defendants"), inclusive, were the alter ego of each other and each of them, and that

20  such a unity of interest and ownership existed between them that separate

21  personalities have not in reality existed; and there would be an inequitable result if

22  the acts and omissions at issue in this case were treated as those of any of the

23  Counterclaim Defendants alone.  Cymbiotika is further informed and believes that

24  Counterclaim Defendants commingle funds and assets among themselves, that

25  Counterclaim Defendants have identical, nearly identical. or effectively identical

26  owners, that the Counterclaim Defendants have the same offices, directors, and

27  officers and that the Counterclaim Defendants use one another as a mere shell or

28  conduit for the affairs of one another.  In addition, Cymbiotika is informed and

4

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

believes that each of the Counterclaim Defendants disregard corporate formalities, shares employees, and each transfers assets or properties away and/or creates or shifts liabilities so that each may be left with insufficient capital to meet the needs of each entity's business and its liabilities and without consideration to the detriment of the entity's creditors.

10.    Cymbiotika is informed and believes, and on that basis alleges that, each of the Counterclaim Defendants were the agents, servants, employees, or in some other legal relationship to the others, whereby legal liability is imputed from one party to the other, and at all relevant times, each of the Counterclaim Defendants were acting within the course and scope of their agency, servant, or employment relationship.

## JURISDICTION AND VENUE

11.    This Court has jurisdiction over the matter pursuant to Virun's First Amended Complaint ("FAC") (Dkt. No. 92), to which this Counterclaim relates, which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq.*  This court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

12.    This Court has personal jurisdiction over Counterclaim Defendants, and venue is proper in this District, because Virun has invoked the jurisdiction of this Court by filing its FAC in this Court.

13.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## NATURE OF THE ACTION

14.    Cymbiotika seeks damages and injunctive relief for acts of fraud, breach of contract, tortious interference, and unfair competition engaged in by Counterclaim Defendants in violation of the laws of the United States and the State of California.  In particular, this case concerns Counterclaim Defendants' breaches of contractual obligations to Cymbiotika, willful and deliberate acts of false

5

138298879.1

1   advertising, and related claims.

2   **FACTUAL BACKGROUND**

3   **Preliminary Discussions Between Cymbiotika and Virun**

4        15.    Cymbiotika is a popular health supplement company that designs high-

5   end, industry-leading, organic, and original formulations for direct-to-consumer

6   sales, predominantly driven by an online subscription model.  Chervin Jafarieh is a

7   founder and member of Cymbiotika.  Shahab Elmi is a co-founder, member, and

8   CEO of Cymbiotika.

9        16.    Elmi and Jafarieh, as agents of Cymbiotika, approached Bromley in

10  late 2018 in his capacity as a principal of Virun to commence discussions about a

11  possible vendor-manufacturer relationship between Cymbiotika and Virun

12  (together, Cymbiotika and Virun will sometimes be referred to as the "Parties").

13       17.    Elmi and Jafarieh expressed Cymbiotika's interest in utilizing Virun's

14  manufacturing services to expand Cymbiotika's product line.  At the time,

15  Cymbiotika had one product on the market; however, Jafarieh had product

16  concepts, formula ideas, and ingredient lists ready for development.  Cymbiotika

17  knew that creating a scalable product line from concept to consumer would require

18  the utilization of a capable third-party manufacturer.

19       18.    Cymbiotika sought a manufacturer who would encourage collaboration

20  and ultimately permit Cymbiotika's ownership of finished products.  Cymbiotika

21  relied on the express representations set forth on Virun's website regarding Virun's

22  policy regarding the ownership of formulas in deciding to enter into discussion with

23  Virun.

24       19.    In late 2018, and at all relevant times, Virun's website contained the

25  following representation regarding formula ownership in its frequently-asked

26  questions ("FAQ") section:

27      [Q.] If Virun develops my product, who owns the formulation?

28

6

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.[1]

20.    Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.] Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client. Our products are developed on a project-by-project basis. Therefore, we do not sell private-label products.[2]

21.    Cymbiotika's industry leading reputation, high-end price points, and unique formulation line are all antithetical to entering into private label arrangements with manufacturers. Virun was no exception, as the products that Virun had ready to go on its shelves for private labeling arrangements were not organic, lacked organic flavors, had preservatives, and were not what ultimately became Cymbiotika's products.

22.    Noting these considerations, and relying on Virun's express representations regarding formulation ownership, Cymbiotika felt Virun would be an ideal partner and engaged in preliminary discussions with Bromley.

**<u>Confidentiality Agreement and Conception of Formal Business Relationship</u>**

23.    To facilitate frank discussions about commencing a potential vendor-manufacturer relationship, the Parties executed the Confidentiality Agreement in January 2019. A copy of the Confidentiality Agreement is attached hereto as Exhibit A.

24.    By its express terms, the Confidentiality Agreement was limited to "discussions concerning a possible future business or research relationship." To the

---

[1] https://virun.com/faq/, last accessed September 12, 2022.
[2] https://virun.com/faq/, last accessed September 12, 2022.

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

extent a relationship was forged, and the Parties believed there was a need to cloak an actual business relationship in confidentiality, such a term would be negotiated and included in any subsequent manufacturing and/or supply agreement.  In fact, Virun provided Cymbiotika with drafts of precisely such agreements during these negotiations that included confidentiality language.  This and many other circumstances demonstrate conclusively that Virun itself knew that the exploratory Confidentiality Agreement was limited to pre-business discussions.

25.     While Virun represented to Cymbiotika that it has some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product.  Instead, Cymbiotika needed a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's innovative and market leading strategy.  Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

**Cymbiotika's Vendor-Manufacturer Relationship with Virun**

26.     Following candid discussions governed by the Confidentiality Agreement, the Parties thereafter entered into a vendor-customer relationship in early 2019 whereby Cymbiotika hired Virun to manufacture dietary supplement products for Cymbiotika based on Cymbiotika's ideas, strategies, needs, and goals.

27.     Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement of the type Virun had presented in draft to Cymbiotika.  Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret.  One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also have addressed the ownership of any formulations forged under that relationship.

8

138298879.1

Cymbiotika expected that it would, and did, own the various formulations it developed with Virun consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

28.    Cymbiotika is informed and believes, and on that basis alleges, that Virun did not insist on entering into a manufacturing agreement, which would have further clarified the ownership of the formulations, because Virun desired the ability to make spurious legal claims if and when Cymbiotika decided to take its business elsewhere.  Cymbiotika is informed and believes, and on that basis alleges, that both Virun and Bromley knew from the outset that they intended to assert ownership over any formulation Virun developed with Cymbiotika despite Virun's express representations to the contrary.  Had Cymbiotika known that Virun and Bromley were reserving the right to assert ownership over formulation developed with Cymbiotika, Cymbiotika would have never entered a business relationship with Virun.

29.    Founded upon an expressed understanding that Cymbiotika owned the product formulations that it developed or that were jointly-developed based on Cymbiotika's ideas, a working relationship eventually formed, as did a friendship between Bromley and Jafarieh.

30.    Cymbiotika provided Virun with its product concepts and the Parties executed Cymbiotika's plans together.  When these extended efforts proved successful, resulting in a finished product, Cymbiotika contracted with Virun to manufacture that product based on Cymbiotika's specifications.

31.    Virun has stock formulations for supplements already widely available on the marketplace, including formulation for a Vitamin C supplement and a Vitamin B12 supplement.  Cymbiotika, however, had no interest in simply repackaging generic formulations of supplements already widely available in the marketplace.  While Virun and Cymbiotika may have started with Virun's generic formulations, Cymbiotika insisted upon significant modifications to ensure the

9

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

formulations sold under Cymbiotika's name were consistent with Cymbiotika's own ideas, strategies, and reputation for innovative products supporting premium prices.

32.     Cymbiotika's team consistently communicated with Virun's team to bring Cymbiotika's ideas to the table and to collaborate on Cymbiotika's product formulation development.  Cymbiotika's team provided and confirmed exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.

33.     Each of the products that Cymbiotika would eventually hire Virun to manufacture took months to develop and went through numerous revisions before meeting Cymbiotika's exacting standards.  The products that Cymbiotika hired Virun to manufacture were entirely distinct from any generic supplement formula that Virun may have possessed.

34.     While the Parties never entered into a formal manufacturing arrangement, the Parties utilized a purchase order system whereby Cymbiotika would place an order with Virun for a specific quantity of products to be delivered pursuant to an agreed-upon timeline.  Utilizing this system, Cymbiotika placed a series of Purchase Orders ("Purchase Orders" or "POs") with Virun from mid-2019 until late 2021.

35.     One of the most important attributes of any supplement formulation is bioavailability, *i.e.* ensuring that the nutritional value of the supplement itself is digested by the consumer in a manner that will achieve maximum benefit for the consumer.  Cymbiotika understood Virun had innovative technology for optimizing bioavailability, which was an additional reason for seeking out Virun as a manufacturing partner.  In fact, Virun owns a number of patents claiming various aspects of its different manufacturing techniques.  Throughout its working relationship and collaborative processes, Virun never materially disclosed nor demonstrated any of these proprietary technical processes or manufacturing

10

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

techniques.  Virun also never suggested that any of these techniques or processes were being protected as trade secrets rather than as claims made in issued patents. Cymbiotika lacks usable knowledge of Virun's manufacturing procedures and/or chemical methodology, which it frankly had no need to learn.

**Virun's Breaches of Purchase Orders Cause Damage to Cymbiotika's Business**

36.    After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was mismanaged, disorganized, and had severe supply chain difficulties.

37.    Virun consistently delayed fulfilling Purchase Orders and would frequently underdeliver.  Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.

38.    Since Cymbiotia utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.  Virun's constant delays and inability to deliver on Purchase Orders timely and in full, caused Cymbiotika's business to suffer greatly.  Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding Purchase Orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

39.    Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

40.     Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on Purchase Orders constituted an existential threat to Cymbiotika. Cymbiotika had to transition to a manufacturer who could meet its rising demand.

### Virun's Social Media Smear Campaign

41.     Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

42.     Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic.  These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.  The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.

43.     Cymbiotika is informed and believes, and on that basis alleges, that Bromley himself was behind some, if not all, of these clandestine attacks, and that he intentionally disparaged the quality of Cymbiotika's new product formulations. On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Parties.

44.     Bromley had once again created an existential threat to Cymbiotika. Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

45.     Attached hereto as Exhibit B is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

46.   Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign.  However, the damage to Cymbiotika's reputation remained.

47.   Cymbiotika is informed and believes, and on that basis alleges, that in addition to its social media campaign, Virun and Bromley continue to engage in an active campaign to tarnish Cymbiotika's reputation and continue to seek means to otherwise harm Cymbiotika.  For example, Cymbiotika is informed and believes, and on that basis alleges, that Virun hired Cymbiotika's former head of information technology for the sole purposes of "digging up dirt" on Cymbiotika.  Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika.  Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment.  Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

## CLAIMS

### FIRST CLAIM FOR FRAUD IN THE INDUCEMENT

### (Against All Counterclaim Defendants)

48.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

138298879.1

49.     When exploring potential manufacturing partners, Elmi and Jafarieh, as principals of Cymbiotika, approached Bromley in his capacity as a principal of Virun and expressed Cymbiotika's interest in utilizing Virun's manufacturing services.

50.     Counterclaim Defendants made a series of false representation to Cymbiotika in order to induce Cymbiotika to select Virun as the manufacturer for its supplement line.  These misrepresentations include, but are not limited to, assertions that Cymbiotika, and not Virun, would own any and all formulations that the Parties jointly developed or were developed from Cymbiotika's ideas. Counterclaim Defendants reiterated the representations that Virun makes to all prospective customers as reflected on its website including that Virun does not produce private label products, but collabulary develops unique products with its customers and that those formulations made with a customer's ideas are the customer's intellectual property.

51.     Reasonably relying on Counterclaim Defendants' representations, including that "[w]hen a client brings us an idea for development, the client owns that formulation," Cymbiotika entered into a business relationship with Virun, whereby Cymbiotika would bring product development concepts to Virun, Virun would manufacture dietary supplement products for Cymbiotika based on those concepts, and Cymbiotika was induced to believe it would retain intellectual property ownership of the completed product formulations.

52.     These representations made by Counter Defendants to Cymbiotika were false when made.  In particular, since Virun now contends that Virun, and not Cymbiotika, own the formulations that Virun developed with Cymbiotika, Counterclaim Defendants now contend that the representations Virun made to Cymbiotika were false when made and to the extent Virun prevails on its claim that it owns such formulations the representations were false when made.

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

53.     Counterclaim Defendant knew that these representations they made to Cymbiotika were false when made or were in reckless disregard for their truth at the time they were made.

54.     Counterclaim Defendants intended that Cymbiotika rely on these representations.

55.     Cymbiotika reasonably relied on the representations of Counterclaim Defendants in entering a business relationship with Virun.

56.     Cymbiotika has been harmed by its reliance on these representations in an amount to be proved at trial.  Additionally, Cymbiotika will be irreparably harmed to the extent that Virun prevails on its claim that it owns any protectable trade secret in any formulation developed with Cymbiotika, such that money damages could not compensate such harm warranting the imposition of injunctive relief.

57.     Cymbiotika's reliance on Counterclaim Defendants' representations were a substantial factor in causes Cymbiotika's harm.

58.     In making these false representations, Counterclaim Defendants acted with fraud, malice, and oppression, entitling Cymbiotika to an award of punitive damages.

## <u>SECOND CLAIM FOR NEGLIGENT MISREPRESENTATION</u>
### <u>(Against All Counterclaim Defendants)</u>

59.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

60.     Counterclaim Defendants made a series of representations of fact, including that Cymbiotika would be the owner of any formulations that Cymbiotika developed with the Counterclaim Defendants, or any one of them.

61.     These representations made by Counter Defendants to Cymbiotika were false when made.  In particular, since Virun now contends that Virun, and not Cymbiotika, own the formulations that Virun developed with Cymbiotika,

15

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

1  Counterclaim Defendants now contend that the representations Virun made to
2  Cymbiotika were false when made and to the extent Virun prevails on its claim that
3  it owns such formulations the representations were false when made.

4      62.    Although Counterclaim Defendants, or any one of them, may have
5  honestly believed that their representations were true when made, Counterclaim
6  Defendants had no reasonable grounds for believing that representation was true
7  when made.

8      63.    Counterclaim Defendants intended that Cymbiotika rely on these
9  representations.

10     64.    Cymbiotika did in fact rely on the Counterclaim Defendants
11  representations in deciding to enter into a business relationship with Virun and such
12  reliance was reasonable.

13     65.    Cymbiotika has suffered damages in an amount to be proven at trial.

14     66.    Cymbiotika's reliance on Counterclaim Defendants' representations
15  were a substantial factor in causing Cymbiotika harm

16          **THIRD CLAIM FOR BREACH OF CONTRACT**
17                  **(Against Virun)**

18     67.    Cymbiotika repeats and realleges the allegations of the preceding
19  paragraphs 1-47 as if fully set forth herein.

20     68.    Cymbiotika and Virun entered into a contract whereby, after
21  formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika
22  would own the formulation and agreed to purchase product manufactured based on
23  that formulation and packaged consistent with Cymbiotika's specifications from
24  Virun.  While there is no writing reflecting all of the terms of this development and
25  manufacturing arrangement, each order for a specific formulation is reflected in
26  Purchase Orders and similar ancillary documentation reflecting such orders and
27  satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its
28  own separate subsidiary contract to this overall contractual relationship.

CYMBIOTIKA'S AMENDED COUNTERCLAIMS
138298879.1

69.     Cymbiotika did all, or substantially, all, of the significant things that the contract and each subsidiary contract required it to do, unless it was otherwise excused from having to do.

70.     Virun breached this contract and one or more of the subsidiary contracts by, among other things, repeatedly failing to deliver paid-for product in full, on time, and in the agreed-upon lead times, resulting in financial and reputational damages to Cymbiotika.

71.     Virun's breaches of the contract and one or more of the subsidiary contracts proximately and actually damaged Cymbiotika because without timely delivery from Virun, Cymbiotika was unable to fulfill outstanding product orders from its paying customers.

72.     As a direct and proximate result of Virun's breaches of Purchase Orders, Cymbiotika has suffered damages in an amount to be proven at trial.

## FOURTH CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Virun)

73.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs 1-47 and 67-72 as if fully set forth herein.

74.     Cymbiotika and Virun entered into a contract, whereby after formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika would own the formulation and agreed to purchase product manufactured based on that formulation and packaged consistent with Cymbiotika's specifications from Virun.  While there is no writing reflecting all of the terms of this development and manufacturing arrangement, each order for a specific formulation is reflected in Purchase Orders and similar ancillary documentation reflecting such orders and satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its own separate subsidiary contract to this overall contractual relationship.

17

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

75.     Cymbiotika performed all conditions precedent to demanding performance from Virun on the contract and any subsidiary contract, except for those obligations waived, excused, or prevented by Virun.

76.     The contract and the subsidiary contracts include an implied covenant of good faith and fair dealing.

77.     Virun breached this covenant by, among other things, acting in bad faith and engaging in conduct that frustrated Cymbiotika's rights with respect to the intended benefits and purpose of the contract and subsidiary contracts.

78.     Virun's repeated inabilities to fulfill Purchase Orders in a timely and complete manner, as well as frequent refusals to respond to reasonable requests for order fulfillment statuses, frustrated Cymbiotika's enjoyment of the benefits of the underlying Purchase Orders.  Additionally, Virun's assertion that it now owns the formulations developed with Cymbiotika interferes with an intended benefit of this contract.

79.     As a direct and proximate result of Virun's breaches of the implied covenant of good faith and fair dealing, Cymbiotika has suffered damages in an amount to be proven at trial.

## **FIFTH CLAIM FOR TRADE LIBEL**
### **(Against All Counterclaim Defendants)**

80.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

81.     Beginning no later than November 2021, Counterclaim Defendants have engaged in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

82.     Counterclaim Defendants' conduct is independently wrongful and unrelated to any contract Cymbiotika has or may have had with any Counterclaim Defendants, or any one of them.

18

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

83.     Counterclaim Defendants' conduct, including their social media campaign, was, and continues to be, designed to discourage customers and potential customers from purchasing products from Cymbiotika.

84.     Counterclaim Defendants' conduct has resulted in pecuniary damage to Cymbiotika due to the resultant loss of sales and goodwill from customers who have seen or heard Counterclaim Defendants false messaging about Cymbiotika's products.

85.     As a direct and proximate result of Counterclaim Defendants' acts, Cymbiotika has suffered damages in an amount to be proven at trial.  Additionally, Counterclaim Defendants' continued publication of false and misleading information about the safety and efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm entitling it to injunctive relief.

86.     Counterclaim Defendants acted volitionally with fraud, oppression, and malice in the act of publishing libelous and disparaging misinformation about Cymbiotika's products, and as such, Cymbiotika is entitled to an award of punitive damages.

## SIXTH CLAIM FOR FALSE ADVERTISING UNDER THE LANHAM ACT
## 15 U.S.C. § 1125(a)
### (Against All Counterclaim Defendants)

87.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

88.     Beginning no later than November 2021, Counterclaim Defendants have engaged in a campaign of making false statement concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

89.     Counterclaim Defendants' assertions about the safety and efficacy of Cymbiotika's products are false and plainly untrue.  Counterclaim Defendants were each aware of the falsity of the statements at the time of their publication.

19

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

90.    Counterclaim Defendants made these false assertions about Cymbiotika's products as part of commercial advertisements, including social media posts, for the purpose of influencing consumers to refrain from purchasing Cymbiotika's products and were disseminated sufficiently to the relevant purchasing public on social media.

91.    Counterclaim Defendants made all such statements in commercial advertising in interstate commerce, including in California, in order to misrepresent the nature, characteristics, and qualities of Cymbiotika's goods and services.

92.    Counterclaim Defendants' false statements regarding Cymbiotika's products are deceptive and are likely to influence consumers' purchasing decisions.

93.    Given their intimate knowledge of Cymbiotika's ingredients and high standards for same, Counterclaim Defendants knew that Cymbiotika's new products did not lack the safety and efficacy Counterclaim Defendants publicly asserted.  Counterclaim Defendants therefore made the false and disparaging statements willfully and with an intent to deceive consumers.

94.    As a direct and proximate result of Counterclaim Defendants' false and disparaging publications, Cymbiotika has suffered damages in an amount to be proven at trial.  Additionally, any continued false advertising by Counterclaim Defendants of the safety or efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm warranting injunctive relief.

95.    Counterclaim Defendants acted here in a willful and wanton manner and as a result, Cymbiotika is entitled to enhanced damages.

96.    Cymbiotika is entitled to an award of attorneys' fees because of the exceptional nature of Counterclaim Defendants' conduct.

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1

## SEVENTH CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

### (Against All Counterclaim Defendants)

97.     Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

98.     Cymbiotika has subscription contract with its customers whereby Cymbiotika supplies such customers with products on a recuring basis.

99.     Counterclaim Defendants knew of Cymbiotika's subscription-based relationship with its customers.

100.    Counterclaim Defendants have interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

101.    Counterclaim Defendants intended their conduct to disrupt these subscription contracts or knew that it was substantially certain that their conduct would disrupt these contracts.

102.    As a direct and proximate result of Counterclaim Defendants' interference, Cymbiotika has suffered damages in an amount to be proven at trial.

103.    Counterclaim Defendants acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## EIGHTH CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

### (Against All Counterclaim Defendants)

104.    Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

105.    Cymbiotika has an economic relationship with its non-subscription based customers, as well as potential customers who would be interested in the

21

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

1  products that it sells that probably would have resulted in an economic benefit

2  Cymbiotika.

3      106.   Counterclaim Defendants knew of Cymbiotika's customers, as well as

4  potential customers who may be interested in Cymbiotika's products.

5      107.   Counterclaim Defendants have interfered with these subscription

6  contracts by, among other things, making false statements publicly about the safety

7  and efficacy of Cymbiotika's products, and intentionally failing and refusing to

8  deliver Cymbiotika products so that Cymbiotika could not fulfill its customers'

9  orders and subscriptions.  This interference is independently wrongful because the

10  statement made were false and independently support a claim for trade liable and

11  false advertising.

12      108.   Counterclaim Defendants intended their conduct to disrupt these

13  economic relationships or knew that it was substantially certain that their conduct

14  would disrupt these relationships.

15      109.   As a direct and proximate result of Counterclaim Defendants'

16  interference, Cymbiotika has suffered damages in an amount to be proven at trial.

17      110.   Counterclaim Defendants acted volitionally with fraud, oppression,

18  and malice entitling Cymbiotika to an award of punitive damage.

19  **<u>NINTH CLAIM FOR UNFAIR COMPETITION UNDER</u>**

20  **<u>CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200</u>**

21  **<u>(Against All Counterclaim Defendants)</u>**

22      111.   Cymbiotika repeats and realleges the allegations of the preceding

23  paragraphs as if fully set forth herein.

24      112.   Counterclaim Defendants engaged in unlawful, unfair, or fraudulent

25  business practices in violation of Section 17200 of the California Business and

26  Professions Code ("Section 17200"), by among other things, affirmatively

27  misrepresenting on its website that "when a client brings us an idea for

28  development, the client owns that formulation" while knowingly intending to retain

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

intellectual property ownership of any product development it formulated with Cymbiotika, and by making false statements about Cymbiotika's products.

113.    Counterclaim Defendants also engaged in unlawful, unfair, or fraudulent business practices in violation of Section 17200 by engaging in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

114.    Counterclaim Defendants' unlawful, unfair, or fraudulent business practices in violation of Section 17200 proximately caused actual injury to Cymbiotika by harming its competitive standing and hindering its prospective contractual relations.

115.    As a direct and proximate result of Counterclaim Defendants unlawful, unfair, or fraudulent business practices in violation of Section 17200, Cymbiotika has been harmed in an amount to be proven at trial.  Additionally, Counterclaim Defendants' conduct, to the extent it continues, will cause irreparable harm warranting injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Cymbiotika respectfully request that this Court enter judgment in their favor and against Counterclaim Defendants and provide the following relief:

a.    Compensatory damages, incidental damages and consequential damages;

b.    Costs of suit, interest, and reasonable attorneys' fees;

c.    Pre and post-judgment interest;

d.    Punitive damages;

e.    Such other relief as this Court deems just and equitable.

138298879.1

1

2
Dated:        September 23, 2022          **FOX ROTHSCHILD LLP**

3                                                        */s/ John Shaeffer*

4                                                        John Shaeffer
                                                          Jeffrey H. Grant
5                                                        Carly Klein
                                                          Attorneys for Defendants and
6                                                        Counterclaimant

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

24

**CYMBIOTIKA'S AMENDED COUNTERCLAIMS**

138298879.1

1

## **DEMAND FOR JURY TRIAL**

2      In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by

3  jury on all issues so triable.

4

5  Dated:        September 23, 2022            FOX ROTHSCHILD LLP

6

7                                            */s/ John Shaeffer*

8                                            John Shaeffer
                                             Jeffrey H. Grant
9                                            Carly Klein
                                             Attorneys for Defendants and
10                                           Counterclaimant

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CYMBIOTIKA'S AMENDED COUNTERCLAIMS

138298879.1