JOHN J. SHAEFFER (SBN 138331)
JShaeffer@FoxRothschild.com
JEFFREY H. GRANT (SBN 218974)
JGrant@FoxRothschild.com
CARLY KLEIN (SBN 340691)
CKlein@Foxrothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone: 310.598.4150
Facsimile: 310.556.9828

Attorneys for Defendant and Cross-Claimant Cymbiotika, LLC and Defendants Chervin Jafarieh and Shahab Elmi

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| VIRUN, INC., <br><br>  Plaintiff, <br><br> v. <br><br> CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an individual; SHAHAB ELMI, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 8:22-CV-00325-SSS <br><br> Hon. Sunshine S. Sykes <br><br> **CYMBIOTIKA'S THIRD-PARTY COMPLAINT AGAINST PHILLIP BROMLEY** <br><br> **DEMAND FOR JURY TRIAL** |
| CYMBIOTIKA LLC, a limited liability company, <br><br>  Counterclaimant, <br><br> v. <br><br> VIRUN, INC. a California Corporation, and Roes 1 to 10 inclusive. <br><br>  Counterclaim Defendants. | |
| CONTINUED ON NEXT PAGE | |

1
CYMBIOTIKA'S THIRD-PARTY COMPLAINT

138300854.2

CYMBIOTIKA LLC, a limited liability company,

        Third-Party Complainant,

    v.

PHILLIP BROMLEY, an individual,

        Third-Party Defendant.

## INTRODUCTION

1. When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was unable to meet its contractual obligations to Defendant and Counterclaimant Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult decision to move the manufacturing of Cymbiotika's dietary supplements from Virun to another manufacturer. This decision was particularly frustrating because Cymbiotika had spent more than a year working hand-in-hand with Virun to develop a line of unique products after being induced by Virun's representation that the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas, would be Cymbiotika's intellectual property. Had Virun and its President Third-Party Defendant Phillip Bromley ("Bromley"), not made such representations to Jafarieh and Elmi, Cymbiotika would have never done business with Virun.

2. Embarrassed by their own ineptitude and jilted as a result of losing Cymbiotika's business and the friendship of Jafarieh, Virun and Bromley lashed out when Cymbiotika took its growing business elsewhere. Bromley first took to social media to engage in an anonymous, weeks' long smear campaign to disparage Cymbiotika and its products by publishing social media posts – that specifically targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new

2

CYMBIOTIKA'S THIRD-PARTY COMPLAINT

138300854.2

formulations were dangerous. Bromley's outlandish and vicious accusations included allegations that Cymbiotika's products contained cancer-causing ingredients.

3. After Bromley's identity surfaced following what Virun and Bromley believed was a clandestine social media campaign to tarnish Cymbiotika's reputation, they revised their approach. Virun began systematically sabotaging the production and delivery of Cymbiotika products that Virun remained contractually obligated to deliver. Specifically, Virun purposefully slowed, or outright prevented, the production of Cymbiotika products knowing that the delay would cause Cymbiotika's customers to cancel their orders and subscriptions. Cymbiotika suspicions of Virun's systematic sabotage were confirmed when it caught Virun in several lies, including that Virun was unable to complete Cymbiotika's purchase orders because raw materials were not available to Virun when, in fact, they were.

4. Months after Bromley's smear campaign and Virun's systematic sabotage, Virun changed strategy and claimed for the first time that Cymbiotika's new formulations were not in fact new and carcinogenic, but were instead actually Virun's proprietary formulations. From this narrative stemmed Virun's far-fetched allegation that Cymbiotika's use of those formulations constitutes a misappropriation of Virun's trade secrets. Of course, Virun's original ruse to mount baseless accusations that Cymbiotika's new formulations cause cancer is wholly incompatible with their second scheme to assert that Virun owns those same formulations.

5. Virun makes these spurious claims despite its own website representing to potential and current clients that Virun does not make private label products, but instead works with each client to develop unique formulations. Virun's website emphatically represents to Virun's prospective clients that Virun does not own the formulations it creates in their collaborations with clients. While

Virun now disavows these representations, such a bait-and-switch is not tolerated under the law and constitutes, at the very least, unfair competition.

## THE PARTIES

6. Cymbiotika is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in San Diego, California.

7. Upon information and belief, Phillip Bromley is an individual residing in this District and is a principal of Counterclaim Defendant Virun.

## JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1367, which provides that the Court has supplemental subject matter jurisdiction over all claims related to claims in an action within this Court's original jurisdiction. This Third-Party Complaint relates to and forms part of the same case or controversy as Virun's First Amended Complaint ("FAC") (Dkt. No. 92), which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq*.

9. This Court has personal jurisdiction over Bromley, and venue is proper in this District pursuant to 28 U.S.C. § 1391, because, on information and belief, he resides in this district and is a principal of Virun, which invoked the jurisdiction of this Court by filing its FAC in this Court.

## NATURE OF THE ACTION

10. Cymbiotika seeks damages and injunctive relief for acts of trade liable, tortious interference, and unfair competition engaged in by Bromley in violation of the laws of the United States and the State of California.

# FACTUAL BACKGROUND

## Preliminary Discussions Between Cymbiotika and Virun

11.    Cymbiotika is a popular health supplement company that designs high-end, industry-leading, organic, and original formulations for direct-to-consumer sales, predominantly driven by an online subscription model. Chervin Jafarieh is a founder and member of Cymbiotika. Shahab Elmi is a co-founder, member, and CEO of Cymbiotika.

12.    Elmi and Jafarieh, as agents of Cymbiotika, approached Bromley in late 2018 in his capacity as a principal of Virun to commence discussions about a possible vendor-manufacturer relationship between Cymbiotika and Virun (together, Cymbiotika and Virun will sometimes be referred to as the "Parties").

13.    Elmi and Jafarieh expressed Cymbiotika's interest in utilizing Virun's manufacturing services to expand Cymbiotika's product line. At the time, Cymbiotika had one product on the market; however, Jafarieh had product concepts, formula ideas, and ingredient lists ready for development. Cymbiotika knew that creating a scalable product line from concept to consumer would require the utilization of a capable third-party manufacturer.

14.    Cymbiotika sought a manufacturer who would encourage collaboration and ultimately permit Cymbiotika's ownership of finished products. Cymbiotika relied on the express representations set forth on Virun's website regarding Virun's policy regarding the ownership of formulas in deciding to enter into discussion with Virun.

15.    In late 2018, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently asked questions ("FAQ") section:

> [Q.] If Virun develops my product, who owns the formulation?

138300854.2

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.[1]

16. Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.] Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client. Our products are developed on a project-by-project basis. Therefore, we do not sell private-label products.[2]

17. Cymbiotika's industry leading reputation, high-end price points, and unique formulation line are all antithetical to entering into private label arrangements with manufacturers. Virun was no exception, as the products that Virun had ready to go on its shelves for private labeling arrangements were not organic, lacked organic flavors, had preservatives, and were not what ultimately became Cymbiotika's products.

18. Noting these considerations, and relying on Virun's express representations regarding formulation ownership, Cymbiotika felt Virun would be an ideal partner and engaged in preliminary discussions with Bromley.

**Confidentiality Agreement and Conception of Formal Business Relationship**

19. To facilitate frank discussions about commencing a potential vendor-manufacturer relationship, the Parties executed the Confidentiality Agreement in January 2019. A copy of the Confidentiality Agreement is attached hereto as Exhibit A.

20. By its express terms, the Confidentiality Agreement was limited to "discussions concerning a possible future business or research relationship." To the

---

[1] https://virun.com/faq/, last accessed September 12, 2022.
[2] https://virun.com/faq/, last accessed September 12, 2022.

extent a relationship was forged, and the Parties believed there was a need to cloak an actual business relationship in confidentiality, such a term would be negotiated and included in any subsequent manufacturing and/or supply agreement. In fact, Virun provided Cymbiotika with drafts of precisely such agreements during these negotiations that included confidentiality language. This and many other circumstances demonstrate conclusively that Virun itself knew that the exploratory Confidentiality Agreement was limited to pre-business discussions.

21. While Virun represented to Cymbiotika that it had some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product. Instead, Cymbiotika needed a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's innovative and market leading strategy. Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

### **Cymbiotika's Vendor-Manufacturer Relationship with Virun**

22. Following candid discussions governed by the Confidentiality Agreement, the Parties thereafter entered into a vendor-customer relationship in early 2019 whereby Cymbiotika hired Virun to manufacture dietary supplement products for Cymbiotika based on Cymbiotika's ideas, strategies, needs, and goals.

23. Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement of the type Virun had presented in draft to Cymbiotika. Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret. One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also

have addressed the ownership of any formulations forged under that relationship. Cymbiotika expected that it would, and did, own the various formulations it developed with Virun consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

24. Cymbiotika is informed and believes, and on that basis alleges, that Virun did not insist on entering into a manufacturing agreement, which would have further clarified the ownership of the formulations, because Virun desired the ability to make spurious legal claims if and when Cymbiotika decided to take its business elsewhere. Cymbiotika is informed and believes, and on that basis alleges, that both Virun and Bromley knew from the outset that they intended to assert ownership over any formulation Virun developed with Cymbiotika despite Virun's express representations to the contrary. Had Cymbiotika known that Virun and Bromley were reserving the right to assert ownership over formulation developed with Cymbiotika, Cymbiotika would have never entered a business relationship with Virun.

25. Founded upon an expressed understanding that Cymbiotika owned the product formulations that it developed or that were jointly-developed based on Cymbiotika's ideas, a working relationship eventually formed, as did a friendship between Bromley and Jafarieh.

26. Cymbiotika provided Virun with its product concepts and the Parties executed Cymbiotika's plans together. When these extended efforts proved successful, resulting in a finished product, Cymbiotika contracted with Virun to manufacture that product based on Cymbiotika's specifications.

27. Virun has stock formulations for supplements already widely available on the marketplace, including formulation for a Vitamin C supplement and a Vitamin B12 supplement. Cymbiotika, however, had no interest in simply repackaging generic formulations of supplements already widely available in the

marketplace. While Virun and Cymbiotika may have started with Virun's generic formulations, Cymbiotika insisted upon significant modifications to ensure the formulations sold under Cymbiotika's name were consistent with Cymbiotika's own ideas, strategies, and reputation for innovative products supporting premium prices.

28. Cymbiotika's team consistently communicated with Virun's team to bring Cymbiotika's ideas to the table and to collaborate on Cymbiotika's product formulation development. Cymbiotika's team provided and confirmed exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.

29. Each of the products that Cymbiotika would eventually hire Virun to manufacture took months to develop and went through numerous revisions before meeting Cymbiotika's exacting standards. The products that Cymbiotika hired Virun to manufacture were entirely distinct from any generic supplement formula that Virun may have possessed.

30. While the Parties never entered into a formal manufacturing arrangement, the Parties utilized a purchase order system whereby Cymbiotika would place an order with Virun for a specific quantity of products to be delivered pursuant to an agreed-upon timeline. Utilizing this system, Cymbiotika placed a series of Purchase Orders ("Purchase Orders" or "POs") with Virun from mid-2019 until late 2021.

31. One of the most important attributes of any supplement formulation is bioavailability, *i.e.* ensuring that the nutritional value of the supplement itself is digested by the consumer in a manner that will achieve maximum benefit for the consumer. Cymbiotika understood Virun had innovative technology for optimizing bioavailability, which was an additional reason for seeking out Virun as a manufacturing partner. In fact, Virun owns a number of patents claiming various

aspects of its different manufacturing techniques. Throughout its working relationship and collaborative processes, Virun never materially disclosed nor demonstrated any of these proprietary technical processes or manufacturing techniques. Virun also never suggested that any of these techniques or processes were being protected as trade secrets rather than as claims made in issued patents. Cymbiotika lacks usable knowledge of Virun's manufacturing procedures and/or chemical methodology, which it frankly had no need to learn.

**Virun's Breaches of Purchase Orders Cause Damage to Cymbiotika's Business**

32. After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was mismanaged, disorganized, and had severe supply chain difficulties.

33. Virun consistently delayed fulfilling Purchase Orders and would frequently underdeliver. Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.

34. Since Cymbiotia utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required. Virun's constant delays and inability to deliver on Purchase Orders timely and in full, caused Cymbiotika's business to suffer greatly. Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding Purchase Orders. Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations. Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

35. Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

36. Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on Purchase Orders constituted an existential threat to Cymbiotika. Cymbiotika had to transition to a manufacturer who could meet its rising demand.

### Virun's Social Media Smear Campaign

37. Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

38. Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic. These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers. The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.

39. Cymbiotika is informed and believes, and on that basis alleges, that Bromley himself was behind some, if not all, of these clandestine attacks, and that he intentionally disparaged the quality of Cymbiotika's new product formulations. On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Parties.

40. Bromley had once again created an existential threat to Cymbiotika. Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

41. Attached hereto as Exhibit B is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

42. Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign. However, the damage to Cymbiotika's reputation remained.

43. Cymbiotika is informed and believes, and on that basis alleges, that in addition to its social media campaign, Virun and Bromley continue to engage in an active campaign to tarnish Cymbiotika's reputation and continued to seek means to otherwise harm Cymbiotika. For example, Cymbiotika is informed and believes, and on that basis alleges, that Virun hired Cymbiotika's former head of information technology for the sole purposes of "digging up dirt" on Cymbiotika. Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika. Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment. Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

# CLAIMS

## FIRST CLAIM FOR TRADE LIBEL

44. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

45. Beginning no later than November 2021, Bromley engaged in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

46. Bromley's conduct is independently wrongful and unrelated to any contract Cymbiotika has or may have had with Virun, or any one of them.

47. Bromley's conduct, including his social media campaign, was, and continues to be, designed to discourage customers and potential customers from purchasing products from Cymbiotika.

48. Bromley's conduct has resulted in pecuniary damage to Cymbiotika due to the resultant loss of sales and goodwill from customers who have seen or heard Bromley's false messaging about Cymbiotika's products.

49. As a direct and proximate result of Bromley's acts, Cymbiotika has suffered damages in an amount to be proven at trial. Additionally, Bromley's continued publication of false and misleading information about the safety and efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm entitling it to injunctive relief.

50. Bromley acted volitionally with fraud, oppression, and malice in the act of publishing libelous and disparaging misinformation about Cymbiotika's products, and as such, Cymbiotika is entitled to an award of punitive damages.

## SECOND CLAIM FOR FALSE ADVERTISING UNDER THE LANHAM ACT 15 U.S.C. § 1125(a)

51. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

52. Beginning no later than November 2021, Bromley engaged in a campaign of making false statement concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

53. Bromley's assertions about the safety and efficacy of Cymbiotika's products are false and plainly untrue. Bromley was aware of the falsity of the statements at the time of their publication.

54. Bromley made these false assertions about Cymbiotika's products as part of commercial advertisements, including social media posts, for the purpose of influencing consumers to refrain from purchasing Cymbiotika's products and were disseminated sufficiently to the relevant purchasing public on social media.

55. Bromley made all such statements in commercial advertising in interstate commerce, including in California, in order to misrepresent the nature, characteristics, and qualities of Cymbiotika's goods and services.

56. Bromley's false statements regarding Cymbiotika's products are deceptive and are likely to influence consumers' purchasing decisions.

57. Given his intimate knowledge of Cymbiotika's ingredients and high standards for same, Bromley knew that Cymbiotika's new products did not lack the safety and efficacy Bromley publicly asserted. Bromley therefore made the false and disparaging statements willfully and with an intent to deceive consumers.

58. As a direct and proximate result of Bromley's false and disparaging publications, Cymbiotika has suffered damages in an amount to be proven at trial. Additionally, any continued false advertising by Bromley of the safety or efficacy

of Cymbiotika's products will cause Cymbiotika irreparable harm warranting injunctive relief.

59. Bromley acted here in a willful and wanton manner and as a result, Cymbiotika is entitled to enhanced damages.

60. Cymbiotika is entitled to an award of attorneys' fees because of the exceptional nature of Bromley's conduct.

## THIRD CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

61. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

62. Cymbiotika has subscription contract with its customers whereby Cymbiotika supplies such customers with products on a recuring basis.

63. Bromley knew of Cymbiotika's subscription-based relationship with its customers.

64. Bromley interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

65. Bromley intended his conduct to disrupt these subscription contracts or knew that it was substantially certain that their conduct would disrupt these contracts.

66. As a direct and proximate result of Bromley's interference, Cymbiotika has suffered damages in an amount to be proven at trial.

67. Bromley acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

138300854.2

# FOURTH CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

68. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

69. Cymbiotika has an economic relationship with its non-subscription based customers, as well as potential customers who would be interested in the products that it sells that probably would have resulted in an economic benefit Cymbiotika.

70. Bromley knew of Cymbiotika's customers, as well as potential customers who may be interested in Cymbiotika's products.

71. Bromley interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products, and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions. This interference is independently wrongful because the statement made were false and independently support a claim for trade liable and false advertising.

72. Bromley intended his conduct to disrupt these economic relationships or knew that it was substantially certain that their conduct would disrupt these relationships.

73. As a direct and proximate result of Bromley's interference, Cymbiotika has suffered damages in an amount to be proven at trial.

74. Counterclaim Defendants acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## FIFTH CLAIM FOR UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

75. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

76. Bromley engaged in unlawful, unfair, or fraudulent business practices in violation of Section 17200 of the California Business and Professions Code ("Section 17200"), by among other things, engaging in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

77. Bromley's unlawful, unfair, or fraudulent business practices in violation of Section 17200 proximately caused actual injury to Cymbiotika by harming its competitive standing and hindering its prospective contractual relations.

78. As a direct and proximate result of Bromley's unlawful, unfair, or fraudulent business practices in violation of Section 17200, Cymbiotika has been harmed in an amount to be proven at trial. Additionally, Bromley's conduct, to the extent it continues, will cause irreparable harm warranting injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Cymbiotika respectfully request that this Court enter judgment in their favor and against Bromley and provide the following relief:

a. Compensatory damages, incidental damages and consequential damages;

b. Costs of suit, interest, and reasonable attorneys' fees;

c. Pre and post-judgment interest;

d. Punitive damages;

e. Such other relief as this Court deems just and equitable.

Dated: September 23, 2022

**Fox Rothschild LLP**

*/s/ John Shaeffer*
―――――――――――――――
John Shaeffer
Jeffrey H. Grant
Carly Klein
Attorneys for Defendants and Counterclaimant

## DEMAND FOR JURY TRIAL

In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by jury on all issues so triable.

Dated: September 23, 2022

**Fox Rothschild LLP**

*/s/ John Shaeffer*
John Shaeffer
Jeffrey H. Grant
Carly Klein
Attorneys for Defendants and Counterclaimant