1                  UNITED STATES DISTRICT COURT

2                 CENTRAL DISTRICT OF CALIFORNIA

3                   EASTERN DIVISION-RIVERSIDE

4                            - - -

5        HONORABLE SUNSHINE S. SYKES, DISTRICT JUDGE PRESIDING

6                            - - -

7    VIRUN, INC.,                      )
                                       )
8                       Plaintiff,     )
                                       )
9            vs.                       )   No. SACV 22-325-SSS
                                       )
10                                     )
     CYMBIOTIKA LLC, a limited         )
11   liability company; CHERVIN        )
     JAFARIEH, an individual; SHABAB   )
12   ELMI, an individual,             )
                                       )
13                      Defendants.    )
     _____)

14

15

16            REPORTER'S TRANSCRIPT OF MOTION PROCEEDINGS

17                    Riverside, California

18                  Friday, October 28, 2022

19                        2:35 p.m.

20

21

22

23             PHYLLIS A. PRESTON, CSR, FCRR
               Federal Official Court Reporter
24             United States District Court
                  3470 Twelfth Street
25             Riverside, California 92501
                    stenojag@aol.com

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:

 4                          NEVERS, PALAZZO, PACKARD,
                            WILDERMUTH & WYNNER, PC
 5                          BY:  SHARLENE LEE
                            31248 Oak Crest Drive, Suite 200
 6                          Westlake Village, California 91361

 7

 8

 9   For the Defendants:

10                          FOX ROTHSCHILD LLP
                            BY:  JOHN SHAEFFER
11                               JEFFREY GRANT
                            Constellation Place
12                          10250 Constellation Boulevard, Suite 900
                            Los Angeles, California 90067

13

14

15

     General Counsel for Cymbiotika:
16

17                          ADAM GISLASON
                            11423 Alps Way
18                          Escondido, California 92026

19

20

21

22

23

24

25
```

```
 1              FRIDAY, OCTOBER 28, 2022; RIVERSIDE, CALIFORNIA

 2                                -o0o-

 3              THE CLERK:  Calling Case No. SACV 22-325, Virun,

 4    Inc., v. Cymbiotika, LLC, et al.

 5              And counsel can approach as soon as they can.  And          02:35

 6    please state your name on the record.

 7              MS. LEE:  Good morning, Your Honor.  Sharlene Lee for

 8    plaintiff Virun, Inc.  I'm joined here at counsel table by

 9    representatives from Virun.

10              MR. SHAEFFER:  Good afternoon, Your Honor.  John          02:36

11    Shaeffer on behalf of the defendants.

12              MR. GRANT:  Good afternoon, Your Honor.  Jeff Grant

13    on behalf of the defendants.

14              MR. GISLASON:  Good afternoon, Your Honor.  Adam

15    Gislason, general counsel for Cymbiotika.                          02:36

16              THE COURT:  Let me give you a moment to set up.  I'm

17    going to set up here as well.  I didn't need this for the last

18    case because there's way more documents in this case.

19              MR. SHAEFFER:  That's an understatement.

20              THE COURT:  We can go ahead and start.  We are here        02:39

21    today for a motion for preliminary injunction.  I have read and

22    considered all the briefing that has been submitted in this

23    case as well as taking a look at all the exhibits that were

24    submitted in support.  I wanted to give you all an opportunity

25    to present any additional argument that you think I should          02:39
```

```
 1   consider.  As I stated before, I've read the briefing, so I'm
 2   familiar with what the arguments are.  If there is anything in
 3   particular that you think I should consider that you believe
 4   you'd like to discuss even further, this would be your
 5   opportunity to do that.  I do intend to allow moving party to    02:40
 6   go first, and then, like I did in the last case, give you maybe
 7   10, 15 minutes to present what you would like to present, and
 8   then I'll move on to nonmoving party, and then we can go back
 9   to the final say by the moving party.
10          One of the things I'd like you to perhaps discuss or    02:40
11   to focus on in regards to your argument is, you know, when I
12   look at these cases, particularly motions for preliminary
13   injunction, the first thing I usually do is start with the
14   proposed order, because when you look at the proposed order, it
15   gives you kind of an idea of what the moving party is trying to  02:40
16   accomplish, and if I were to sign such an order, how would that
17   play out in practice.
18          So, of course, the proposed order needs to be
19   specific, it needs to define what it is that the Court is being
20   asked to do so that once it leaves this courthouse, it's very    02:41
21   clear what is and is not acceptable and what needs to be done.
22   And so when I looked at this order, it doesn't provide that
23   clarity that I would hope with being attached to such a motion
24   for preliminary injunction.  So I think you should focus in on
25   that.                                                            02:41
```

```
 1              What exactly is -- you know, going back to the basic,
 2    what is the trade secret?  Looking at the products that were
 3    listed in the order, what products are -- is defendant
 4    currently producing?  What products have been produced?  What
 5    is the trade secret in relation to those products?  Is it          02:42
 6    specific as to the ingredients, the formulations, the amounts,
 7    the process to produce?  And perhaps that, you know, there's a
 8    wealth of information that was provided.  There is also -- I
 9    found myself in reviewing this, oftentimes I was trying to
10    myself fill in the gaps and compare exhibits and trying to         02:42
11    understand perhaps what the formula is and how that formula
12    might constitute a trade secret, you know, looking at some of
13    the exhibits that were attached in regards to I think the
14    chemical or the amounts that were -- let me just get to it so I
15    don't misspeak.                                                    02:43
16              Looking at the declaration of Mr. Bromley, he speaks
17    of having the consulting firm, Advanced Botanical Consulting &
18    Testing, test some of defendants' products, and then attached
19    to his declaration are those tests which give amounts of
20    different ingredients and percentages.  So then if I were to      02:43
21    look at that perhaps as a formula trade secret, then I'm trying
22    to look for, well, where is the Virun's product that mirrors
23    that so I can see that, okay, this is the ingredients in this
24    product, this perhaps is Virun's product, they match.  You
25    know, how am I supposed to interpret that?  Is that in and of     02:44
```

```
 1   itself a trade secret because of these formulas?

 2            So I found myself doing this a lot.  And it could be

 3   because, you know, this is supplements and products and

 4   formulas is new to me and maybe that is the way it's done and

 5   that's what you're arguing or perhaps it's something else.  So      02:44

 6   I'd like you to -- to focus in on that at least in your

 7   argument and be very specific as to what you believe, moving

 8   party, plaintiff, is the trade secret specifically.  And if the

 9   Court were to agree, is the proposed order -- how would that

10   even be enforced in practice?  Because it seems as if you're        02:45

11   asking this Court to say all of those -- let me open that

12   up to -- it seems to be what you're asking this Court to say is

13   in page 2 of the proposed order, Section A, on line 27, "to

14   restrain and enjoin the defendant from using or disclosing

15   plaintiff's trade secret," whatever that may be, "and               02:45

16   confidential information relating to several products."

17   There's 12 of them.

18            So are you essentially asking -- you're saying those

19   products in and of themselves are the trade secret and this

20   Court should enjoin the production altogether of all of those       02:46

21   products?  And if so, where is it that you detail or show me

22   that all of those products are trade secrets?

23            The only contract that I believe is in this case is

24   the confidentiality agreement, and that's something you can

25   speak to as well.  It doesn't appear that after Virun and           02:46
```

 1   Cymbiotika agree to then start producing products together that

 2   there was another agreement entered into, correct?

 3          MS. LEE:  Your Honor, we also contend that the

 4   invoices --

 5          THE COURT:  The invoices.                                    02:46

 6          MS. LEE:  -- are contracts as well.

 7          THE COURT:  Okay.  But not just another agreement in

 8   and of itself, separate -- another contract other than invoices

 9   and this confidentiality agreement?

10          MS. LEE:  Correct.  The -- yeah, we believe the only      02:47

11   written agreements are the confidentiality agreement and then

12   the invoices, which each in and of itself is a separate

13   contract.

14          THE COURT:  Yes.  Okay.  And that was just a separate

15   and apart question I had.  So I think if you could focus in on   02:47

16   that, issues that I brought up, and then I think we can go from

17   there.  So go ahead.

18          MS. LEE:  Thank you, Your Honor.  With respect to the

19   question of what is the trade secret, we believe that the

20   documents pretty clearly lay out the disclosure of Virun's      02:48

21   trade secrets to Cymbiotika, specifically in the declaration of

22   Philip Bromley.  Starting with Exhibit 8, if you look at

23   Exhibit 8 to the declaration of Philip Bromley, you'll see an

24   email dated 8/29/19, and there's a quote for a sleep formula

25   and then attached is something called a supplement fact sheet.  02:48

1    And that's on page 3 of that Exhibit 8 there.  And if you -- so

2    there's a box with percentages, and then down below we've filed

3    under seal separately, you know, pursuant to the Court's order,

4    the list of ingredients with the percentages.  So there was the

5    redacted one filed first and then the one under seal, and                    02:49

6    that's -- so that's the main trade secret information with

7    respect to each product.  It's the -- specifically the

8    ingredients and the percentages of the ingredients used in each

9    formulation.  So I guess to put it in another way, it's kind of

10   the recipe, so to speak, for the supplements.                                02:49

11        So, you know, in -- in the declarations, we've

12   actually attached copies of these -- several of these

13   supplement fact sheets that were disclosed to Cymbiotika,

14   including Exhibits 10, 11, 13, 14, 15, 16, let's see, 17, and

15   so forth.  And each of those disclosures with the supplement                 02:50

16   facts includes the percentages of the ingredients separately.

17   So that's --

18        THE COURT:  So are you saying -- so if I were to look

19   at Exhibit 40, which talks about -- which gives the results of

20   that Advanced Botanical testing as to the activated charcoal --              02:50

21   so one of these sheets that you're alluding to in -- I guess it

22   would be the -- what did you call them?  The --

23        MS. LEE:  Supplement fact sheets.

24        THE COURT:  Yes.

25        MS. LEE:  I think we abbreviated them SFS --                            02:50

1          THE COURT:  SFS.

2          MS. LEE:  -- in our papers and --

3          THE COURT:  So is there one of those for the charcoal

4    that would then line up with the same percentages?

5          MS. LEE:  There is one of those for, yeah, each of

6    the products that we are -- that are in dispute that would line

7    up with those percentages, and that's why we had to file

8    everything under seal.

9          THE COURT:  But where is that?

10         MS. LEE:  For the activated charcoal and lemon cream?

11         THE COURT:  I guess what I'm getting at is I'm trying

12   to see -- so you're saying you have this fact sheet which gives

13   the percentages of all of this formula, you know, the recipe?

14         MS. LEE:  Yes, Your Honor.

15         THE COURT:  And you're saying that the defendant

16   stole that secret and they've recreated their own -- you know,

17   their own recipe, but they may have added a few things here and

18   there to tweak it a little.  But the base recipe is your

19   recipe?

20         MS. LEE:  Yes.

21         THE COURT:  And so what I'm trying to understand is

22   the comparison that the two base recipes are the same.  And so

23   I have the percentages.  You know, if we were making a cake, I

24   could see that, you know, there's a cup of flour, there's a

25   half a cup of sugar, you know, there's a teaspoon of baking

02:50
02:51
02:51
02:51
02:52

```
 1  soda, and I could see that defendants' is the same cake but
 2  they added lemon and banana.  So I guess I'm trying to see how
 3  those match up in the evidence you've submitted, and perhaps
 4  that's a wrong way for me to go about it and that doesn't
 5  matter.  I should just -- I should just understand it's the        02:52
 6  same formula because the declaration is telling me that.  So do
 7  you understand what I'm saying?
 8            MS. LEE:  I think I do, Your Honor.
 9            THE COURT:  So if I look at this Advanced Botanical,
10  you know, you all went to the -- you know, you all asked          02:52
11  Advanced Botanical to do this testing to kind of show this is
12  the exact same thing, this is our formula, this is our recipe,
13  and they gave the results of the percentage of ingredients in
14  whatever was created by Cymbiotika as to this activated
15  charcoal.  So now I'm looking for Virun's activated charcoal      02:53
16  formula to see that, hey, the percentages are exactly the same.
17  And so I don't know where that is.
18            MS. LEE:  Right.  And, Your Honor, I think that maybe
19  it's a little bit confusing to think about it that way.  So,
20  you know, we've -- as I mentioned, in the declaration of Philip   02:53
21  Bromley in support of the motion, we've attached many, many
22  documents showing our disclosure of the supplement fact sheets
23  with the ingredient percentages for Virun's formulations that
24  were supplied to Cymbiotika.
25            THE COURT:  Mm-hmm.                                     02:53
```

1          MS. LEE:  So we -- and Cymbiotika, of course, has

2     admitted that they provided those formulations to their other

3     competitor manufacturers, and they've also said that they've

4     taken those formulas and improved upon them.  So we're not

5     saying necessarily that it's a one-to-one comparison --        02:54

6          THE COURT:  I see.

7          MS. LEE:  -- that the percentage is the exact same.

8     And, in fact, I think, you know, there has been like some

9     tweaking, as you mentioned, of that.

10         So we don't believe that the law requires that we        02:54

11    show that there is a one-to-one formula there.  We've shown the

12    disclosure and they've admitted to the use of those formulas,

13    and that's the key part there.  And they've even said that they

14    took those formulas and used those to tweak them to improve

15    upon our substantial amount of research, work, and development  02:54

16    over several years.

17         It's also a little bit confusing to look at the --

18    those analyses because those reflect the active ingredients

19    only as opposed to the inactive ingredients.  And a lot of

20    this -- the formulation, it's not just the main ingredient     02:54

21    that's the title of the formulation.  It's the inactive

22    ingredients that are used to stabilize the formula and to make

23    it taste better and all these additional other things that --

24    science.  But -- so what we attached, those certificates -- or

25    those -- that testing results was to show kind of our story of  02:55

1   how we kind of came to suspect that something was up, and we

2   did our due diligence to try and see, hey, does this kind of

3   show that this could be the case.

4          And so once we had that evidence, then we went to

5   Cymbiotika, you know, we sent them the cease and desist letter,   02:55

6   and to our surprise, they actually said, *Yes, we actually did*

7   *disclose those formulas, and, in fact, they're ours*.  And so

8   that was the point at which we proceeded with pursuing this

9   litigation.

10         So we were -- so I don't mean -- yeah, so the -- that   02:55

11  Exhibit 40, it's a little bit confusing to look at that and to

12  think that we need to provide that for every -- for every

13  product available.

14         To go back to Your Honor's main point about the --

15  how to craft an order to enforce it, we would say that if the   02:55

16  Court would like, we could propose an alternative order that

17  specifically refers to each and every SFS and the emails

18  disclosing those FS -- SFSes that specifies those products, and

19  we can create that list.  The list actually is a little bit

20  broader than those 12 products listed because we also disclosed   02:56

21  the SFS for other products that Cymbiotika evidenced interest

22  in purchasing, such as NMN, which I forget what that stands

23  for, but another supplement that was not ultimately purchased

24  but the formulation was still provided to Cymbiotika so that

25  they could consider buying that one as well -- or buying   02:56

1    products made using that formulation.

2              THE COURT:  Okay.

3              MS. LEE:  Would Your Honor like me to address this

4    point further?

5              THE COURT:  No, you can go ahead and move on.  Thank        02:56

6    you.

7              MS. LEE:  Okay.  Thank you.  With respect to the

8    issue of contract, I think as we mentioned before, yes, we

9    contend that the contracts that are applicable here are the

10   confidentiality agreement as well as the invoices, which we        02:56

11   contend each and every one of them is a contract there.

12             Just overall, a few more points that I just wanted to

13   clarify or mention to the Court.  Some of the briefing has

14   spoken about the likelihood of success.  I just wanted to

15   emphasize that, of course, the Ninth Circuit has held in          02:57

16   *Alliance for the Wild Rockies v. Cottrell*, that's 632 F.3d 1127

17   from 2011, that the "'serious questions' approach survives

18   *Winter*," and for that reason, "'serious questions going to the

19   merits' and a hardship balance that tips sharply toward the

20   plaintiff can support issuance of an injunction, assuming that    02:57

21   the other two elements of the *Winter* test are met."

22             So here we would say that while we've talked about

23   how we've shown -- we've more than shown a "likelihood of

24   success on the merits," the applicable standard is the

25   "'serious questions' test," and, you know, we believe that        02:58

1    we've shown "serious questions going to the merits" with

2    respect to our claims for trade secret misappropriation, breach

3    of contract, and breach of the covenant of good faith and fair

4    dealing.

5           Similarly, with respect to "the balance of equities"    02:58

6    factor, I wanted to emphasize that there's some discussion in

7    the briefing about undue hardship.  Here, similar to *FitSpot*

8    *Ventures, LLC v. Bier*, "Plaintiff has shown a compelling case

9    that this property," these formulations that we're talking

10   about, "never belonged to defendant in the first place."  While    02:58

11   Cymbiotika's briefing has focused on how it would harm their

12   company to issue this injunction, again, returning this

13   information or not being able to use this information cannot

14   hurt them because they were not entitled to use it to begin

15   with.  And, of course, they are separately entitled to still do    02:59

16   business and still sell supplements with these, you know,

17   active ingredients, they just can't use it -- our formulations

18   to do so.  So I just wanted to emphasize that defendant would

19   still be free to sell other supplements using properly acquired

20   or developed intellectual property.    02:59

21           Another point I wish to make was a little bit about

22   the timing of the -- of defendants' allegations that there were

23   representations by Virun that Cymbiotika would own the

24   formulations.  So as pointed out in the briefing, Virun sent a

25   cease and desist email to Cymbiotika in fall, I believe    02:59

November 2021, and Cymbiotika did not respond.  In January 2022

we -- earlier this year, we sent a cease and desist letter to

Cymbiotika, and in response, defendants said basically that

they looked at the website and the website meant that they

would own the formulations.  And it's only much, much later

when defendants filed their opposition to this preliminary

injunction motion that defendants for the first time stated

that there were somehow oral representations in December of

2018 that said that they would own the formulations.

        And as set forth in our briefing, the timing of

those -- even if these allegations are credible, the timing of

those -- of these supposed representations matches Virun's

efforts to develop Cymbiotika's DHA formula, which everyone

agrees is the only formula that Cymbiotika ever provided.

        These allegations about oral representations by Virun

are not only vague, they don't say who made them, when they

made them, what they said, but they're also contradicted by the

substantial evidence that we've provided, including emails that

reference that these formulations were made for other Virun

customers who are identified by name.  And actually some of

defendants' own evidence references that.

        For example, Exhibit 10 to the opposition, that's an

email from Philip Bromley at Virun to Jamie Bigelow at

Cymbiotika dated March 11th, 2020, stating, "We will increase

the vitamin C to 1,000 milligrams per 15 milliliters, the same

1  as," and then a customer's name.  And then in Exhibit 16,

2  Philip told -- from Virun told Jamie Bigelow from Cymbiotika on

3  June 12th, 2020, in that email, he says, "Can you please send,

4  Jamie, the last COA," that's certificate of analysis, "and spec

5  for this in the," and then a name of a customer, "folder."         03:02

6  Again, these emails clearly show that Cymbiotika knew these

7  products were being provided to other customers, and so

8  their -- their allegations basically are not credible for that

9  additional reason.

10       Further, other reasons why their allegations are not      03:02

11  credible was that Virun actually told -- told Cymbiotika they

12  would charge $10,000 to develop the DHA, and it was at that

13  point that Cymbiotika said that they would rather go with the

14  low-hanging fruit, which is the private-label formulations.

15  The formulations are not listed on the substantial number of    03:02

16  quotes that are reflected in the Bromley emails or the

17  invoices.  Instead, the quotes kind of refer to, you know, cost

18  includes, bottle cap, cup filling, bottling, labeling, things

19  like that, not anything about IP.

20       Also, Cymbiotika has actually said that they paid         03:03

21  higher amounts to competitor manufacturers after the

22  relationship between the two parties broke down.  And so it

23  seems straining credulity to say that they thought that they

24  were somehow also getting very valuable trade secret such as

25  formulations at a lower price than the actual cost of the       03:03

1    products through this other manufacturer.

2          Finally, let's see.  Oh, another point is there was

3    some mention in the briefing that Cymbiotika has never talked

4    about private labeling.  Well, I noticed in preparing for this

5    hearing, Your Honor, that in Exhibit 4 to the Bromley                      03:04

6    declaration on page 4, there is a signature block that

7    identifies Cymbiotika's employee Tyler Ford as the white-label

8    accounts procurement manager, and that's from February 24th,

9    2022.  And white label, Your Honor, is another term for private

10   labeling.  So they have -- not only do they talk about private            03:04

11   labeling quite a bit, they actually have a whole dedicated

12   employee who manages their white-label accounts.

13         And a few more items.  Actually -- the emails, Your

14   Honor, also identify several points at which Cymbiotika's

15   representatives state that they will just take the formulas and           03:04

16   add a few ingredients that are not an exact replica; for

17   example, Exhibit 2 of defendants' evidence, Exhibit 3,

18   Exhibit 15.  So there's multiple emails there, and I'm sure

19   Your Honor looked at all the emails so I don't need to repeat

20   all of those.                                                             03:05

21         Is there anything else Your Honor would like me to

22   address?

23         THE COURT:  Not at this time.  I may have a couple

24   questions after.  I'll give --

25         MS. LEE:  Okay.  Thank you, Your Honor.                             03:05

1          THE COURT:  -- the other side the opportunity.  Thank

2    you.

3          MR. SHAEFFER:  Thank you, Your Honor.  This is

4    somewhat of an unusual trade secrets case because there is an

5    underlying dispute as to who actually owns the formula.  And          03:05

6    you wanted a piece of new evidence.  We had a mistake in our

7    brief in that Virun's website today, I found this out, if you

8    go on the website, you won't see the frequently asked questions

9    anymore, but if you go on the site map, it's still there.  And

10   if you click on the site map, there are two important          03:06

11   admissions that Virun makes on its website.  They have a

12   question:  "Do you make private-label products?"  Despite what

13   counsel just said, they on their website say, "No, we don't.

14   Each of our products is custom made for the customers."  And

15   you can get to that website just going to virun.com/faq.  And          03:06

16   it still says, "If you bring an idea to us," not a formula, but

17   "an idea to us, you own it."  That was on their website when my

18   clients went to them.  My clients would not have gone to Virun

19   if they thought Virun would hold them hostage in the products

20   that were developed.          03:06

21          Just to hit that point for a second more, because

22   their -- the only document they have is the NDA which clearly

23   states on its face is for pre-business negotiations.  What's

24   very, very important here are documents that were attached in

25   reply.  It's Docket Reference 90-1 is the marketing supply          03:07

1  agreement and 90-2 is the exclusivity agreement.

2        This shows conclusively that Virun did not believe

3  its NDA extended beyond pre-business negotiations.  What's also

4  very important about those documents, in each of those

5  documents, there's a specific section on who will own the

6  formula that is developed.  While at most Virun provided these

7  to our client, Virun has its own in-house counsel, they never

8  followed up with us.  The only reason we are here on a dispute

9  today over trade secrets and who owns these trade secrets is

10  their counsel did not follow up and get the parties to

11  negotiate and agree to a manufacturing agreement.  Because if

12  their counsel had come to us and said, *Here's our manufacturing*

13  *agreement, we want you to sign it, we're going to ensure all*

14  *the formulas are confidential and we'll own it*, we would have

15  walked away.  We never would have done that.  We would not have

16  been in this deal.

17        They have not shown a likelihood of a success that

18  the parties had any agreement that they were going to keep

19  anything of Virun's confidential because Virun knew that its

20  NDA didn't extend by their own manufacturing agreements and

21  other agreements, and by them not requiring us to sign

22  agreements to keep their work confidential, they're not doing

23  an adequate job of protecting their own confidentiality.

24        But I think your more important issue -- I think

25  that's much less of an important issue.  The more important

03:07

03:08

03:08

03:08

03:08

1  issue is the one Your Honor cited initially here, which is what

2  are the trade secrets?  The trade secrets cannot be, despite

3  what counsel said, the ingredients because the ingredients are

4  on the box.  They are on the box that Virun sold us and they're

5  on the box that we sell today.  The ingredients, A, don't                03:09

6  match, but, B, it can't be the ingredients.

7          So the next argument is, well, it's the percentage of

8  those ingredients, but as Your Honor pointed out, they've not

9  shown you any evidence that we use the same percentages.  And I

10  refer Your Honor to Docket 38-8, our Exhibit 18, where we put         03:09

11  the ingredient lists side by side.  And what's really important

12  here -- first, what's not -- while it's significant that the

13  ingredients -- active and inactive ingredients aren't

14  necessarily the same, some are the same.  1,000 milligrams of

15  vitamin C, they both have that.  But I can go to CVS and buy 50      03:10

16  other vitamin Cs that have 1,000 milligrams of vitamin C, so

17  that's not protectable.  But what's --

18          THE COURT:  Can you stop for a second?

19          MR. SHAEFFER:  Yes.

20          THE COURT:  I was just trying to -- where is that             03:10

21  you're saying?

22          MR. SHAEFFER:  It's 38-8, it is Exhibit 18.

23          THE COURT:  Docket 38?

24          MR. SHAEFFER:  Docket 38 dash -- Docket 38-8, 18.

25  And the other -- other way you could look at it is Docket 39-9,      03:10

1    Exhibits 19 to 24.  Exhibits 19 to 24 are the actual boxes and

2    18 is just a listing of all of them.

3              THE COURT:  Docket 39-9 you said?

4              MR. SHAEFFER:  38-9 is the actual boxes themselves

5    side by side.                                                    03:11

6              MR. GRANT:  39-9 or 38-9?

7              MR. SHAEFFER:  39-9.  And 39-8, Exhibit 18, is a

8    spreadsheet that I put together, making that a little easier to

9    read.

10             THE COURT:  Okay.  Go ahead.                           03:11

11             MR. SHAEFFER:  What's important looking at

12   Exhibit 18, or at least important to me, is if these products

13   are the same, shouldn't the nutritional information be the

14   same?  Shouldn't the products have the same amount of calories,

15   same amount of carbohydrates, same amount of fat?  They don't.  03:11

16   None of them match up.  None of these products match up.  What

17   they're arguing for is precisely what the U.S. Supreme Court

18   has repeatedly said you can't do.  They seem to be arguing,

19   first, *If we convince you that we own these formulas and*

20   *Cymbiotika doesn't, well, we made charcoal for Cymbiotika, they*  03:12

21   *didn't have charcoal before they came to us, and they're making*

22   *charcoal now, so it's got to be ours.*  That's not the law.

23             *Bonito Boat*, the U.S. Supreme Court case of *Bonito*

24   *Boat,* clearly states that competition in the United States

25   allows competitors to copy to the most minute detail the other  03:12

1   side's product so long as they don't violate the law.  And they

2   haven't shown you what the trade secret is that was taken.  It

3   can't be the ingredients.  They're on the box.  They can argue

4   the percentages, but if the percentages were the same, the

5   nutritional information would be the same.  They may argue it's            03:12

6   the manufacturing techniques, but there is no allegation we

7   manufacture the products the same way.

8          What they seem to be citing is a statement in my

9   letter, my letter, their best evidence of misappropriation of

10  trade secrets is my response to their cease and desist letter            03:13

11  where it says, "Yes, we gave the composition of the product to

12  the other side."  We didn't say we gave the percentages.  We

13  said, *We have a vitamin C.  Here's the ingredients in our*

14  *vitamin C.  Can you make us something similar?*

15         Because the most important thing is -- Your Honor              03:13

16  probably goes.  If you go into any pharmacy, you're going to

17  see enumerable amount of vitamins.  I can go buy citric acid.

18  That's vitamin C.  I could take a tablespoon of vitamin C.  Not

19  a very efficient way of doing it.  What Virun has and what

20  makes Virun special is they have ability to maximize              03:13

21  bioavailability of that vitamin C so it maximizes its

22  absorption into your body.  And each company does it its own

23  way.  We don't use their way of doing it.  And they have

24  patents on the way they do it.  We went to a new manufacturer

25  who does it a different way.                              03:14

1          So Your Honor is absolutely right.  It's their burden

2     to show that a -- what is the trade secret?  First they have to

3     show what the trade secret is.  They haven't done that.  Then

4     they go to the next thing.  They have to show that we

5     misappropriated the trade secret.  That's an intentional act.          03:14

6     If we believed we owned the trade secret, we're negligent.  We

7     haven't misappropriated anything at that point.  If we had a

8     good-faith belief that this was ours, even if they're right and

9     you rule that they owned it, it's not a misappropriation of

10    trade secret because we had a good-faith belief we owned it.          03:14

11         Moreover, the point that was made, which I find very

12    interesting, is they developed these products for us and we

13    took them.  It would make sense if they developed these

14    products and we took them so someone could make them cheaper

15    for us, but we're spending more money now to make our products.      03:15

16    As Your Honor knows from our briefing, we lost a lot of

17    customers when we switched from Virun to a new customer because

18    there were changes in the products.  All the customers say, *It*

19    *looks different, it tastes different, it's different*, and they

20    didn't like that.  So that there indicates that it's not mis --     03:15

21    there is really no misappropriation going on there.

22         Moreover, when we get to the next -- the element of

23    irreparable harm, there's been no allegation here that there's

24    going to be any misappropriation in the future that Your Honor

25    should enjoin.  What they're arguing for is we have a new           03:15

1  manufacturer who's manufacturing our product.  We're not

2  disclosing our new formula to anyone.  That's a past

3  misappropriation.  If they prevail in this case, they can

4  recover all our profits that we've earned on those products.  I

5  don't think they'll prevail, but if they did, they can get the          03:16

6  money we've earned from these products.

7          What a preliminary injunction motion on -- on a -- a

8  preliminary injunction motion on a misappropriation of trade

9  secrets is directed to is to prevent the further dissemination

10 of a trade secret, dissemination or further use.  There's no          03:16

11 allegation we're going to use any other formula.  There's no

12 allegation we're going to take anything to anyone else.  So

13 there's no irreparable harm here.

14         And getting to the balance of equities, we're unusual

15 in that we run a subscription-based business.  If you stop any          03:16

16 of our products, we're immediately in breach of contract with

17 65 percent of our customers.  And if we can't deliver them one

18 product because we're enjoined, we're probably going to lose

19 all those customers.  We're out of business.  We're basically

20 out of business if you grant an injunction here.  And if you          03:17

21 understand that that's the scope of the injunction, the bond is

22 going to have to be through the roof here because you're going

23 to put a company out of business, which is not the point of

24 this.

25         What you have here is you have a very disgruntled          03:17

manufacturer.  Virun is tremendously skilled, and we say it

throughout our briefs, in working with us to develop new

formulas.  These are new formulas.  They say it on their

website that they don't make private-label products.  They work

to make everything unique.  They don't dispute that four of

these products Virun had never thought of before.  So those are

all new.  The other ones, the vitamin C, the B12, and those, we

showed how we materially modified those products, but we worked

with Virun and Virun was very important to assist us there.

But at the end of the day, Virun could not deliver the products

in a timely coherent matter and we were forced to take the

dramatic risk of switching.  We didn't want to switch, but we

had to switch.  And they're mad and they want to put us out of

business for that, and they can't do that.

          Unless Your Honor has any questions, I'm done.

          THE COURT:  So are you saying -- just going back to

the balance of the equities, are you saying that 100 percent of

your products is the products we're discussing here today?

          MR. SHAEFFER:  Well, Your Honor had raised a really

interesting point, and I have that same question, was on this

proposed order.  They want to enjoin every single one of our

products.  I think they would be obligated to show -- they

can't say, *Oh, your vitamin -- your vitamin C has our form --*

*has our trade secret in it so we're borrowing all your*

*products*.  They'd have to show it product by product, and they

```
 1    haven't done that.

 2            And what's important, Your Honor, because you

 3    referred to the testing they did.  Remember in Mr. Bromley's

 4    declaration he said the results of those testing -- he wasn't

 5    saying the percentage is the same -- he's saying the results of    03:19

 6    those testings show they're using macadamia nut.  *Cymbiotika is*

 7    *using macadamia nut in their product so it's mine.  That's a*

 8    *secret fingerprint*.  But we pointed out, *It's in your patent.*

 9    *Your patent says you use a macadamia fat for bioavailability so*

10    *using macadamia nut cannot be a trade secret because you've*       03:19

11    *publicly disclosed it*.

12            So I don't know how you'd craft an order here based

13    on the record.  Maybe later they could renew a motion when they

14    have more specificity, but based on what they have now, I don't

15    see how you can.                                                    03:19

16            THE COURT:  But what I was asking is, so if you're

17    looking at the proposed order, all of those 12 products, is

18    that the entirety of what Cymbiotika produces or is there

19    something beyond that?

20            MR. SHAEFFER:  Cymbiotika produces a number of             03:20

21    additional products, but some of its most valuable products are

22    contained in there.  So the argument was if they get an

23    injunction on all our products, we can go to sell other things,

24    that's not true.  Mr. Elmi specifically said that in his

25    declaration.  "If this is granted, I'm laying off all 40 of our    03:20
```

employees.  We're out of business."  Counsel says, *Well, you*

*can ignore his declaration,* but where's the contrary evidence?

We've been here for six months.  They could have deposed him on

it if they wanted to.  They chose not to.

So the CFO of the company is saying, *We're out of*                03:20

*business if this injunction is granted.  There's no way we can*

*survive based on our other products.*

THE COURT:  Okay.

MR. SHAEFFER:  Thank you.

THE COURT:  Thank you.                                             03:20

Okay.  Go ahead.

MS. LEE:  Your Honor, I would just want to direct

the -- with respect to a number of issues.  With respect to

Virun's website and the language on there, I think our briefing

has addressed the language that's actually on the website as     03:21

opposed to the language that counsel and the briefing appears

to cite without basis or incompletely.  Specifically, I would

refer Your Honor to our request for judicial notice, Exhibit B,

which mentions the language that counsel mentioned as well as

stating that in other cases there is private-label              03:21

arrangements.  So I'm not sure why that argument continues to

be made.

With respect to the NDA issue, I think our briefing

has thoroughly addressed that.  As set forth in our briefing,

you know, we believe the confidentiality agreement, you know,   03:21

1  does not -- is not limited to pre-business relationship

2  negotiations.  It's a strange reading to read the language in

3  the way that Cymbiotika has suggested.  But further, because

4  Virun and Cymbiotika entered into a number of purchase orders,

5  all of the negotiations and discussions before each of those          03:22

6  orders was, of course, pre-business negotiations as well and

7  would be covered under the NDA to the extent Your Honor

8  believes that it's circumscribed in the way suggested.

9          THE COURT:  And I think one of the, you know, key

10  issues that I keep kind of falling back on is -- really, I            03:22

11  mean, one of the main questions is, you know, at what point, if

12  ever, does a private-label version of Virun's existing product,

13  does that ever belong to someone else?  You know, can you --

14  can you add so many more things to it that it -- now it's an

15  entirely new product?  And there's no agreement laying out what       03:23

16  the terms are, you know, what is the -- you know, this is a

17  private-label product, this is a product that was created with

18  Cymbiotika and Virun, therefore, who owns this product?  We

19  don't have an agreement here unless you're saying the invoices

20  create that agreement of who owns what.  Is that what you're          03:23

21  saying?  If I were to look at an invoice, I would know from

22  that invoice who owns the product?

23          MS. LEE:  Well, the invoices do not include any

24  mention of ownership of the formulations, Your Honor, which,

25  you know, we think is probative of who owns it.                       03:23

1           There is also the fact that Cymbiotika was well aware

2    that, you know, if there was a -- as we explained in our

3    initial motion, Your Honor, the private-label industry, it's

4    very common to add common additives and flavorings to it, and

5    that's not a really big deal, and that's how it's kind of                    03:24

6    customized for each customer.  The point at which it becomes

7    more complicated is the point at which Virun, you know, begins

8    to charge money, such as for that DHA product at the beginning

9    of the relationship where they tried for four months, you know,

10   at the cost of 50 grand to try and develop it and to stabilize            03:24

11   it, were unable to do so, and then asked Cymbiotika for $10,000

12   to continue development of that, and that's sort of the

13   relation -- like when there's a different agreement on the

14   who -- ownership of that formulation because Cymbiotika had

15   provided the initial formula, Virun was tinkering with it and          03:24

16   asked for money to develop it, and they would have entered into

17   an agreement at that point.

18           In the private-label industry, it's common to have,

19   you know, again, these existing formulations provided by Virun

20   and they just -- you know, they say, *Oh, we're doing this*           03:25

21   *product for one customer.  We can do this and, you know, a*

22   *slight variation for you*.  And that's a very common thing.

23           There are those draft agreements that were circulated

24   which counsel referred to, but the fact that they were not

25   ultimately entered into and that Cymbiotika ignored them              03:25

1  doesn't mean, oh, gotcha, suddenly Cymbiotika owns Virun's

2  formulations.  That's not the law.  That would seem like a

3  crazy result to say that because Virun did not force Cymbiotika

4  to enter into a written agreement on it but suddenly by default

5  Cymbiotika owns those formulations and all of its IP, that      03:25

6  would just be a completely inequitable result.

7         With respect to the what are the trade secrets issue,

8  as counsel pointed out, you know, there are ingredients listed

9  on the box, as is required.  What's not on the box, again, are

10  the percentages of those ingredients.  Those are the things     03:26

11  that were -- the information that was redacted in each SFS.  It

12  was filed under seal.  It was thoroughly identified.  And so,

13  again, that would be our contention of, like, the main trade

14  secrets.  We believe that, you know, in, you know, the course

15  of the parties' relationship, there probably have been other    03:26

16  things, but those are the really big main ones, and that's what

17  we're seeking the preliminary injunction for, the information

18  provided in each of those SFS documents that were provided to

19  Cymbiotika.

20         There's a big deal being made of, *Oh, you know, they*   03:26

21  *don't have the same percentage because they don't have the same*

22  *nutritional facts*, and this goes back to the idea of, you know,

23  the fact that Cymbiotika had access and used it, not that they,

24  you know -- and, again, they've said that they took it and they

25  tinkered with it, and that's not just something from counsel's   03:26

1    own letter, that's actually from the declaration of Jamie

2    Bigelow where she also says that they provided it to these

3    manufacturers and that they used those formulations to create

4    those new and improved products.

5            So I would liken this to, you know, other situations

6    where again a recipe is taken.  There's that *Bambu* case

7    involving some sort of Vietnamese drink where, you know, a

8    recipe is taken, and just because modifications are made to

9    that recipe, the underlying problem is they were not entitled

10   to use -- to build on Virun's research and knowledge.  They can

11   separately create it.  And, of course, charcoal is not

12   something that we are complaining about here; we're complaining

13   about specifically our charcoal formulation and the inactive

14   ingredients used to stabilize it.  So I think there's a little

15   bit of confusion there.

16           And, again, with respect to the point that the -- you

17   know, that the ingredients must match, you know, we disagree

18   that that's the law.  We disagree that, you know, again, we've

19   provided the ample evidence to show that Cymbiotika had access

20   to these formulations and they've again admitted that they've

21   used it.  And so, you know, under the applicable standard of

22   "serious questions," we believe we've met that.

23           Let's see.  With respect to the issue of irreparable

24   harm, again, you know, I think the record is pretty clear that

25   these formulations have been taken and have been disclosed to

1    Virun's manufacturer competitors, who are taking them and using

2    them not only to sell to Cymbiotika, we believe that they

3    probably have been -- are being disclosed further, and that's

4    devaluing the value of Virun's formulations.

5         THE COURT:  Do you mean disclosed further allowing                03:28

6    other companies besides Cymbiotika to use the formulas to

7    create their own supplements; is that what you're saying?

8         MS. LEE:  We believe that it's possible that

9    Cymbiotika has -- is using those manufacturers also to enter

10   the private-label business as well.                                     03:29

11        THE COURT:  To enter?

12        MS. LEE:  The private-label business where they

13   provide those formulations to other companies.  So it's not

14   just Cymbiotika's direct sales to its own customers but also

15   that they are private labeling Virun's formulations, you know,          03:29

16   and allowing other companies to come up with their own, you

17   know, label.

18        THE COURT:  So let's say -- hypothetically let's say

19   they're not doing that, and perhaps counsel agrees to

20   stipulate, *We haven't done it, we're not going to do it, we're*        03:29

21   *the only ones creating these formulas, these products*, then how

22   would you balance irreparable injury with that?  Isn't that

23   something that could just be resolved later on during trial if

24   you were to prevail as far as lost profits or, you know,

25   regaining whatever they sold and getting that back?                     03:29

1          MS. LEE:  Again, Your Honor, as set forth in our

2     motion, you know, our company, Virun, has been suffering damage

3     to its own customer relationships and goodwill.  Virun, you

4     know, as set forth in the motion, has entered into a number of

5     exclusivity agreements with its own customers.  For example,          03:30

6     there is one involving its vitamin C formulation and there is

7     an agreement that Virun would only make this product in a pouch

8     form for this customer.  And now, because this formulation has

9     been let out of the bag so to speak and taken by Cymbiotika,

10    Cymbiotika is taking it and not just making it in the form that     03:30

11    Virun made it for Cymbiotika, but they've put it into a pouch

12    as well.  And so that customer has accused Virun of breaching

13    that agreement.

14          And so the number of instances, Your Honor, where

15    this -- this is causing further damage to Virun's own business     03:30

16    separate and apart from, you know, lost sales to Cymbiotika,

17    like it doesn't have the control over -- yeah, over the

18    distribution of that, that it, you know, basically has sold to

19    other customers.

20          With respect to the issue of whether it would put          03:31

21    Cymbiotika out of business, actually Cymbiotika's own briefing,

22    including the declaration of Shabab Elmi, states that actually

23    these products that were -- are made -- you know, relate to the

24    formulations that Virun gave them, it's roughly about

25    50 percent of its business, according to its own briefings, and     03:31

1   there's, like, a little chart.  You know, we don't know if

2   that's actually true or not, but that's what they've said in

3   their own thing, which would imply that about half of their

4   other revenues are coming from other products and they could

5   still make money.                                                    03:31

6           Further, Cymbiotika has also said that their revenues

7   have grown 300 percent in like the last year or something like

8   that.  And so I feel like they're probably not going to go out

9   of business if -- even if half of it gets halved.

10          Let's see.  With respect to the subscription-based --       03:32

11  oh, let's see.  I think -- I think that's about it actually,

12  Your Honor, unless there's something else you'd like me to

13  address.

14          THE COURT:  No.  I think you've covered it all, so

15  thank you.                                                           03:32

16          MS. LEE:  Thank you.

17          THE COURT:  So as with my last case, I don't intend

18  to issue a ruling from the bench.  I am going to take the

19  matter under submission.  I do appreciate the argument that was

20  provided by both sides and both counsel, and this matter will       03:32

21  be deemed submitted.  Okay?

22          MR. SHAEFFER:  Thank you, Your Honor.

23          THE COURT:  Okay.  Thank you.

24          MS. LEE:  Thank you, Your Honor.

25                      (Proceedings concluded.)

```
1                    CERTIFICATE OF OFFICIAL REPORTER

2

3

4           I, PHYLLIS A. PRESTON, FEDERAL OFFICIAL REALTIME

5   COURT REPORTER, IN AND FOR THE UNITED STATES DISTRICT COURT FOR

6   THE CENTRAL DISTRICT OF CALIFORNIA, DO HEREBY CERTIFY THAT

7   PURSUANT TO SECTION 753, TITLE 28, UNITED STATES CODE THAT THE

8   FOREGOING IS A TRUE AND CORRECT TRANSCRIPT OF THE

9   STENOGRAPHICALLY REPORTED PROCEEDINGS HELD IN THE

10  ABOVE-ENTITLED MATTER AND THAT THE TRANSCRIPT PAGE FORMAT IS IN

11  CONFORMANCE WITH THE REGULATIONS OF THE JUDICIAL CONFERENCE OF

12  THE UNITED STATES.

13

14

15                  DATED THIS 14TH DAY OF DECEMBER, 2022

16

17

18              /s/ PHYLLIS A. PRESTON

19         _____

20         PHYLLIS A. PRESTON, CSR No. 8701, FCRR

21           FEDERAL OFFICIAL COURT REPORTER

22

23

24

25
```