JOHN J. SHAEFFER (SBN 138331)
  JShaeffer@FoxRothschild.com
JEFFREY H. GRANT (SBN 218974)
  JGrant@FoxRothschild.com
CARLY KLEIN (SBN 340691)
  CKlein@Foxrothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:  310.598.4150
Facsimile:   310.556.9828

Attorneys for Defendant and Cross-Claimant Cymbiotika, LLC and Defendants Chervin Jafarieh and Shahab Elmi

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| VIRUN, INC.,<br><br>       Plaintiff,<br><br>      v.<br><br>CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an individual; SHAHAB ELMI, an individual; and DOES 1 through 10, inclusive,<br>       Defendants. | Case No. 8:22-CV-00325-SSS<br><br>Hon. Sunshine S. Sykes<br><br>**CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS AGAINST VIRUN, INC.**<br><br>**DEMAND FOR JURY TRIAL** |
| CYMBIOTIKA LLC, a limited liability company,<br><br>      Counterclaimant,<br><br>      v.<br><br>VIRUN, INC. a California Corporation, and Roes 1 to 10 inclusive.<br><br>      Counterclaim Defendants. | |
| CONTINUED ON NEXT PAGE | |

1

142725897.4

1    CYMBIOTIKA LLC, a limited liability
2    company,

3                   Third-Party Complainant,

4           v.

5    PHILLIP BROMLEY, an individual,

6                   Third-Party Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

# INTRODUCTION

1.    When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was unable to meet its contractual obligations to Defendant and Counterclaimant Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult decision to move the manufacturing of Cymbiotika's dietary supplements from Virun to another manufacturer.[1]  This decision was particularly frustrating because over the course of nearly two years, Cymbiotika had invested millions of dollars working specifically with Virun.  A move to another manufacturer – compelled by Virun's incompetence – could further disrupt Cymbiotika's business, which is predicated upon its subscriber-customers receiving their products on time on a monthly basis.  In particular, Cymbiotika knew that the disruption to this monthly cadence would cause subscribers to cancel their subscriptions and get their dietary supplements elsewhere.

2.    Cymbiotika had spent more than a year working hand-in-hand with Virun to develop a line of unique products after being induced by Virun's representation that the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas, would be Cymbiotika's intellectual property.  Had Virun and its President, Third-Party Defendant Phillip Bromley ("Bromley"), not made such representations to Jafarieh and Elmi, Cymbiotika would have never done business with Virun.

3.    Embarrassed by their own ineptitude and jilted as a result of losing Cymbiotika's business and the friendship of Jafarieh, Virun and Bromley lashed out when Cymbiotika took its growing business elsewhere.  Bromley first took to social media to engage in an anonymous, weeks' long smear campaign to disparage Cymbiotika and its products by publishing social media posts – that specifically

---

[1] Together, Virun and Cymbiotika will sometimes be referred to as "Parties."

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new formulations were dangerous. Bromley's outlandish and vicious accusations included allegations that Cymbiotika's products contained cancer-causing ingredients. To some extent, Virun's and Bromley's campaign was successful. Cymbiotika experienced a dip in sales and Cymbiotika received a slew of one-star (1*) reviews on Google, at least one of which repeated the defamatory remarks that Bromley and Virun had made a few weeks prior about the very formulations that Virun now claim Cymbiotika misappropriated.

4. After Bromley's identity surfaced following what Virun and Bromley believed was a clandestine social media campaign to tarnish Cymbiotika's reputation, they revised their approach. Virun began systematically sabotaging the production and delivery of Cymbiotika products that Virun remained contractually obligated to deliver. Specifically, Virun purposefully slowed or outright prevented the production of Cymbiotika products knowing that the delay would cause Cymbiotika's customers to cancel their orders and subscriptions. Cymbiotika suspicions of Virun's systematic sabotage were confirmed when it caught Virun in several lies, including that Virun was unable to complete Cymbiotika purchase orders because raw materials were not available to Virun when, in fact, they were.

5. Months after Bromley's smear campaign and Virun's systematic sabotage, Virun changed strategy and claimed for the first time that Cymbiotika's new formulations were not in fact new and carcinogenic, but were instead actually Virun's proprietary formulations. From this narrative stemmed Virun's far-fetched allegation that Cymbiotika's use of those formulations constitutes a misappropriation of Virun's trade secrets. Of course, Virun's original ruse to mount baseless accusations that Cymbiotika's new formulations cause cancer is wholly incompatible with their second scheme to assert that Virun owns those same formulations.

142725897.4

6.      Virun makes these spurious claims despite its own website representing to potential and current clients – including Cymbiotika – that Virun does not make private label products but instead works with each client to develop unique formulations.  Virun's website emphatically represents to Virun's prospective clients that **the client**, not Virun,  owns the formulations that Virun manufacturers in  collaboration with its clients.  This and other representations were expressly repeated or reaffirmed throughout the Parties' entire relationship by not only what Virun said – *e.g.*, Virun and Bromley always referring to the products as "Cymbiotika products" or "your products" – but what they didn't say.  Not once during the term of parties relationship  did Virun ever refer to the products as "Virun's products" or claim ownership over the product formulas.  In fact, Virun did not make this claim until months after the relationship was terminated.  While Virun now disavows these representations, such a bait-and-switch is not tolerated under the law and constitutes, at the very least, unfair competition.

## THE PARTIES

7.      Cymbiotika is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in San Diego, California.

8.      Upon information and belief, Virun is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in this District.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over the matter pursuant to Virun's First Amended Complaint ("FAC") (Dkt. No. 92), to which this Counterclaim relates, which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq*.  This court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

1    10.    This Court has personal jurisdiction over Virun, and venue is proper in
2    this District, because Virun has invoked the jurisdiction of this Court by filing its
3    FAC in this Court.

4    11.    Venue is proper in this District pursuant to 28 U.S.C. § 1391.

5    ## NATURE OF THE ACTION

6    12.    Cymbiotika seeks damages and injunctive relief for acts of fraud,
7    breach of contract, tortious interference, and unfair competition engaged in by
8    Virun in violation of the laws of the United States and the State of California.  In
9    particular, this case concerns Virun' breaches of contractual obligations to
10   Cymbiotika, willful and deliberate acts of false advertising, and related claims.

11   ## FACTUAL BACKGROUND

12   ### Preliminary Discussions Between Cymbiotika and Virun

13   13.    Cymbiotika is a popular health supplement company that designs high-
14   end, industry-leading, organic, and original formulations for direct-to-consumer
15   sales, predominantly driven by an online subscription model.  Chervin Jafarieh is a
16   founder and member of Cymbiotika.  Shahab Elmi is a co-founder, member, and
17   CEO of Cymbiotika.

18   14.    Elmi and Jafarieh, as agents of Cymbiotika, approached Bromley in
19   late 2018 in his capacity as a principal of Virun to commence discussions about a
20   possible vendor-manufacturer relationship between Cymbiotika and Virun
21   (together, Cymbiotika and Virun will sometimes be referred to as the "Parties").

22   15.    Elmi and Jafarieh expressed Cymbiotika's interest in utilizing Virun's
23   manufacturing services to expand Cymbiotika's product line.  At the time,
24   Cymbiotika had one product on the market; however, Jafarieh had product
25   concepts, formula ideas, and ingredient lists ready for development.  Cymbiotika
26   knew that creating a scalable product line from concept to consumer would require
27   the utilization of a capable third-party manufacturer.

28

6

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

16.    Cymbiotika sought a manufacturer who would encourage collaboration and ultimately permit Cymbiotika's ownership of finished products.  Cymbiotika relied on the express representations set forth on Virun's website regarding Virun's policy regarding the ownership of formulas in deciding to enter into discussion with Virun.

17.    Cymbiotika was a thriving business prior to ever meeting with Virun.  Cymbiotika had already developed and marketed an Omega product that was met with success.  During this time, Cymbiotika had  spent months conceptualizing, developing, and planning for the sale of additional products that would become the Cymbiotika product line.  It was at this point that Cymbiotika needed to expand and find a manufacturer that could accommodate Cymbiotika's growing product lines and the unique challenges associated with the bespoke formulas that were the cornerstone of Cymbiotika's brand and business plans.

18.    At this time (mid to late 2018), Cymbiotika researched and was in communications with numerous potential manufacturers.  Algorithm, the Canadian company that manufactured B12 oil for Omega products for Cymbiotika, suggested that Cymbiotika consider Virun, which was also located in Southern California.

19.    In late 2018, Cymbiotika conducted basic due diligence regarding Virun.  For one, Cymbiotika carefully reviewed and considered Virun's website.  At the time, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in

7

142725897.4

some instances companies have asked to private label a formula

already owned by Virun, and in those cases, Virun retains ownership.[2]

20.     Virun also represented on its website, in its FAQ section, and contrary

to the representations that it has made in this case, that it does not sell private-label

products and that each formulation it makes for a customer is custom and not some

off the shelf formula:

[Q.]  Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on

collaboration with our client. Our products are developed on a project-

by-project basis. Therefore, we do not sell private-label products.[3]

21.     After Jafarieh and Elmi reviewed Virun's website, including the

FAQs, which set forth Virun's policy – that Virun's customers would own the

formulas –  they discussed the pros and cons of working with Virun.   Elmi and

Jafarieh agreed that Virun's policy, i.e., that Cymbiotika would own its own

formulas, was critical to Cymbiotika's brand and business model.  Relying on these

representations,Cymbiotika reached out to Virun to discuss a potential business

relationship.

22.     Representatives from Cymbiotika and Virun met on several occasions

in late 2018 and early 2019 to discuss Cymbiotika's desire to work with a contract

manufacturer to bring Cymbiotika's product ideas, concepts, and specifications to

market. At this time, Cymbiotika was considering several manufacturers, and

wanted to choose the manufacturer that would be the best fit for Cymbiotika's goals

in the short and long term.

23.     Cymbiotika communicated that it already had a product on the market

and had designs and development plans for additional, trailblazing products.

Cymbiotika and Virun discussed Cymbiotika's plans for visionary products.  They

---

[2]  https://virun.com/faq/, last accessed February 24, 2023.
[3]  https://virun.com/faq/, last accessed February 24, 2023.

8

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

also discussed the need to offer commonly available products as part of the initial launch of Cymbiotika's product line, specifically Vitamin C, Vitamin D and Vitamin B12. Cymbiotika and Virun referred to these commonly available products as "low hanging fruit" because these products are the most recognized and searched supplements by consumers. Cymbiotika was confident that its versions of these common products, based on the specifications and ideas that Cymbiotika has been researching and developing on its own for months prior, would be successful.

24. The representations set forth on Virun's website regarding ownership of formulations based on the customer's ideas were reiterated by its principals during these initial meetings so that Cymbiotika would choose Virun as its manufacturer rather than some other company.. Specifically, and without limitation, in or around December of 2018, Virun's President and its Chief Operating Officer, respectively Bromley and Peter Hoosier, represented orally to Elmi (Cymbiotika's CEO) that Cymbiotika would own the formula for the products that Virun manufactured for Cymbiotika.

25. During these initial meetings, and on multiple occasions thereafter, Virun represented privately and publicly that it was excited to work with a company like Cymbiotika, and principals like Jafarieh, that brought its own product ideas and innovations to the table. Bromley repeatedly praised Cymbiotika's principals for their innovative concepts, willingness to think "outside of the box" and ability to develop unique product formulas. Bromley stated this on multiple occasions – referring to Jafarieh as a "role model" -- that Cymbiotika's approach was different from Virun's other customers, who relied upon Virun to simply develop the formulations with little to no input from the customer.

26. Cymbiotika's industry leading reputation, high-end price points, and unique formulation line are all antithetical to entering into private label arrangements with manufacturers. Virun was no exception, as the products that

9

142725897.4

Virun had ready to go on its shelves for private labeling arrangements were not organic, lacked organic flavors, had preservatives, and were not what ultimately became Cymbiotika's products.

27.    Virun's repeated representations regarding formula ownership were critical to inducing Cymbiotika's to work with Virun.  Cymbiotika was interested in working with a manufacturer that would not only permit, but welcome customers, like Cymbiotika, to bring their own product and formula ideas to table, and that customer would own such formulas.  Cymbiotika specifically sought to avoid manufacturers that required its customers to simply choose already existing formulas and slapping their own labels and brand on them (otherwise known as white labeling or private label).  Cymbiotika also wanted to avoid having to enter into a license arrangement for the formula.  Cymbiotika preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

28.    Noting these considerations, and relying on Virun's express representations regarding formulation ownership, Cymbiotika felt Virun would be an ideal partner and engaged in preliminary discussions with Bromley.  When Cymbiotika agreed to work with Virun, Cymbiotika did so on a handshake given the representations that Virun had made to Cymbiotika, both online (on Virun's website) and verbally during meetings.

**Confidentiality Agreement and Conception of Formal Business Relationship**

29.    To facilitate frank discussions about commencing a potential vendor-manufacturer relationship, the Parties executed the Confidentiality Agreement in January 2019.  A copy of the Confidentiality Agreement is attached hereto as Exhibit A.

30.    By its express terms, the Confidentiality Agreement was limited to "discussions concerning a possible future business or research relationship."  To the

10

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

extent a relationship was forged, and the Parties believed there was a need to cloak an actual business relationship in confidentiality, such a term would be negotiated and included in any subsequent manufacturing and/or supply agreement.  In fact, Virun provided Cymbiotika with drafts of precisely such agreements during these negotiations that included confidentiality language.  This and many other circumstances demonstrate conclusively that Virun itself knew that the exploratory Confidentiality Agreement was limited to pre-business discussions.

31.    While Virun represented to Cymbiotika that it has some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product.  Instead, Cymbiotika needed a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's innovative and market leading strategy.  Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

**Cymbiotika's Vendor-Manufacturer Relationship with Virun**

32.    Following candid discussions governed by the Confidentiality Agreement, the Parties thereafter entered into a vendor-customer relationship in early 2019 whereby Cymbiotika hired Virun to manufacture dietary supplement products for Cymbiotika based on Cymbiotika's ideas, strategies, needs, and goals.

33.    More specifically, Cymbiotika and Virun entered into a contract whereby, after formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika would own the formulation and agreed to purchase product manufactured based on that formulation and packaged consistent with Cymbiotika's specifications from Virun.  While there is no writing reflecting all of the terms of this development and manufacturing arrangement, each order for a specific formulation is reflected in Purchase Orders and similar ancillary documentation

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

reflecting such orders and satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its own separate subsidiary contract to this overall contractual relationship.

34.     The material terms of the parties' agreement included, but was not limited to, a commitment by Virun to manufacture and deliver the product formulations set forth in the Purchase Orders in the quantity specified therein.  In exchange, Cymbiotika agreed to timely compensate Virun for the manufactured products.  Virun also agreed, either expressly or impliedly, to timely and honestly notify Cymbiotika if and when manufacturing or supply issues arose that might impact the delivery of products identified in the Purchase Orders.

35.     Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement of the type Virun had presented in draft to Cymbiotika.  Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret.  One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also have addressed the ownership of any formulations forged under that relationship. Cymbiotika expected that it would, and did, own the various formulations it developed with Virun consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

36.     Cymbiotika is informed and believes, and on that basis alleges, that Virun did not insist on entering into a manufacturing agreement, which would have further clarified the ownership of the formulations, because Virun desired the ability to make spurious legal claims if and when Cymbiotika decided to take its business elsewhere.  Cymbiotika is informed and believes, and on that basis alleges, that both Virun and Bromley knew from the outset that they intended to assert ownership over any formulation Virun developed with Cymbiotika despite Virun's express representations to the contrary.  Had Cymbiotika known that Virun and

12

142725897.4

Bromley were reserving the right to assert ownership over formulation developed with Cymbiotika, Cymbiotika would have never entered a business relationship with Virun.

37.    Founded upon an expressed understanding that Cymbiotika owned the product formulations that it developed or that were jointly-developed based on Cymbiotika's ideas, a working relationship eventually formed, as did a friendship between Bromley and Jafarieh.

38.    Substantiating the fact that the products were the result of **Cymbiotika first brining robust ideas and concepts to Virun, followed by** an extensive joint effort **to have Cymbiotika products manufactured,** and not simply a repackaging of some existing Virun formulation, is that it took six months from the time Virun and Cymbiotika began working together before there existed a formulation that met Cymbiotika's strict product specifications.  While Virun fixates on an email discussing "low-hanging fruit," Cymbiotika did not slap it label on any of Virun's "low-hanging fruit" formulations, which would not have required the extensive time and work required for each Virun formulation that Cymbiotika ultimately sold.

39.    The first fruit of this venture as Cymbiotika's Vitamin B-12 product. While Virun, as most supplement manufacturers, have an existing Vitamin B-12 formula, there is no trade secret around a Vitamin B-12 formulation that includes a specific amount of B-12.  To what amounted to a generic Vitamin B-12 formulation, Cymbiotika substituted in organic ingredients and added adenosylcobalamin and Vitamin B-6.  Any contention that the modifications Cymbiotika demanded and made were simply tweaks is utterly undermined by the six months between the time Cymbiotika and Virun began working on formulations and the completing of the a Vitamin B-12 product acceptable to Cymbiotika, which was the first Virun formulation that Cymbiotika sold.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS
142725897.4

40.    Cymbiotika provided Virun with its product concepts and the Parties executed Cymbiotika's plans together.  When these extended efforts proved successful, resulting in a finished product, Cymbiotika contracted with Virun to manufacture that product based on Cymbiotika's specifications.

41.    Virun had stock formulations for supplements already widely available on the marketplace, including formulation for a Vitamin C supplement and a Vitamin B12 supplement.  Cymbiotika, however, had no interest in simply repackaging generic formulations of supplements already widely available in the marketplace.  While Virun and Cymbiotika may have started with Virun's generic formulations, Cymbiotika insisted upon significant modifications to ensure the formulations sold under Cymbiotika's name were consistent with Cymbiotika's own ideas, strategies, and reputation for innovative products supporting premium prices.

42.    Cymbiotika's team consistently communicated with Virun's team to bring Cymbiotika's ideas to the table and to collaborate on Cymbiotika's product formulation development.  Cymbiotika's team provided and confirmed exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.

43.    Each of the products that Cymbiotika would eventually hire Virun to manufacture took months to develop and went through numerous revisions before meeting Cymbiotika's exacting standards.  The products that Cymbiotika hired Virun to manufacture were entirely distinct from any generic supplement formula that Virun may have possessed.

44.    While the Parties never entered into a formal manufacturing arrangement, the Parties utilized a purchase order system whereby Cymbiotika would place an order with Virun for a specific quantity of products to be delivered pursuant to an agreed-upon timeline.  Utilizing this system, Cymbiotika placed a

14

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

series of Purchase Orders ("Purchase Orders" or "POs") with Virun from mid-2019 until late 2021.

45.    One of the most important attributes of any supplement formulation is bioavailability, *i.e.* ensuring that the nutritional value of the supplement itself is digested by the consumer in a manner that will achieve maximum benefit for the consumer.  Cymbiotika understood Virun had innovative technology for optimizing bioavailability, which was an additional reason for seeking out Virun as a manufacturing partner.  In fact, Virun owns a number of patents claiming various aspects of its different manufacturing techniques.  Throughout its working relationship and collaborative processes, Virun never materially disclosed nor demonstrated any of these proprietary technical processes or manufacturing techniques.  Virun also never suggested that any of these techniques or processes were being protected as trade secrets rather than as claims made in issued patents. Cymbiotika lacks usable knowledge of Virun's manufacturing procedures and/or chemical methodology, which it frankly had no need to learn.

**Cymbiotika Brought Virun the Ideas to Virun to Co-Develop the Formulas**

46.    Cymbiotika did not private label a product with Virun.  To the contrary, in accordance with industry custom and practice, when a company "white labels," "private labels" or "licenses" products for another company, that relationship is governed by a written agreement.  Cymbiotika did not have a written agreement with Virun in this regard.  In fact, such an contract was offered by Virun, but it was rejected by Cymbiotika because it contained language that was directly at-odds with the representations made by Virun and the understanding of the parties: Cymbiotika owned the formulations for the products that it brought to the table, i.e., that were based on Cymbiotika's ideas.  This goes for each and every product manfactured by Virun for Cymbiotika.

47.    After some discussion, a business relationship was forged and Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and

15

142725897.4

visions.  Jamie Bigelow, Cymbiotika's Creative Director, provided Bromley with Cymbiotika's product ideas at the outset of their relationship in a correspondence dated on February 27, 2019 entitled "New Formulations."  Exhibit B.  This process, where Jafarieh provided Bigelow with his product concepts and Bigelow transmitted and executed these plans with Virun, became the process underlying Cymbiotika and Virun's working relationship.

48.    Jafarieh and Bigelow consistently communicated with Virun **to have Virun manufacture the products that Cymbiotika conceptualized** and to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.  Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

49.    Virun and Cymbiotika co-created products**, based on Cymbiotika's ideas and specifications,** from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnseium L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, Glutathione and Red Yeast Rice.  Each of these were derived from Jafarieh's ideas and specifications.  Cymbiotika understood and expected it owned the formulations developed with Virun, and Virun never suggested otherwise.

**Vitamin B12**:  Cymbiotika dictated the formulation for a Vitamin B12 product.    Jafarieh mandated the addition of fulvic acid complex, adenosyl-cobalamin, B6, and organic flavor terpenes.

**Vitamin C**:  Cymbiotika dictated the formulation for the Vitamin C product.  Beginning in or about January 2020, Cymbiotika co-created a Vitamin C product with Virun that incorporated Cymbiotika's ideas and concepts.  Among other things, Jafarieh insisted on adding bamboo silica.

16

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

**Activated Charcoal**:  Cymbiotika began creating the activated charcoal product in or about January 2020.  Virun did not have a private label of a similar product concept.  Jafarieh approached Bromley with the concept for this product and stated that Cymbiotika would source the charcoal raw material itself and provide this to Virun, along with any other ingredients Virun was missing.

**Magnseium L-Threonate**: Cymbiotika began developing its liposomal magnesium l-threonate product with Virun in or around March of 2020.  Virun did not offer a similar product concept as a private label.  Jarafrieh come to Virun to create a formula using a very specific form of brain magnesium.  Additionally, Jafarieh specified that this product formula should have a simple vanilla flavor and contain macadamia nut butter.

**Micelle Mushrooms**: In or about October 2019, Cymbiotika came to Virun with the concept of creating a seven-product blend of mushrooms in syrup form.  Exhibit C.  Virun did not have any similar product to this mushroom blend at the time.  Cymbiotika leveraged its relationship with a grower in San Diego to create chocolate mushrooms.

**Supergreens with Chlorophyll**: Cymbiotika began developing its supergreens with chlorophyll product, formerly known as sulforaphane, in or about June 2020. Jafarieh's idea for this novel product was to create a chlorophyll formula to market to Cymbiotika's predominantly vegan clientele to supplement the lower iron levels that result from a vegan, plant-based diet.

**Glutathione**:  Beginning in or about January 2020, Cymbiotika developed a glutathione product with Virun.  Cymbiotika added the probiotic strain, lactobicullus rhamnosus in creating the formula.

**Red Yeast Rice**.  Virun did not offer a product predicated on red yeast rice.  In the summer of 2020, Cymbiotika approached Virun about making a product based on red rice yeast.

17

142725897.4

50.    All of the products that Virun manufactured for Cymbiotika, **based on Cymbiotika's ideas and specifications,** went through an extensive development process that, for each of Cymbiotika's products, began with Cymbiotika, and lasted several months. This process included extensive back and forth discussions between Cymbiotika and Virun, whereby Cymbiotika drove the creative process to make certain that each Cymbiotika product manufactured by Virun were unique and geared towards Cymbiotika's clientele that preferred high-quality, plant-based products that justified premium prices.  Cymbiotika purposefully avoided what would have been the easy route: slapping its labels on existing Virun formulas even though the ingredients in those formulas did not meet Cymbiotika standards or specifications that its customers trust.

51.    Had Virun, consistent with the language contained in its form manufacturing agreement, raised the issue of ownership of the formulations and even suggested that Virun rather than Cymbiotika would own the formulations and that Virun would assert some trade secret protection over the formulas that Cymbiotika understood it jointly developed with Virun, the relationship would have immediately ceased.  Cymbiotika is informed and believes, and on that basis alleges, that Virun clearly understood, and lead Cymbiotika to believe, that such formulas were Cymbiotika's and not Virun property.  Cymbiotika is informed and believes, and on that basis alleges, that Virun did not follow up and document its relationship with Cymbiotika because it did not want to put into writing what Cymbiotika and Virun had orally agreed to – the the formulations were Cymbiotika's and not Virun's property.  Cymbiotika is informed and believes, and on that basis alleges, that Virun wanted to ensure some vagaries on ownership because Virun knew that it did not have the compacity or competence to actually manufacture these formulations to meet Cymbiotika needs.  Cymbiotika is informed and believes, and on that basis alleges, that Virun aways intended to have this bait and switch in its back pocket as weapon that it could use to force

142725897.4

Cymbiotika to continue to due business with Virun despite its incompetence as well as a weapon it could unload against Cymbiotika and possibly any future manufacturer to harm Cymbiotika if it left.

52.    Virun repeatedly confirmed that Cymbiotika owned the formulations. In a communication dated August 11, 2020, Bromley told Jafarieh that he (Bromley) could "promote your [Jafarieh] glutathione product on our webinar tomorrow.  I can use prohealth but would prefer yours."  In another communication from Bromley to Jafarieh, Bromley remarked that "[y]ou [Jafarieh] are involved and I respect you and Jamie for that."  In a video posted by Bromley on the internet,[4] Bromley remarked that Jafarieh was "educated," "smart" and that he "develop[ed] products."  Bromley repeatedly referred to Cymbiotika's products as "your" – Cymbiotika's – products.

53.    Virun never claimed ownership to any of Cymbiotika's formulas at the time they were being developed.  Indeed, Virun never asserted ownership until after its own mismanagement caused Virun to lose Cymbiotika's business.  Virun's instant ownership claims are driven by remorse, not the facts.

**Virun's Breaches of Purchase Orders Cause Damage to Cymbiotika's Business**

54.    After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was mismanaged, disorganized, and had severe supply chain difficulties.

55.    Virun consistently delayed fulfilling Purchase Orders and would frequently underdeliver.  Often, Virun refused to return phone calls and/or emails for weeks.  Virun ignored many desperate pleas for information regarding product fulfillment.  Purchase Orders were often cut short without warning or explanation.

56.    By way of example, Cymbiotika pre-paid for 10,000 units in one purchase order for delivery by a certain date.  On that date, Cymbiotika received

---

[4] https://www.youtube.com/watch?v=boxMr0xDfeU, last accessed February 24, 2023.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

1   6,000 units and was told that the remainder would have to be fulfilled later.  In

2   other instances, purchase orders were never filled and others were simply closed by

3   Virun without explanation.

4        57.    The initial lead time for products from Virun was 2-3 weeks from

5   Purchase Order to product delivery.  This eventually increased over to time to 4-6

6   and them later, from 8-12 weeks.  Cymbiotika frequently received no

7   communication from Virun throughout the times of delay to explain what was

8   happening internally or what an updated timeframe would look like for each

9   overdue Purchase Order.

10       58.    Cymbiotika's Purchase Orders with Virun specified certain unit

11  amounts of products for Virun to manufacture for Cymbiotika.  It is understood in

12  the industry that there might exist a variance of 3-5% on a manufacturing Purchase

13  Order that could result in overages or loss in production.  Such a variance would

14  have been within the expectations of the Parties.  However, Virun's Purchase

15  Orders had an exorbitant amount of loss compared to this normal variance and

16  Virun would often close a Purchase Order out after shipping a few increments over

17  time without fulfilling the entire order.  When Virun did so, Virun cited having a

18  higher loss in production than the 3-5% variance.  This excuse confounded

19  Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to

20  cover raw materials.  With such high amounts of "loss in production," it became

21  clear that Virun didn't buy enough raw materials to fulfill the orders within the

22  acceptable industry-wide variance.

23       59.    By way of further example, Cymbiotika at one point had placed its D3

24  and magnesium products offline because Virun could not keep up with the Purchase

25  Orders that Cymbiotika needed fulfilled.  Cymbiotika, had empty shelves on these

26  products as a result.  These items were Cymbiotika's best-selling products at the

27  time.  When Virun finally responded to Cymbiotika's inquiries into these product

28  delays, Cymbiotika received numerous conflicting updates on the magnesium

product production.   For example, Cymbiotika was told that the last thing Virun was waiting on to produce magnesium was the magtein raw material to come in from the supplier.  Cymbiotika thereafter directly corresponded with Virun's supplier to gain clarity.  Cymbiotika confirmed that the magtein was in fact available for Virun to pick up, but that Virun failed to arrange a pickup, causing even more delays.

60.    Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.  Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale but also caused a massive amount of churn and countless customer complaints.  Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with inventory.  Cymbiotika was consistently running out of stock of various products.

61.    Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.  Virun's constant delays and inability to deliver on Purchase Orders, timely and in full, caused Cymbiotika's business to suffer greatly.  Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding Purchase Orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

62.    Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

63.     Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on Purchase Orders constituted an existential threat to Cymbiotika. Cymbiotika had to transition to a manufacturer who could meet its rising demand.

### Virun's Social Media Smear Campaign

64.     Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

65.     Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic.  These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

66.     By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt."  Exhibit D. The user stated that:

> This ingredient is in several of CYMBIOTIKA's supplement products and has been shown to cause causer. . . CYMBIOTIKA does not want you to know this – BEWARE, they will delete-comments re anyone who questions them on this.  *Id.*

67.     The user specifically "tagged" a number of known Cymbiotika's customers to ensure that they saw the post.

68.     The user "contradiction2u" also posted a screenshot from Cymbtioka's own website, which reflected Cymbtioka's use of sorbic potassium salt in one of

nts

age    M Gmail    Q Maps    di Mail - philip.bromle...    GS Inbox - GigSalad    Virun

22

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

Cymbtioka's products. Exhibit D. Incredibly, the screenshot also shows the bookmark bar and bookmarks for Bromely's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.

69. As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself. As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations.

70. At all times relevant to the social media postings, Bromley was the President of Virun. On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

71. The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation. Bromley had once again created an existential threat to Cymbiotika. Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

72. Attached hereto as Exhibit D is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

73. Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign. However, the damage to Cymbiotika's reputation remained.

74. Cymbiotika is informed and believes, and on that basis alleges, that in addition to its social media campaign, Virun and Bromley continue to engage in an active campaign to tarnish Cymbiotika's reputation and continue to seek means to otherwise harm Cymbiotika. For example, Cymbiotika is informed and believes,

23

142725897.4

and on that basis alleges, that Virun hired Cymbiotika's former head of information technology for the sole purposes of "digging up dirt" on Cymbiotika. Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika. Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment. Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

## CLAIMS

## FIRST CLAIM FOR FRAUD IN THE INDUCEMENT

75. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

76. When exploring potential manufacturing partners, Elmi and Jafarieh, as principals of Cymbiotika, approached Bromley in his capacity as a principal of Virun and expressed Cymbiotika's interest in utilizing Virun's manufacturing services.

77. Virun made a series of false representation to Cymbiotika in order to induce Cymbiotika to select Virun as the manufacturer for its supplement line. These misrepresentations include, but are not limited to, assertions that Cymbiotika, and not Virun, would own any and all formulations that the Parties jointly developed or were developed from Cymbiotika's ideas. Virun reiterated the representations that Virun makes to all prospective customers as reflected on its website including that Virun does not produce private label products, but

24

142725897.4

collabulary develops unique products with its customers and that those formulations made with a customer's ideas are the customer's intellectual property.

78.     Virun's representations were made in writing and orally.  In late 2018, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.

79.     Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.]  Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client. Our products are developed on a project-by-project basis. Therefore, we do not sell private-label products.

80.     These representations, which were set forth on Virun's website and reviewed by Cymbiotika in late 2018, were expressly reiterated by its principals to induce Cymbiotika to enter into a contractual relationship. Specifically, in or around December of 2018, Virun's President and its Chief Operating Officer, respectively Bromley and Peter Hoosier, represented orally to Cymbiotika's Chief Executive Officer, Shahab Elmi, that Cymbiotika would own the formula for the products that Virun manufactured for Cymbiotika.

81.     Reasonably relying on Virun' representations, including that "[w]hen a client brings us an idea for development, the client owns that formulation," Cymbiotika entered into a business relationship with Virun, whereby Cymbiotika would bring product development concepts to Virun, Virun would manufacture dietary supplement products for Cymbiotika based on those concepts, and

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

Cymbiotika was induced to believe it would retain intellectual property ownership of the completed product formulations.

82.     Virun's repeated representations regarding formula ownership were critical to inducing Cymbiotika's to work with Virun.  Cymbiotika was interested in working with a manufacturer that would not only permit, but welcome companies to bring their own product and formula ideas to table, and that each company would own the formula.  Cymbiotika sought to avoid manufacturers that required its customers to simply choose already existing formulas and slapping their own labels and brand on them (otherwise known as white labeling or private label). Cymbiotika also wanted to avoid having to enter into a license arrangement for the formula.  Cymbiotika preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

83.     These representations made by Virun to Cymbiotika were false when made.  In particular, since Virun now contends that Virun, and not Cymbiotika, own the formulations that Virun developed with Cymbiotika, the representations Virun made to Cymbiotika were false when made and to the extent Virun prevails on its claim that it owns such formulations the representations were false when made.

84.     Virun knew that these representations it made to Cymbiotika were false when made or were in reckless disregard for their truth at the time they were made.

85.     Virun intended that Cymbiotika rely on these representations.  When Cymbiotika agreed to work with Virun, Cymbiotika did so on a handshake given the representations that Virun had made to Cymbiotika, both online (on Virun's website) and verbally during meetings.

86.     Cymbiotika reasonably relied on the representations of Virun in entering a business relationship with Virun.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

87.    Cymbiotika did not private label a product with Virun.  To the contrary, in accordance with industry custom and practice, when a company "white labels," "private labels" or "licenses" products for another company, that relationship is governed by a written agreement.  Cymbiotika did not have a written agreement with Virun in this regard.

88.    Relying on Virun's representations regarding ownership of the formulas,  Cymbiotika entered into a business relationship wo Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  Jamie Bigelow, Cymbiotika's Creative Director, provided Bromley with Cymbiotika's product ideas at the outset of their relationship in a correspondence dated on February 27, 2019 entitled "New Formulations."  Exhibit B.  This process, where Jafarieh provided Bigelow with his product concepts and Bigelow transmitted and executed these plans with Virun, became the process underlying Cymbiotika and Virun's working relationship.

89.    Jafarieh and Bigelow consistently communicated with Virun to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name. Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

90.    Virun and Cymbiotika co-created products from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnseium L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, and Glutathione. Jamie Dec.  Each of these were derived from Jafarieh's ideas and specifications. Cymbiotika understood and expected it owned the formulations developed with Virun, and Virun never suggested otherwise.

27

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

**Vitamin B12**:  Cymbiotika dictated the formulation for a Vitamin B12 product.   Jafarieh mandated the addition of fulvic acid complex, adenosyl-cobalamin, B6, and organic flavor terpenes.

**Vitamin C**:  Cymbiotika dictated the formulation for the Vitamin C product. Beginning in or about January 2020, Cymbiotika co-created a Vitamin C product with Virun that incorporated Cymbiotika's ideas and concepts. Among other things, Jafarieh insisted on adding bamboo silica.

**Activated Charcoal**:   Cymbiotika began creating the activated charcoal product in or about January 2020.  Virun did not have a private label of a similar product concept.  Jafarieh approached Bromley with the concept for this product and stated that Cymbiotika would source the charcoal raw material itself and provide this to Virun, along with any other ingredients Virun was missing.

**Magnseium L-Threonate**: Cymbiotika began developing its liposomal magnesium l-threonate product with Virun in or around March of 2020.  Virun did not offer a similar product concept as a private label.  Jarafrieh come to Virun to create a formula using a very specific form of brain magnesium. Additionally, Jafarieh specified that this product formula should have a simple vanilla flavor and contain macadamia nut butter.

**Micelle Mushrooms**: In or about October 2019, Cymbiotika came to Virun with the concept of creating a seven-product blend of mushrooms in syrup form.  Exhibit C.  Virun did not have any similar product to this mushroom blend at the time.  Cymbiotika leveraged its relationship with a grower in San Diego to create chocolate musrooms.

**Supergreens with Chlorophyll**: Cymbiotika began developing its supergreens with chlorophyll product, formerly known as sulforaphane, in or about June 2020. Jafarieh's idea for this novel product was to create a

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

chlorophyll formula to market to Cymbiotika's predominantly vegan clientele to supplement the lower iron levels that result from a vegan, plant-based diet.

**Glutathione**:  Beginning in or about January 2020, Cymbiotika developed a glutathione product with Virun.  Cymbiotika added the probiotic strain, lactobicullus rhamnosus in creating the formula.

**Red Yeast Rice**.  Virun did not offer a product predicated on red yeast rice. In the summer of 2020, Cymbiotika approached Virun about making a product based on red rice yeast.

91.    All of the products that Virun manufactured for Cymbiotika went through an extensive development process, each of which lasted several months and included extended back and forth discussions between Cymbiotika and Virun in order to obtain unique products geared to Cymbiotika's plant-based preference clientele that could be sold at premium prices.  It would be antithetical and likely damaging to Cymbiotika's business for Cymbiotika to simply slap a label on an existing Virun product concept when the ingredients included did not meet the brand quality standards that customers have grown to trust.

92.    Cymbiotika has been harmed by its reliance on these representations in an amount to be proved at trial.  Additionally, Cymbiotika will be irreparably harmed to the extent that Virun prevails on its claim that it owns any protectable trade secret in any formulation developed with Cymbiotika, such that money damages could not compensate such harm warranting the imposition of injunctive relief.

93.    Cymbiotika's reliance on Virun' representations were a substantial factor in causes Cymbiotika's harm.

94.    In making these false representations, Virun acted with fraud, malice, and oppression, entitling Cymbiotika to an award of punitive damages.

## SECOND CLAIM FOR NEGLIGENT MISREPRESENTATION

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

95.    Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

96.    Virun made a series of representations of fact, including that Cymbiotika would be the owner of any formulations that Cymbiotika developed with the Virun.

97.    Virun's representations were made in writing and orally.  In late 2018, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.

98.    Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.]  Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client. Our products are developed on a project-by-project basis. Therefore, we do not sell private-label products.

99.    These representations, which were set forth on Virun's website and reviewed by Cymbiotika in late 2018, were reiterated by its principals to induce Cymbiotika to enter into a contractual relationship. Specifically, in or around December of 2018, Virun's President and its Chief Operating Officer, respectively Bromley and Peter Hoosier, represented orally to Cymbiotika's Chief Executive Officer, Shahab Elmi, that Cymbiotika would own the formula for the products that Virun manufactured for Cymbiotika.

100.    These representations made by Virun to Cymbiotika were false when made.  In particular, since Virun now contends that Virun, and not Cymbiotika,

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

own the formulations that Virun developed with Cymbiotika, the representations Virun made to Cymbiotika were false when made and to the extent Virun prevails on its claim that it owns such formulations the representations were false when made.

101.    Virun's repeated representations regarding formula ownership were critical to inducing Cymbiotika's to work with Virun.  Cymbiotika was interested in working with a manufacturer that would not only permit, but welcome companies to bring their own product and formula ideas to table, and that each company would own the formula.  Cymbiotika sought to avoid manufacturers that required its customers to simply choose already existing formulas and slapping their own labels and brand on them (otherwise known as white labeling or private label). Cymbiotika also wanted to avoid having to enter into a license arrangement for the formula.  Cymbiotika preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

102.    Although Virun may have honestly believed that their representations were true when made, Virun had no reasonable grounds for believing that representation was true when made.

103.    Virun intended that Cymbiotika rely on these representations.  When Cymbiotika agreed to work with Virun, Cymbiotika did so on a handshake given the representations that Virun had made to Cymbiotika, both online (on Virun's website) and verbally during meetings.

104.    Cymbiotika did in fact rely on Virun's representations in deciding to enter into a business relationship with Virun and such reliance was reasonable.

105.    Cymbiotika did not private label a product with Virun.  To the contrary, in accordance with industry custom and practice, when a company "white labels," "private labels" or "licenses" products for another company, that

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS
142725897.4

relationship is governed by a written agreement.  Cymbiotika did not have a written agreement with Virun in this regard.

106.   Relying on Virun's representations regarding ownership of the formulas,  Cymbiotika entered into a business relationship wo Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  Jamie Bigelow, Cymbiotika's Creative Director, provided Bromley with Cymbiotika's product ideas at the outset of their relationship in a correspondence dated on February 27, 2019 entitled "New Formulations."  Exhibit B.  This process, where Jafarieh provided Bigelow with his product concepts and Bigelow transmitted and executed these plans with Virun, became the process underlying Cymbiotika and Virun's working relationship.

107.   Jafarieh and Bigelow consistently communicated with Virun to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.  Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

108.   Virun and Cymbiotika co-created products from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnseium L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, and Glutathione.  Jamie Dec.  Each of these were derived from Jafarieh's ideas and specifications.  Cymbiotika understood and expected it owned the formulations developed with Virun, and Virun never suggested otherwise.

**Vitamin B12**:  Cymbiotika dictated the formulation for a Vitamin B12 product.  Jafarieh mandated the addition of fulvic acid complex, adenosyl-cobalamin, B6, and organic flavor terpenes.

**Vitamin C**:  Cymbiotika dictated the formulation for the Vitamin C product.  Beginning in or about January 2020, Cymbiotika co-created a Vitamin C

32

product with Virun that incorporated Cymbiotika's ideas and concepts. Among other things, Jafarieh insisted on adding bamboo silica.

**Activated Charcoal**:   Cymbiotika began creating the activated charcoal product in or about January 2020.  Virun did not have a private label of a similar product concept.  Jafarieh approached Bromley with the concept for this product and stated that Cymbiotika would source the charcoal raw material itself and provide this to Virun, along with any other ingredients Virun was missing.

**Magnseium L-Threonate**: Cymbiotika began developing its liposomal magnesium l-threonate product with Virun in or around March of 2020.  Virun did not offer a similar product concept as a private label.  Among other things, Jafarieh specified that this product formula should have a simple vanilla flavor and contain macadamia nut butter.

**Micelle Mushrooms**: In or about October 2019, Cymbiotika came to Virun with the concept of creating a seven-product blend of mushrooms in syrup form.  Exhibit C.  Virun did not have any similar product to this mushroom blend at the time.  Cymbiotika leveraged its relationship with a grower in San Diego to create chocolate mushrooms.

**Supergreens with Chlorophyll**: Cymbiotika began developing its supergreens with chlorophyll product, formerly known as sulforaphane, in or about June 2020. Jafarieh's idea for this novel product was to create a chlorophyll formula to market to Cymbiotika's predominantly vegan clientele to supplement the lower iron levels that result from a vegan, plant-based diet.

**Glutathione**:  Beginning in or about January 2020, Cymbiotika developed a glutathione product with Virun.  Cymbiotika added the probiotic strain, lactobicullus rhamnosus in creating the formula.

109.   All of the products that Virun manufactured for Cymbiotika went through an extensive development process, each of which lasted several months and

33

142725897.4

1  included extended back and forth discussions between Cymbiotika and Virun in

2  order to obtain unique products geared to Cymbiotika's plant-based preference

3  clientele that could be sold at premium prices.  It would be antithetical and likely

4  damaging to Cymbiotika's business for Cymbiotika to simply slap a label on an

5  existing Virun product concept when the ingredients included did not meet the

6  brand quality standards that customers have grown to trust.

7      110.  Cymbiotika has suffered damages in an amount to be proven at trial.

8      111.  Cymbiotika's reliance on Virun's representations were a substantial

9  factor in causing Cymbiotika harm

10              **THIRD CLAIM FOR BREACH OF CONTRACT**

11      112.  Cymbiotika repeats and realleges the allegations of the preceding

12  paragraphs 1-64 as if fully set forth herein.

13      113.  Cymbiotika and Virun entered into a contract whereby, after

14  formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika

15  would own the formulation and agreed to purchase product manufactured based on

16  that formulation and packaged consistent with Cymbiotika's specifications from

17  Virun.  While there is no writing reflecting all of the terms of this development and

18  manufacturing arrangement, each order for a specific formulation is reflected in

19  Purchase Orders and similar ancillary documentation reflecting such orders and

20  satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its

21  own separate subsidiary contract to this overall contractual relationship.

22      114.  More specifically, Cymbiotika and Virun entered into a contract

23  whereby, after formulations developed to Cymbiotika's satisfaction were complete,

24  Cymbiotika would own the formulation and agreed to purchase product

25  manufactured based on that formulation and packaged consistent with Cymbiotika's

26  specifications from Virun.  While there is no writing reflecting all of the terms of

27  this development and manufacturing arrangement, each order for a specific

28  formulation is reflected in Purchase Orders and similar ancillary documentation

34

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

1   reflecting such orders and satisfaction of such orders.  Moreover, each of these

2   Purchase Orders constitutes its own separate subsidiary contract to this overall

3   contractual relationship.

4        115.   The material terms of the parties' agreement included, but was not

5   limited to, a commitment by Virun manufacture and deliver the product

6   formulations set forth in the Purchase Orders in the quantity specified therein.  In

7   exchange, Cymbiotika agreed to timely compensate Virun for the manufactured

8   products.  Virun also agreed, either expressly or impliedly, to timely and honestly

9   notify Cymbiotika if and when manufacturing or supply issues arose that might

10  impact the delivery of products identified in the Purchase Orders.

11       116.   Cymbiotika did all, or substantially, all of the significant things that

12  the contract and each subsidiary contract required it to do, unless it was otherwise

13  excused from having to do.

14       117.   Virun breached this contract and one or more of the subsidiary

15  contracts by, among other things, repeatedly failing to deliver paid-for product in

16  full, on time, and in the agreed-upon lead times, resulting in financial and

17  reputational damages to Cymbiotika.

18       118.   Virun consistently delayed fulfilling Purchase Orders and would

19  frequently underdeliver.  Often, Virun refused to return phone calls and/or emails

20  for weeks.  Virun ignored many desperate pleas for information regarding product

21  fulfillment.  Purchase Orders were often cut short without warning or explanation.

22       119.   By way of example, Cymbiotika pre-paid for 10,000 units in one

23  purchase order for delivery by a certain date.  On that date, Cymbiotika received

24  6,000 units and was told that the remainder would have to be fulfilled later.  In

25  other instances, purchase orders were never filled and others were simply closed by

26  Virun without explanation.

27       120.   The initial lead time for products from Virun was 2-3 weeks from

28  Purchase Order to product delivery.  This eventually increased over to time to 4-6

and them later, from 8-12 weeks.  Cymbiotika frequently received no communication from Virun throughout the times of delay to explain what was happening internally or what an updated timeframe would look like for each overdue Purchase Order.

121.   Cymbiotika's Purchase Orders with Virun specified certain unit amounts of products for Virun to manufacture for Cymbiotika.  It is understood in the industry that you have a variance of 3-5% on a manufacturing Purchase Order that could result in overages or loss in production.  This variance would have been understandable.  However, Virun's Purchase Orders had an exorbitant amount of loss compared to this normal variance and would often close a PO out after shipping a few increments over time without fulfilling the entire order.  When Virun did so, Virun cited having a higher loss in production than the 3-5% variance.  This excuse confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials.  With such high amounts of "loss in production," it became clear that Virun didn't buy enough raw materials to fulfill the exact orders within the acceptable industry-wide variance.

122.   By way of further example, Cymbiotika at one point had placed its D3 and magnesium products offline because Virun could not keep up with the Purchase Orders that Cymbiotika needed fulfilled.  Cymbiotika, had empty shelves on these products as a result.  These items were Cymbiotika's best-selling products at the time.  When Virun finally responded to our inquiries into these product delays, Cymbiotika received numerous conflicting updates on the magnesium product production.   For example, Cymbiotika was told that the last thing Virun was waiting on to produce magnesium was the magtein raw material to come in from the supplier.  Cymbiotika thereafter directly corresponded with Virun's supplier to gain clarity.  Cymbiotika confirmed that the magtein was in fact available for Virun to pick up, but that Virun failed to arrange a pickup, causing even more delays.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

123.   Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.  Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale but also caused a massive amount of churn and countless customer complaints.  Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with inventory.  Cymbiotika was consistently running out of stock of various products.

124.   Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.  Virun's constant delays and inability to deliver on Purchase Orders timely and in full, caused Cymbiotika's business to suffer greatly.  Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding Purchase Orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

125.   Virun's breaches of the contract and one or more of the subsidiary contracts proximately and actually damaged Cymbiotika because without timely delivery from Virun, Cymbiotika was unable to fulfill outstanding product orders from its paying customers.

126.   As a direct and proximate result of Virun's breaches of Purchase Orders, Cymbiotika has suffered damages in an amount to be proven at trial.

**FOURTH CLAIM FOR BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING**

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

127.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs 1-47 and 67-72 as if fully set forth herein.

128.   Cymbiotika and Virun entered into a contract, whereby after formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika would own the formulation and agreed to purchase product manufactured based on that formulation and packaged consistent with Cymbiotika's specifications from Virun.  While there is no writing reflecting all of the terms of this development and manufacturing arrangement, each order for a specific formulation is reflected in Purchase Orders and similar ancillary documentation reflecting such orders and satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its own separate subsidiary contract to this overall contractual relationship.

129.   More specifically, Cymbiotika and Virun entered into a contract whereby, after formulations developed to Cymbiotika's satisfaction were complete, Cymbiotika would own the formulation and agreed to purchase product manufactured based on that formulation and packaged consistent with Cymbiotika's specifications from Virun.  While there is no writing reflecting all of the terms of this development and manufacturing arrangement, each order for a specific formulation is reflected in Purchase Orders and similar ancillary documentation reflecting such orders and satisfaction of such orders.  Moreover, each of these Purchase Orders constitutes its own separate subsidiary contract to this overall contractual relationship.

130.   The material terms of the parties' agreement included, but was not limited to, a commitment by Virun manufacture and deliver the product formulations set forth in the Purchase Orders in the quantity specified therein.  In exchange, Cymbiotika agreed to timely compensate Virun for the manufactured products.  Virun also agreed, either expressly or impliedly, to timely and honestly notify Cymbiotika if and when manufacturing or supply issues arose that might impact the delivery of products identified in the Purchase Orders.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

131.   Cymbiotika performed all conditions precedent to demanding performance from Virun on the contract and any subsidiary contract, except for those obligations waived, excused, or prevented by Virun.

132.   The contract and the subsidiary contracts include an implied covenant of good faith and fair dealing.

133.   Virun consistently delayed fulfilling Purchase Orders and would frequently underdeliver.  Often, Virun refused to return phone calls and/or emails for weeks.  Virun ignored many desperate pleas for information regarding product fulfillment.  Purchase Orders were often cut short without warning or explanation.

134.   By way of example, Cymbiotika pre-paid for 10,000 units in one purchase order for delivery by a certain date.  On that date, Cymbiotika received 6,000 units and was told that the remainder would have to be fulfilled later.  In other instances, purchase orders were never filled and others were simply closed by Virun without explanation.

135.   The initial lead time for products from Virun was 2-3 weeks from Purchase Order to product delivery.  This eventually increased over to time to 4-6 and them later, from 8-12 weeks.  Cymbiotika frequently received no communication from Virun throughout the times of delay to explain what was happening internally or what an updated timeframe would look like for each overdue Purchase Order.

136.   Cymbiotika's Purchase Orders with Virun specified certain unit amounts of products for Virun to manufacture for Cymbiotika.  It is understood in the industry that you have a variance of 3-5% on a manufacturing Purchase Order that could result in overages or loss in production.  This variance would have been understandable.  However, Virun's Purchase Orders had an exorbitant amount of loss compared to this normal variance and would often close a PO out after shipping a few increments over time without fulfilling the entire order.  When Virun did so, Virun cited having a higher loss in production than the 3-5% variance.

39

142725897.4

This excuse confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials.  With such high amounts of "loss in production," it became clear that Virun didn't buy enough raw materials to fulfill the exact orders within the acceptable industry-wide variance.

137.  By way of further example, Cymbiotika at one point had placed its D3 and magnesium products offline because Virun could not keep up with the Purchase Orders that Cymbiotika needed fulfilled.  Cymbiotika, had empty shelves on these products as a result.  These items were Cymbiotika's best-selling products at the time.  When Virun finally responded to our inquiries into these product delays, Cymbiotika received numerous conflicting updates on the magnesium product production.   For example, Cymbiotika was told that the last thing Virun was waiting on to produce magnesium was the magtein raw material to come in from the supplier.  Cymbiotika thereafter directly corresponded with Virun's supplier to gain clarity.  Cymbiotika confirmed that the magtein was in fact available for Virun to pick up, but that Virun failed to arrange a pickup, causing even more delays.

138.  Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.  Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale but also caused a massive amount of churn and countless customer complaints.  Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with inventory.  Cymbiotika was consistently running out of stock of various products.

139.  Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.  Virun's constant delays and inability to deliver on Purchase Orders timely and in full, caused Cymbiotika's business to suffer greatly.  Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for

40

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

updates and information on outstanding Purchase Orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

140.    Virun breached this covenant by, among other things, acting in bad faith and engaging in conduct that frustrated Cymbiotika's rights with respect to the intended benefits and purpose of the contract and subsidiary contracts.

141.    Virun's repeated inabilities to fulfill Purchase Orders in a timely and complete manner, as well as frequent refusals to respond to reasonable requests for order fulfillment statuses, frustrated Cymbiotika's enjoyment of the benefits of the underlying Purchase Orders.  Additionally, Virun's assertion that it now owns the formulations developed with Cymbiotika interferes with an intended benefit of this contract.

142.    As a direct and proximate result of Virun's breaches of the implied covenant of good faith and fair dealing, Cymbiotika has suffered damages in an amount to be proven at trial.

## FIFTH CLAIM FOR FALSE ADVERTISING UNDER THE LANHAM ACT
## 15 U.S.C. § 1125(a)

143.    Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

144.    Beginning no later than November 2021, Virun engaged in a campaign of making false statement concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

145.    Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an

41

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic. These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

146. By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt." Exhibit D. The user stated that:

> This ingredient is in several of CYMBIOTIKA's supplement products
> and has been shown to cause causer. . . CYMBIOTIKA does not want
> you to know this – BEWARE, they will delete-comments re anyone
> who questions them on this. *Id.*

147. The user "tagged" a number of Cymbiotika's customers to ensure that they saw the post.

148. The user "contradiction2u" also posted a screenshot from Cymbtioka's own website, which reflected Cymbtioka's use of sorbic potassium salt in one of Cymbtioka's products. Exhibit D. Incredibly, the screenshot also which shows the bookmark bar and bookmarks for Bromely's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.



149. As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself. As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations.

42

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

150.   At all times relevant to the social media postings, Bromley was the President of Virun.  On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

151.   The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.  Bromley had once again created an existential threat to Cymbiotika.  Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

152.   Attached hereto as Exhibit D is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

153.   Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign.  However, the damage to Cymbiotika's reputation remained.

154.   Virun's assertions about the safety and efficacy of Cymbiotika's products are false and plainly untrue.  In particular, Virun have specialized knowledge in the field of nutritional supplements and whether they are or are not known to be carcinogenic.  Further, as Cymbiotika's manufacturer, Virun was uniquely positioned to appreciate the fact that none of the ingredients in Cymbiotika's products were known to be carcinogenic.  Virun was aware of the falsity of the statements at the time of their publication.

155.   Virun made false assertions about Cymbiotika's products as part of commercial advertisements, including social media posts, for the purpose of influencing consumers to refrain from purchasing Cymbiotika's products and were disseminated sufficiently to the relevant purchasing public on social media.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

156.   Virun made all such statements in commercial advertising in interstate commerce, including in California, in order to misrepresent the nature, characteristics, and qualities of Cymbiotika's goods and services.

157.   Virun's false statements regarding Cymbiotika's products are deceptive and are likely to influence consumers' purchasing decisions.

158.   Given its intimate knowledge of Cymbiotika's ingredients and high standards for same, Virun knew that Cymbiotika's new products did not lack the safety and efficacy Counterclaim Defendants publicly asserted.  Virun therefore made the false and disparaging statements willfully and with an intent to deceive consumers.

159.   As a direct and proximate result of Virun's false and disparaging publications, Cymbiotika has suffered damages in an amount to be proven at trial. Additionally, any continued false advertising by Virun of the safety or efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm warranting injunctive relief.

160.   Virun acted here in a willful and wanton manner and as a result, Cymbiotika is entitled to enhanced damages.

161.   Cymbiotika is entitled to an award of attorneys' fees because of the exceptional nature of Virun's conduct.

## <u>SIXTH CLAIM FOR TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS</u>

162.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

163.   Cymbiotika has subscription contract with its customers whereby Cymbiotika supplies such customers with products on a recuring basis.

164.   Virun knew of Cymbiotika's subscription-based relationship with its customers.

44

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

165.   Virun interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

166.   Virun intended their conduct to disrupt these subscription contracts or knew that it was substantially certain that their conduct would disrupt these contracts.

167.   As a direct and proximate result of Virun's interference, Cymbiotika has suffered damages in an amount to be proven at trial.

168.   Virun acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## SEVENTH CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

169.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

170.   Cymbiotika has an economic relationship with its non-subscription based customers, as well as potential customers who would be interested in the products that it sells that probably would have resulted in an economic benefit Cymbiotika.

171.   Virun knew of Cymbiotika's customers, as well as potential customers who may be interested in Cymbiotika's products.

172.   Virun interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products, and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.  This interference is independently wrongful because the statement

45

142725897.4

made were false and independently support a claim for trade liable and false advertising.

173.    Virun intended its conduct to disrupt these economic relationships or knew that it was substantially certain that their conduct would disrupt these relationships.

174.    As a direct and proximate result of Virun's interference, Cymbiotika has suffered damages in an amount to be proven at trial.

175.    Virun acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## EIGHTH CLAIM FOR UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

176.    Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

177.    Virun engaged in unlawful, unfair, or fraudulent business practices in violation of Section 17200 of the California Business and Professions Code ("Section 17200"), by among other things, affirmatively misrepresenting on its website that "when a client brings us an idea for development, the client owns that formulation" while knowingly intending to retain intellectual property ownership of any product development it formulated with Cymbiotika, and by making false statements about Cymbiotika's products.

178.    Virun also engaged in unlawful, unfair, or fraudulent business practices in violation of Section 17200 by engaging in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

179.    Virun's unlawful, unfair, or fraudulent business practices in violation of Section 17200 proximately caused actual injury to Cymbiotika by harming its competitive standing and hindering its prospective contractual relations.

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4

180.   As a direct and proximate result of Virun's unlawful, unfair, or fraudulent business practices in violation of Section 17200, Cymbiotika has been harmed in an amount to be proven at trial.  Additionally, Virun's conduct, to the extent it continues, will cause irreparable harm warranting injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Cymbiotika respectfully request that this Court enter judgment in their favor and against Virun and provide the following relief:

a.   Compensatory damages, incidental damages and consequential damages;

b.   Costs of suit, interest, and reasonable attorneys' fees;

c.   Pre and post-judgment interest;

d.   Punitive damages;

e.   Such other relief as this Court deems just and equitable.

Dated:   February 24, 2023              **FOX ROTHSCHILD LLP**

*/s/ John Shaeffer*

John Shaeffer
Jeffrey H. Grant
Carly Klein
Attorneys for Defendants and
Counterclaimant

47

1

## **DEMAND FOR JURY TRIAL**

2          In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by

3     jury on all issues so triable.

4

5     Dated:          February 24 2023                **FOX ROTHSCHILD LLP**

6

7                                                      */s/ John Shaeffer*

8                                                      John Shaeffer
                                                      Jeffrey H. Grant
9                                                      Carly Klein
                                                      Attorneys for Defendants and
10                                                     Counterclaimant

11

12

13

14

15          **PURSUANT TO THE COURT'S FEBRUARY 10, 2023 ORDER, A**

16     **"REDLINED" VERSION OF THE AMENDED COUNTERCLAIMS IS**

17                              **ATTACHED AS EXHIBIT E**

18

19

20

21

22

23

24

25

26

27

28

CYMBIOTIKA'S SECOND AMENDED COUNTERCLAIMS

142725897.4