1  JOHN J. SHAEFFER (SBN 138331)
     JShaeffer@FoxRothschild.com
2  JEFFREY H. GRANT (SBN 218974)
     JGrant@FoxRothschild.com
3  CARLY KLEIN (SBN 340691)
     CKlein@Foxrothschild.com
4  FOX ROTHSCHILD LLP
   Constellation Place
5  10250 Constellation Blvd, Suite 900
   Los Angeles, CA 90067
6  Telephone:  310.598.4150
   Facsimile:   310.556.9828
7
8  Attorneys for Defendant and Cross-
   Claimant Cymbiotika, LLC and
   Defendants Chervin Jafarieh and
9  Shahab Elmi

10

## UNITED STATES DISTRICT COURT

11

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

12

| | |
|---|---|
| 13  VIRUN, INC., | Case No. 8:22-CV-00325-WLH-DFM |
| 14             Plaintiff, | Hon. Wesley L. Hsu |
| 15       v. | **CYMBIOTIKA LLC'S THIRD AMENDED COUNTERCLAIMS AGAINST VIRUN, INC. FOR:** |
| 16  CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an | |
| 17  individual; SHAHAB ELMI, an individual; and DOES 1 through 10, | **(1)  Fraud;** |
| 18  inclusive, | **(2)  Negligent Misrepresentation;** |
| 19             Defendants. | **(3)  Breach of Contract;** |
| 20  CYMBIOTIKA LLC, a limited liability company, | **(4)  Breach of the Covenant of Good Faith and Fair Dealing;** |
| 21  | **(5)  False Advertising under the Lanham Act - 15 U.S.C. § 1125(a); and** |
| 22             Counterclaimant, | |
| 23       v. | **(6)  Tortious Interference with Contractual Relations** |
| 24  VIRUN, INC. a California Corporation, and Roes 1 to 10 inclusive. | |
| 25  | **DEMAND FOR JURY TRIAL** |
| 26             Counterclaim Defendants. | |
| 27  | |
| 28  CONTINUED ON NEXT PAGE | |

CONTINUED ON NEXT PAGE

1

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

1

2

CYMBIOTIKA LLC, a limited liability
company,

                    Third-Party Complainant,

3

4

          v.

5

PHILLIP BROMLEY, an individual,

6

                    Third-Party Defendant.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

2

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

**INTRODUCTION**

1.      When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was unable to meet its contractual obligations to Defendant and Counterclaimant Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult decision to move the manufacturing of Cymbiotika's dietary supplements from Virun to another manufacturer.[1]  This decision was particularly frustrating because over the course of nearly two years, Cymbiotika had invested millions of dollars working specifically with Virun.  A move to another manufacturer – compelled by Virun's incompetence – could further disrupt Cymbiotika's business, which is predicated upon its subscriber-customers receiving their products on time on a monthly basis.  In particular, Cymbiotika knew that the disruption to this monthly cadence would cause subscribers to cancel their subscriptions and get their dietary supplements elsewhere.

2.      Cymbiotika had spent more than a year working hand-in-hand with Virun to develop a line of unique products after being induced by Virun's representation that the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas, would be Cymbiotika's intellectual property.  Had Virun and its President, Third-Party Defendant Phillip Bromley ("Bromley"), not made such representations to Jafarieh and Elmi, Cymbiotika, they would have never done business with Virun.

3.      Embarrassed by their own ineptitude and jilted as a result of losing Cymbiotika's business and the friendship of Jafarieh, Virun and Bromley lashed out when Cymbiotika took its growing business elsewhere.  Bromley first took to social media to engage in an anonymous, weeks' long smear campaign to disparage Cymbiotika and its products by publishing social media posts – that specifically

---

[1] Together, Virun and Cymbiotika will sometimes be referred to as the "Parties."

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

1  targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new

2  Vitamin C formulation included cancer causing agents.    Cymbiotika saw a

3  meaningful uptick in customers canceling their Vitamin C subscriptions during this

4  campaign and received a slew of one-star (1*) reviews on Google, at least one of

5  which repeated the defamatory remarks that Bromley and Virun had made a few

6  weeks prior about the very formulations that Virun now claim Cymbiotika

7  misappropriated.

8      4.    Months after Bromley's smear campaign, Virun changed strategy and

9  claimed for the first time that Cymbiotika's new Vitamin C formulation, along with

10 its other new formulations, were instead actually Virun's proprietary formulations.

11 From this narrative stems Virun's far-fetched allegation that Cymbiotika's use of

12 those formulations constitutes a misappropriation of Virun's trade secrets.  Of course,

13 Virun's original ruse to mount baseless accusations that Cymbiotika's new

14 formulations cause cancer is wholly incompatible with its second scheme to assert

15 that Virun owns those same formulations.

16     5.    Virun makes these spurious claims despite its own website representing

17 to potential and current clients – including Cymbiotika – that Virun does not make

18 private label products but instead works with each client to develop unique

19 formulations.  Virun's website emphatically represents to Virun's prospective clients

20 that **the client**, not Virun, owns the formulations that Virun manufacturers in

21 collaboration with its clients.  This and other representations were expressly repeated

22 or reaffirmed throughout the Parties' entire relationship by not only what Virun said

23 – *e.g.*, Virun and Bromley always referring to the products as "Cymbiotika products"

24 or "your products" – but what they didn't say.  Not once during the term of Parties'

25 relationship did Virun ever refer to the products as "Virun's products" or claim

26 ownership over the product formulas.  In fact, Virun did not make this claim until

27 months after the relationship was terminated. While Virun now disavows these

28

4

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

representations, such a bait-and-switch is not tolerated under the law and constitutes, at the very least, unfair competition.

## THE PARTIES

6.      Cymbiotika is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in San Diego, California.

7.      Upon information and belief, Virun is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business in this District.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the matter pursuant to Virun's First Amended Complaint ("FAC") (Dkt. No. 92), to which this Counterclaim relates, which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq.*  This court has subject matter jurisdiction over the Counterclaims pursuant to 28 U.S.C. §§ 1331, 1338, and 1367.

9.      This Court has personal jurisdiction over Virun, and venue is proper in this District, because Virun has invoked the jurisdiction of this Court by filing its FAC in this Court.

10.      Venue is proper in this District pursuant to 28 U.S.C. § 1391.

## NATURE OF THE ACTION

11.      Cymbiotika seeks damages and injunctive relief for acts of fraud, breach of contract, tortious interference, and unfair competition engaged in by Virun in violation of the laws of the United States and the State of California.  In particular, this case concerns Virun' breaches of contractual obligations to Cymbiotika, willful and deliberate acts of false advertising, and related claims.

# FACTUAL BACKGROUND

## Preliminary Discussions Between Cymbiotika and Virun

12.     Cymbiotika is a popular health supplement company that designs high-end, industry-leading, organic, and original formulations for direct-to-consumer sales, predominantly driven by an online subscription model.  Chervin Jafarieh is a founder and member of Cymbiotika.  Shahab Elmi is a co-founder, member, and CEO of Cymbiotika.

13.     Cymbiotika was a thriving business prior to ever meeting with Virun.  Cymbiotika had already developed and marketed an Omega product that was met with success.  During this time, Cymbiotika had spent months conceptualizing, developing, and planning for the sale of additional products that would become the Cymbiotika product line.  It was at this point that Cymbiotika needed to expand and find a manufacturer that could accommodate Cymbiotika's growing product lines and the unique challenges associated with the bespoke formulas that were the cornerstone of Cymbiotika's brand and business plans.

14.     In late 2018, Cymbiotika was looking to develop a liposomal version of its uniquely vegan Omega 3/EPA supplement and began contacting various contract manufacturers of liposomal emulsions. Cymbiotika researched and was in communications with numerous potential manufacturers.  Algorithm, the Canadian company that manufactured B12 oil for Omega products for Cymbiotika, suggested that Cymbiotika consider Virun, which was also located in Southern California.

15.     In late 2018, Cymbiotika conducted basic due diligence regarding Virun.  For one, Cymbiotika carefully reviewed and considered Virun's website.  At the time, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

[A.] When a client brings us an idea for development, the client owns that formulation.  This is the most common scenario.  However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.[2]

16.    Virun also represented on its website, in its FAQ section, and contrary to the representations that it has made in this case, that it does not sell private-label products and that each formulation it makes for a customer is custom and not some off the shelf formula:

[Q.] Does Virun sell private-label products?

[A.] No.  Every product we create is a custom formulation based on collaboration with our client.  Our products are developed on a project-by-project basis.  Therefore, we do not sell private-label products.[3]

A copy of these representations made on Virun's website is attached hereto as **Exhibit E**.

17.    After Jafarieh and Elmi reviewed Virun's website, including the FAQs, which set forth Virun's policy – that Virun's customers would own the formulas – they discussed the pros and cons of working with Virun.  Elmi and Jafarieh agreed that Virun's policy, *i.e.*, that Cymbiotika would own its own formulas, was critical to Cymbiotika's brand and business model.

18.    Relying on these representations, Cymbiotika reached out to Virun to discuss a potential business relationship.  Virun was simply one of several liposomal formulators/manufacturers that Cymbiotika was considering at the time.

**Confidentiality Agreement and Conception of Formal Business Relationship**

19.    After email exchanges in late 2018, Jafarieh traveled to Virun's facility in Pomona, California on January 8, 2019, and met with Bromley and other Virun employees.  To facilitate frank discussions about commencing a potential vendor-

---

[2] https://virun.com/faq/, last accessed February 24, 2023.
[3] https://virun.com/faq/, last accessed February 24, 2023.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

manufacturer relationship, Jafarieh, on behalf of Cymbiotika, and Bromley, on behalf of Virun, executed Virun's form Confidentiality Agreement on January 8, 2019.  A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

20.    By its express terms, the Confidentiality Agreement was limited to "discussions concerning a possible future business or research relationship."  To the extent a relationship was forged, and the Parties believed there was a need to cloak an actual business relationship in confidentiality, such a term would need to be negotiated and included in any subsequent manufacturing and/or supply agreement. In fact, Virun provided Cymbiotika with drafts of precisely such agreements during these negotiations that included confidentiality language.  This and many other circumstances demonstrate conclusively that Virun itself knew that the exploratory Confidentiality Agreement was limited to pre-business discussions.

21.    Following the execution of the Confidentiality Agreement, Jafarieh discussed Cymbiotika's business and desires, including the importance that it owned its formulas.

22.    While Virun represented to Cymbiotika that it has some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product.  Instead, Cymbiotika specifically sought out to hire a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's brand and business strategies as an innovative leader with the overarching goal to be "first to market" with each of its products.  Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

23.    Bromley and others at this January 8, 2019 meeting confirmed the statements made on Virun's website – that it was Virun's practice, and would continue to be Virun's practice – that formulas developed based on a customer's idea

8

345656\00001\147722615.2

are owned by that customer, and that this was the most common scenario.  In fact, Jafarieh would not have traveled to Pomona for this meeting had Bromley not stated that Cymbiotika would own all formulas based on Cymbiotika's ideas if it contracted with Virun.  Virun would thereafter repeat these representations to several other Cymbiotika employees during formula development.

24.   Virun's repeated representations both during this January 8, 2019 meeting and subsequently thereafter regarding formula ownership were critical to inducing Cymbiotika to work with Virun.  Cymbiotika wanted a manufacturer that would not only allow it to bring its own products and formula ideas to the table, but also to retain ownership over such formulas.  Cymbiotika specifically sought to avoid manufacturers that required its customers to choose pre-existing formulas and simply sell those formulas under a different label and brand (otherwise known as "white labeling" or "private labeling").  Cymbiotika also wanted to avoid having to enter into a license arrangement for the formulas.  Cymbiotika's preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

25.   Cymbiotika is informed and believes, and on that basis alleges, that Virun and Bromley knew that the ownership statements that Cymbiotika would own all the formulations developed by Virun based on ideas Cymbiotika brought to Virun for development – including the ownership statements on Virun's website and reiterated verbally by Bromley and others to Cymbiotika – were false when made.  Specifically, Cymbiotika is informed and believes, and on that basis alleges, that at the time these representations were made it was not "the most common scenario" that Virun's customers owned their formulas that Virun developed based on the customers' idea.  In fact, Cymbiotika is informed and believes, and on that basis alleges, that Virun did not have a single contractual relationship with any of its existing customers where the customer owned its formula developed by Virun based

9

on the customers' idea.  Cymbiotika is informed and believes, and on those bases alleges, that at this time when Bromley represented to Jafarieh that Virun's customers owned the formula, Virun and Bromley believed that Virun owned all of the formulas it had developed for customers based on the customers' idea and the only instance where Virun did not own a formula that it manufactured was in the rare instance where a customer brought a completed formula that required no development whatsoever by Virun.  Virun's and Bromley's clear intent to defraud Jafarieh and Cymbiotika is further evidenced by Bromley's post-hoc explanation that what Virun meant by "idea" was a fully developed formulation, a justification belied by the plain meaning of Virun's representation: "When a client brings us an idea **for development.**" (emphasis added).  Moreover, neither Bromley nor Virun ever disclosed this alternative definition of the word "ideas" to Cymbiotika, never offered a disclaimer on Virun's website, and never explained to Cymbiotika before Cymbiotika agreed to work with Virun that the word "ideas" had a unique meaning different from its ordinary meaning.

26.    Cymbiotika is further informed and believes, and on that basis alleges, that, even accepting Virun's undisclosed definition of the term "idea," it was not the "most common scenario" since, it was "rare" that a customer would ever bring a completed formula to Virun for production.  Moreover, Cymbiotika is informed and believes, and on that basis alleges, that Virun as a matter of policy would not manufacture a product based on a customer's own formulation for fear of liability.

27.    Had Cymbiotika known on January 8, 2019, that (1) it was not in fact Virun's common practice to have its customers own the formulas based on their ideas, (2) what Virun meant by "idea" was actually a completed formula, or (3) Virun intended to claim ownership over any formula it collaboratively developed with Cymbiotika, Cymbiotika would have immediately broken off any further discussions with Virun and would have entered into a development and manufacturing relationship with another formulator willing to agree that any formula developed that

10

1    was based on an idea conceived by Cymbiotika, even if collaboratively developed
2    with the formulator, would be owned by Cymbiotika.

3    <u>**Cymbiotika's Vendor-Manufacturer Relationship with Virun**</u>

4         28.    Once Virun confirmed that it encouraged and welcomed Cymbiotika's
5    collaboration and agreed that Cymbiotika would own what Virun formulated,
6    consistent with Virun's past practices, Cymbiotika orally contracted with Virun to
7    develop liposomal formulations of Cymbiotika's supplement ideas that could be
8    manufactured using Virun existing facility. Obviously, any formulation development
9    would need to be a collaborative process between Cymbiotika and Virun. While
10   Cymbiotika clearly knew the profile and function of the product it wanted, along with
11   the relevant active ingredients, Cymbiotika was not privy to Virun's manufacturing
12   techniques and what additional components would need to be added to a formula or
13   their percentages in order to achieve a stable liposomal emulsion that would achieve
14   maximum bioavailability.

15        29.    Virun told Cymbiotika that it had patented, and thereby publicly
16   disclosed, its manufacturing techniques, which included the raw materials and their
17   percentages.    As such, the Parties agreed that Cymbiotika would bring the
18   supplement idea to Virun, Virun would use its patented techniques to obtain a stable
19   and deliverable supplement, and finally the two would work collaboratively
20   thereafter to achieve the consistence, flavor profile, and color that Cymbiotika
21   wanted for a distinctive, premium supplement product that Cymbiotika's customers
22   would want to purchase.

23        30.    The Parties further agreed that Cymbiotika would not be charged for
24   formula development, but once Cymbiotika had approved the formula developed by
25   Virun, Cymbiotika would thereafter purchase product manufactured and packaged
26   by Virun based on that formula for a reasonable time.

27        31.    As part of this agreement to purchase product from Virun based on such
28   formulas, Virun represented that its lead time for such production was 2-3 weeks

11

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

from its receipt of all raw materials. Cymbiotika additionally agreed to pay 50% of any invoice at the time of ordering and the remaining 50% at the time Cymbiotika received the finished goods from Virun ("Formulation and Manufacturing Agreement").

32.    Virun's representation that Cymbiotika would own all formulas based on Cymbiotika's ideas was inextricably intertwined with the Cymbiotika agreement to have Virun manufacture products based on such formula for a reasonable time and thus part of the Parties' overall agreement.

33.    Cymbiotika is informed and believes, and on that basis alleges, that this interrelationship between the formula and manufacturing is further evidenced by the fact that any formula Virun would develop would be optimized for Virun's patented manufacturing practices and techniques, meaning that such formula would not be optimized for another liposomal manufacturer's facility. Stated more simply, while the general practice of creating a stable emulsion (*e.g.,* oil in water or water in oil) is common, including liposomal emulsions, there are innumerable and varied methods to optimize the practice and different manufacturers have their preferred methods and materials. Thus, the formulas developed for Virun's facility would not be replicated by another manufacturer using different manufacturing methods and processes.

34.    The contract terms relating to both price and quantity of all goods Virun manufactured for Cymbiotika under the Parties' Formula and Manufacturing Agreement are separately and specifically identified in the purchase orders and invoices by and between Cymbiotika and Virun for each batch of a specific supplement that Virun would manufacture. Cymbiotika is informed and believes, and on that basis alleges, that each of these invoices and purchase order are still in the possession, custody, or control of Virun.

35.    After a formula was completed, approved by Cymbiotika, and it passed its stability analysis, Cymbiotika would provide purchase orders for a given number of products based on that formula. In turn, Virun would issue an initial invoice that

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

in addition to stating the price and quantity ordered would include an expected completing date for the invoice, and Cymbiotika would pay 50% of that invoice at the time of issuance.

36.    When production under each invoice was complete, or partially complete such that Cymbiotika could pick up a partial order, Virun would then issue another invoice for the completed product and Cymbiotika would pay the balance of the invoice for the production completed.  Virun's invoices did not alter the material terms to the Formulation and Manufacturing Agreement other than the specifics of the amount of product to be made, the dollar amount for the invoice, and provide an expected date by which the invoice would be complete.  Cymbiotika timely paid each Virun invoice.

37.    Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement.  Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret.  One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also have addressed the ownership of any formulations forged under that relationship. Cymbiotika expected that it would, and did, own the various formulations it developed with Virun, consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

38.    No later than early April 2019, both Jafarieh and Shahab Elmi, Cymbiotika's CEO, inquired about formalizing Cymbiotika's relationship with Virun in one or more written agreements.  It was not until end of May 2019, that Virun first provided "three different agreements we have the option of entering," which included a manufacturing and supply agreement, a research agreement, and a quality agreement.  Cymbiotika is informed and believes, and on that basis alleges, that these agreements were templates Virun had used with other customers, but none of these templates seemed relevant to Virun's relationship with Cymbiotika.

13

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

39.     Cymbiotika is informed and believes, and on that basis alleges, that Virun avoided a written agreement that clarified ownership of the formulations so that Virun could engage in a bait-and-switch wherein it could later claim, as it has done here, that it (rather than Cymbiotika) owns Cymbiotika's formulas.  In other words, by waiting until after Cymbiotika had become heavily invested and reliant on Virun's services, Virun could place Cymbiotika in "golden handcuffs" before Virun claimed ownership of the Cymbiotika formulations.

40.     Cymbiotika is further informed and believes, and on that basis alleges, that Virun has done this with its other customers as well.  For example, more than a year after the Parties had been in business together, Virun sent Cymbiotika a contract Virun had with another customer in which Virun asserted ownership over the specifics of the formula it had developed for that customer based on that customer's ideas, which directly contradicted what Virun represented to the public and to Cymbiotika it would do.  However, by claiming ownership of any formula developed from an idea brought by a customer, Virun effectively prevented that customer from transitioning its products away from Virun.  Simply, any customer who had already agreed to have Virun produce its formulations to the specifications and tastes of its end users was inevitably forced to keep its production with Virun regardless of Virun's ability to timely meet demand because any change in manufacturing would only further delay shipments and would result in unwanted changes to the products (*e.g.*, flavors and consistencies). This could (and would) result in the loss of customers.

**Cymbiotika Brought Virun the Ideas to Virun to Co-Develop the Formulas**

41.     During their January 8, 2019 meeting, Cymbiotika disclosed to Virun the following supplement ideas: (1) Vegan DHA; (2) Sleep Time containing CBD; (3) Sleep Time without CBD; (4) lactoferrin bound glutathione; (5) a mushroom complex; (6) an immune product; (7) a Vitamin D product using a plant-based Vitamin D; and (8) CoQ10 PQQ supplement.

14

42.    At no time during this meeting did Bromley or anyone affiliated with Virun suggested that Virun already had a "white label" version of any of these products that would fully meet Cymbiotika's needs.  Moreover, Cymbiotika would not have been interested in selling any existing Virun formulas.

43.    After the January 8, 2019 meeting, Bromley reported each of Cymbiotika's ideas to his formulators.

44.    After some discussion, a business relationship was forged, and Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  After Virun proved unable to stabilize a liposomal DHA product based on Cymbiotika's specifications, and Virun seemed to be frustrated, Jafarieh suggested that the initial products be made simpler.  This simpler product was referred to as "low hanging fruit" amongst the Parties.

45.    Among these "low hanging fruit," projects were a sleep formulation and brain formulation that would include ingredient blends developed by Jafarieh and Jamie Bigelow, Cymbiotika's Creative Director.

46.    Cymbiotika is informed and believes, and on that basis alleges, that Virun did not have any existing formulas similar to Cymbiotika's idea for either its sleep formula or brain formula.  In fact, once formulated, Bromley himself referred to these formulas as **Cymbiotika's** proprietary formulas.  Despite this representation, however, Bromley would later make Cymbiotika's sleep and brain formulas for Virun's other customers, referring to them as Virun's own "low hanging fruit."

47.    Jafarieh and Bigelow consistently communicated with Virun **to have Virun manufacture the products that Cymbiotika conceptualized** and to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name. Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

15

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

**Product Development and Sales**

48.     Virun and Cymbiotika co-created products**, based on Cymbiotika's ideas and specifications,** from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnesium L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, Glutathione and Red Yeast Rice.  Each of these were derived from Jafarieh's ideas and specifications.

49.     Cymbiotika always understood and expected that it would own the formulations developed with Virun, and Virun never suggested otherwise.  The fact that nearly five months passed from when Cymbiotika first approached Virun with its ideas and when Virun had completed formulations ready for shipment belies Virun's contention that any of these formulas were pre-existing "white label" formulations since pre-existing formulations would not have taken so long to make.

50.     All of the products that Virun manufactured for Cymbiotika, **based on Cymbiotika's ideas and specifications,** went through an extensive development process that, for each of Cymbiotika's products, began with Cymbiotika, and lasted several months.  This process included extensive back and forth discussions between Cymbiotika and Virun, whereby Cymbiotika drove the creative process to make certain that each Cymbiotika product manufactured by Virun were unique and geared towards Cymbiotika's clientele that preferred high-quality, plant-based products that justified premium prices.  Cymbiotika purposefully avoided what would have been the easy route: slapping its labels on existing Virun formulas even though the ingredients in those formulas did not meet Cymbiotika standards or specifications that its customers trust.

51.     **Vitamin B12**:  Vitamin B12 was the first product Cymbiotika ordered from Virun pursuant to a June 13, 2019 purchase order, to which Virun provided an invoice and Cymbiotika paid a 50% deposit at that time.  Cymbiotika dictated the formulation for this Vitamin B12 product.  Jafarieh mandated the addition of fulvic acid complex, adenosyl-cobalamin, B6, and organic flavor terpenes.  Virun did not

16

complete this order until three months later in September 2019, at which point it issued another invoice and Cymbiotika paid the remaining balance on the invoice. Thereafter Cymbiotika would continue to purchase B12 as evidenced by Virun's invoices consistent with the parties' agreements. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

52. **Sleep (Rumi Sleep):** Sleep was the second product that Cymbiotika purchased from Virun after formulation was completed. Cymbiotika identified to Virun all of the active ingredients that it wanted in this product. Cymbiotika was first able to order the sleep formulation once it passed stability in October 2019. Virun provided Cymbiotika an invoice at that time and Cymbiotika paid its 50% deposit. Virun completed this order in December 2019, at which point Cymbiotika paid the remainder of the invoice balance and picked up the product. Thereafter Cymbiotika continued to purchase Sleep, and derivatives thereof, as evidenced by Virun's invoices consistent with the Parties' agreement. Bromley later confirmed in an email that this product was Cymbotika's proprietary formula. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

53. **Brain (Golden Mind):** Virun completed Cymbiotika's Brain formulation contemporaneously with the Sleep formula, which Cymbiotika was to sell under the brand name Golden Mind. Cymbiotika identified all of the active ingredients that it wanted in this product, and, like the Sleep formula, Bromley also identified this product as Cymbotika's proprietary formula. Cymbiotika first purchased Golden Mind from Virun in October 2019 after Virun had completed its formulation and it passed stabilization testing. Cymbiotika made its 50% deposit at that time. Virun, however, did not fulfill this order until late December 2019, at which time Cymbiotika had already paid the remaining balance for the product. Thereafter Cymbiotika would continue to purchase Golden Mind, and derivatives

17

1  thereof, as evidenced by Virun's invoices consistent with the parties' agreements.
2  Cymbiotika is informed and believes, and thereon alleges, that Virun has possession,
3  custody, or control over these invoices.

4      54.   **Vitamin D3/MK7/Ubiquinol:**  At its January 8, 2019 meeting with
5  Virun, Cymbiotika identified a vegan vitamin D3 product that contained MK7 and
6  ubiquinol as one of its product ideas.  While Virun had a non-vegan D3 formula,
7  Cymbiotika wanted a vegan supplement, which Virun did not have at the time.
8  Thereafter Cymbiotika and Virun worked on the formulation to effectuate
9  Cymbiotika's idea.  Cymbiotika first ordered and made a 50% deposit for a supply
10 of this D3 formulation in November 2019, pursuant to an invoice from Virun, after
11 it passed stabilization testing.  At the time, Virun indicated its lead time on the order
12 would take 10-12 weeks, not the 2-3 weeks to which the Parties had agreed.  When
13 the order was finally completed by Virun, Cymbiotika paid the balance of the invoice
14 and picked up the product.  Thereafter, Cymbiotika would continue to purchase
15 Vitamin D3, as evidenced by Virun's invoices consistent with the parties'
16 agreements. Cymbiotika is informed and believes, and thereon alleges, that Virun has
17 possession, custody, or control over these invoices.

18      55.   **Micelle Mushrooms**: At its January 8, 2019 meeting with Virun,
19 Cymbiotika shared its idea for a mushroom supplement.  Virun did not have any
20 similar product to this mushroom blend at the time.  Work on this product did not
21 begin until  about October 2019, when Cymbiotika provided more specifics to Virun
22 for its idea, and Cymbiotika leveraged its relationship with a grower in San Diego to
23 create chocolate mushrooms. *See* **Exhibit C**.  After Cymbiotika paid Virun the 50%
24 deposit on the invoice to get production in queue, Virun began work of this product.
25 By the end of June 2020, Virun completed production for this mushroom supplement
26 after the formulation was able to pass stabilization testing.  Pursuant to the Parties'
27 agreement, Cymbiotika then paid the remaining balance and picked up the

28

production.    Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

56.    **Glutathione**:  In January 2019, Cymbiotika identified to Virun its idea for a supplement containing glutathione.  Although Virun had a prior glutathione formulation, and had a patented method for binding lactoferrin with glutathione to improve its bioavailability, Cymbiotika desired a materially different formula from Virun's pre-existing glutathione formulation.  Cymbiotika proposed the idea of adding the probiotic strain, lactobicullus rhamnosus to a glutathione supplement. Development of Cymbiotika's glutathione product began in or around January 2020. During the course of the Parties' dealings, Bromley referenced the glutathione supplement developed for Cymbiotika as Cymbiotika's glutathione product thereby further reinforcing the Parties' understanding that Cymbiotika, and not Virun, was the owner of that formula.  In April of 2020, Virun provided to Cymbiotika an initial invoice based on Cymbiotika's purchase order for its glutathione supplement after the product had been finally formulated and passed stabilization testing.  Virun, however, would not begin fulfilling this order until August 2020, and continually thereafter had difficulty meeting its contractually agreed upon production demands. Cymbiotika would later sell this product under the brand name ReGenesis.  Virun continued to issue invoices in response to Cymbiotika's orders, at which time Cymbiotika would make a 50% deposit and Virun would then issue a second invoice when production was complete on some or all of an order that was available for Cymbiotika to pick up. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

57.    **Activated Charcoal**:  In December of 2019, Jafarieh brought to Virun a formula idea that included activated charcoal and suggested that "[t]his has never been done before."  Virun did not have a private label of a similar product concept. Cymbiotika even offered to source the charcoal for the product for Virun.  Virun issued its first invoice for this charcoal formula in April 2020 after the formula was

19

345656\00001\147722615.2

finalized and the product passed stability testing.  Cymbiotika made a 50% payment on the invoice to start the production process. At that time, Virun stated that its production lead time would be 6-8 weeks for the products.  Virun completed production on this initial invoice in June of 2020, issued a further invoice on the production once completed, and Cymbiotika paid the remaining balance on the invoice for the completed product.  Thereafter, Virun would issue additional invoices up receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as was the practice with the production of other formulas.  Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

58.  **Vitamin C**:  While Cymbiotika and Virun had some discussions about developing a Vitamin C supplement in 2019, actual development did not begin until 2020.  Cymbiotika dictated the formulation for the Vitamin C product.  Beginning in or about January 2020, Cymbiotika co-created a Vitamin C product with Virun that incorporated Cymbiotika's ideas and concepts.  Among other things, Jafarieh insisted on adding bamboo silica. Virun did not issue its first invoice for a Vitamin C supplement to Cymbiotika until March of 2020, following the completion of formulation and stability analysis testing.  Thereafter, Cymbiotika paid 50% of the invoice amount.  Virun completed an initial production based on this invoice the following month, at which point Cymbiotika paid the balance on the invoice for what was produced and picked up the product.  Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as was the practice with the production of other formulas. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

59.  **Magnseium L-Threonate**: In 2019, Cymbiotika presented Virun with its idea for a magnesium product.  In April of 2019, Virun asked that Cymbiotika hold the idea because Virun was too busy with the development of Cymbiotika's

20

345656\00001\147722615.2

other products.  Then, in June of 2019, Jafarieh sent to Virun his formulation ideas for Cymbiotika's magnesium supplement.  Virun did not offer a similar product concept as a private label.  Jafarieh came to Virun to create a formula using a very specific form of brain magnesium Cymbiotika wanted to use.  Jafarieh also specified that this product formula should have a simple vanilla flavor and contain macadamia nut butter.  Development did not commence in earnest on this product, however, until March of 2020.  Virun issued its first invoice for this magnesium supplement to Cymbiotika in September 2020, after the formula was finalized and the product passed stabilization.  At that time, Cymbiotika made a 50% payment on this invoice so that production could begin.  While Cymbiotika had hoped for a quicker production, Virun was not able to complete even partial production until the end of October, and Cymbiotika would pay the remaining 50% due on what Virun was able to produce at that time.  Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as was the practice with the production of other formulas.  Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

60.    **Sulforaphane with Chlorophyll**: Cymbiotika began developing its sulforaphane with chlorophyll product in or about June 2020. Jafarieh's idea for this novel product was to create a chlorophyll formula to market to Cymbiotika's predominantly vegan clientele to supplement the lower iron levels that result from a vegan, plant-based diet.  In August 2020, Virun issued an invoice for a quantity of this product and Cymbiotika paid 50% of the invoice amount to get production started.  It took Virun four months to complete this production and Virun issued an invoice reflecting partial completion in December of 2020.  Cymbiotika thereafter paid the balance for what was completed and picked up the product.  From thereon, Virun would issue additional invoices upon receipt of future orders from Cymbiotika and Cymbiotika would pay those invoices as was the practice with the production of

21

345656\00001\147722615.2

other formulas.  Cymbiotika is informed and believes, and thereon alleges, that Virun
has possession, custody, or control over these invoices.

61.  **Elderberry:**  In June of 2020, Jafarieh began discussing with Bromley
a supplement containing elderberry and Zinc.  While Virun had a supplement formula
containing elderberry, Cymbiotika made meaningful modifications to that formula to
ensure that it would be a formula Cymbiotika would own under the Parties'
agreement.  When Virun completed the formulation and it passed stability testing,
Virun issued its first invoice for this product based on Cymbiotika's order late in
September of 2020.  Cymbiotika thereafter paid 50% of the invoice amount at the
beginning of October so production could commence.  Virun completed a partial
production on the Elderberry invoice in November 2020 and issued an invoice for
the production.  Cymbiotika paid the remaining 50% balance of the invoice for the
product once it was completed.  Thereafter, Virun would issue additional invoices
upon receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as
was the practice with the production of other formulas. Cymbiotika is informed and
believes, and thereon alleges, that Virun has possession, custody, or control over
these invoices.

62.  **Red Yeast Rice**.  In the summer of 2020, Cymbiotika approached Virun
about making a product based on red rice yeast.  Prior to that, Virun did not offer a
product predicated on red yeast rice.  Once the supplement was formulated based on
Cymbiotika's ideas and after the formulation passed stability, Virun issued an initial
invoice in October 2020 based on Cymbiotika order.  That invoice was then revised
in November 2020, and Cymbiotika made its 50% down payment on the invoice
during the first week of December.  Virun completed production on this initial
invoice at the end of January 2021.  At that point, Cymbiotika paid the remaining
balance and pick up the inventory.  Thereafter, Virun would issue additional invoices
upon receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as
was the practice with the production of other formulas.  Cymbiotika is informed and

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

63.    With each of the products discussed above, had Virun raised the issue of ownership of the formulations or even suggested that Virun, rather than Cymbiotika, would own the formulations or that Virun would ever attempt to assert some trade secret protection over the formulas that Cymbiotika understood it jointly developed with Virun, the relationship would have immediately ceased.

64.    Cymbiotika is informed and believes, and on that basis alleges, that Virun clearly understood, and deliberately mislead Cymbiotika to believe, that the formulas identified above were Cymbiotika's and not Virun's property.

65.    Cymbiotika is informed and believes, and on that basis alleges, that Virun did not follow up and document its relationship with Cymbiotika because it did not want to put into writing what Cymbiotika and Virun had orally agreed to – the formulations were Cymbiotika's and not Virun's property.

66.    Cymbiotika is informed and believes, and on that basis alleges, that Virun, at all relevant times, wanted to create some vagaries on ownership because Virun knew that it did not have the capacity or competence to actually manufacture these formulations to meet Cymbiotika's needs.

67.    Cymbiotika is informed and believes, and on that basis alleges, that Virun aways intended to engage in this bait-and-switch so that it could force Cymbiotika to continue doing business with Virun despite Virun's incompetence.

68.    Virun repeatedly confirmed that Cymbiotika owned the formulations. In a communication dated August 11, 2020, Bromley told Jafarieh that he (Bromley) could "promote your [Jafarieh] glutathione product on our webinar tomorrow.  I can use prohealth but would prefer yours."

69.    In another communication from Bromley to Jafarieh, Bromley remarked that "[y]ou [Jafarieh] are involved and I respect you and Jamie for that."

23

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

70.    In a video posted by Bromley on the internet,[4] Bromley remarked that Jafarieh was "educated," "smart," and that he "develop[ed] products." Bromley repeatedly referred to Cymbiotika's products as "your" – Cymbiotika's – products.

71.    Virun never claimed ownership to any of Cymbiotika's formulas at the time they were being developed. Indeed, Virun never asserted ownership until after its own mismanagement caused Virun to lose Cymbiotika's business. Virun's instant ownership claims are driven by remorse, not the facts.

**Virun's Breaches of the Formulation and Manufacturing Agreement Cause Damage to Cymbiotika's Business**

72.    After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was being mismanaged, was disorganized, and had severe supply chain difficulties.

73.    A material term of the Formulation and Manufacturing Agreement was Virun's representation that its lead time of manufacturing was 2-3 weeks from its receipt of raw materials. Although the initial lead time for products from Virun was supposed to be 2-3 weeks from purchase order to product delivery, this eventually increased to 4-6 weeks, and then to 8-12 weeks. Making matters worse, Virun offered no explanations for these delays and would frequently ignore Cymbiotika when asked about them or for an updated timeframe for each overdue purchase order.

74.    Cymbiotika agreed to pay 50% of each invoice amount at the time of order based on Virun's representation that its lead time of manufacturing was 2-3 weeks. Not only did Virun make this lead time representation at the outset of the relationship, but it also communicated this promise numerous times thereafter.

75.    On each invoice, Virun represented when each order would be shipped to Cymbiotika. This "ship" date often communicated a time that was often between 8-15 weeks later. This additional shipping time supposedly took into consideration

---

[4] https://www.youtube.com/watch?v=boxMr0xDfeU, last accessed February 24, 2023.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

certain COVID-19-related supply chain issues.  However, notwithstanding those COVID-19 supply chain issues, Virun's delays in fulfilling orders far exceeded even the extended dates promised on the invoices.

76.    While there may have been particular instances where delay was not Virun's fault, the repeated, inexcusable, and consistent delays hurt Cymbiotika's business.  For example, Virun's delays made it impossible for Cymbiotika to adequately plan for customer deliveries.  This also created an unreasonable financial burden for Cymbiotika because Cymbiotika was forced pay half of each invoice upfront even when production would be delayed for months.

77.    This caused Cymbiotika irreparable harm because it was unable to meet subscription requirements.  In turn, Cymbiotika faced numerous cancellations from its subscribers due to Virun's inability to meet demand.  Virun's inability to meet its obligations to Cymbiotika started from the outset of its production of products for Cymbiotika and never improved.  In fact, as time went on, things only got worse.

78.    Virun consistently delayed fulfilling purchase orders and would frequently underdeliver.  Often, Virun refused to return phone calls and/or emails for weeks.  Virun ignored many desperate pleas for information regarding product fulfillment.  purchase orders were often cut short without warning or explanation.

79.    By way of example, Cymbiotika pre-paid for 10,000 units in one purchase order for delivery by a certain date.  On that date, Cymbiotika received 6,000 units and was told that the remainder would have to be fulfilled later.  In other instances, purchase orders were never filled, and others were simply closed by Virun without explanation.

80.    By way of further example, on April 13, 2020, Cymbiotika placed an order for 5,000 units of Glutathione, paying 50% of the purchase price in advance.  The shipping date on the invoice indicated shipment in full by June 8, 2020, or 8 weeks later.  The shipment, however, was not completed and took over 39 weeks later to reach near completion, with small batches being produced sporadically over

25

the course of a 23-week period.  This was wholly insufficient given Cymbiotika's subscription service business model.

81.    Cymbiotika's purchase orders with Virun specified certain unit amounts of products for Virun to manufacture for Cymbiotika.  It is understood in the industry that there might exist a variance of 3-5% on a manufacturing purchase order that could result in overages or loss in production.  Such a variance would have been within the expectations of the Parties and was understood by Cymbiotika to be part of the agreement.  However, Virun's purchase orders had an exorbitant amount of loss compared to this normal variance and Virun would often close a purchase order out after shipping a few increments over time without fulfilling the entire order.

82.    When this would occur, Virun claimed that having a higher loss in production than the 3-5% variance justified its breaches to Cymbiotika.  This excuse confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials.  With such high amounts of "loss in production," it became clear that Virun was ill-prepared to perform on its promises to Cymbiotika and failed to purchase enough raw materials to fulfill the orders within the acceptable industry-wide variance.

83.    By way of further example, Cymbiotika, at one point, was forced to take its D3 and magnesium products offline because Virun could not keep up with the purchase orders that Cymbiotika needed fulfilled.  Cymbiotika, had empty shelves on these products as a result.  These items were Cymbiotika's best-selling products at the time.

84.    When Virun finally responded to Cymbiotika's inquiries into these product delays, Cymbiotika received numerous conflicting reports from Virun.  For example, Virun told Cymbiotika a delay with its magnesium production was caused by Virun's supplier, who was, according to Virun, slow to deliver the raw magtein materials needed for the magnesium production.  Cymbiotika, however, learned that this was false after it contacted Virun's supplier to gain clarity.  As it turned out, the

26

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

magtein was readily available for Virun to pick up, but Virun had failed to arrange a pickup, causing even more delays.

85.    These material breaches directly harmed Cymbiotika. For example, Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products. Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale, but also caused a massive amount of churn and countless customer complaints. Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with its inventory and complained that Cymbiotika was consistently running out of stock of various products.

86.    Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.

87.    Virun's constant delays and inability to deliver on purchase orders, timely and in full, caused Cymbiotika's business to suffer greatly.

88.    Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding purchase orders.

89.    Cymbiotika is informed and believes, and on that basis alleges, that Virun would blame its own incompetence and failures on its suppliers, claiming that its suppliers were the cause of Virun's delays by falsely claiming that the suppliers were late to deliver the raw materials Virun needed for particular formulations.

90.    Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

91.    Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

92.     Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on purchase orders constituted an existential threat to Cymbiotika. Cymbiotika had to transition to a manufacturer who could meet its rising demand.

### Virun's Social Media Smear Campaign

93.     Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

94.     Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an "anonymous" social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic.

95.     These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

96.     By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt." *See* **Exhibit D**.  The user stated:

> This ingredient is in several of CYMBIOTIKA's supplement products and has been shown to cause cancer. . . CYMBIOTIKA does not want you to know this – BEWARE, they will delete-comments re anyone who questions them on this.

97.     The user specifically "tagged" a number of Cymbiotika's known customers to ensure that they saw the post.

98.     The user "contradiction2u" also posted a screenshot from Cymbiotika's own website, which reflected Cymbiotika's use of sorbic potassium salt in one of Cymbiotika's products.  *See* **Exhibit D**.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

99. Incredibly, the screenshot also shows the bookmark bar and bookmarks for Bromley's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.



100. As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself.

101. As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations intentionally to hurt Cymbiotika's business.

102. At all times relevant to the social media postings, Bromley was the President of Virun.  On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

103. Cymbiotika saw a noticeable uptick in subscription cancellations for its Vitamin C product (with sorbic acid potassium salt) in connection with Bromley's smear campaign and saw a noticeable downturn in orders and new subscriptions for this product during that same time.

104. The baseless and damaging lies spread by the "anonymous" assailant including "contradiction2u," resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.  Bromley had once again created an existential threat to Cymbiotika.  Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

105. Attached hereto as **Exhibit D** is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm

29

Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

106.   Following the delivery of the cease-and-desist letter, Bromley ceased his social media smear campaign.  However, the damage caused to Cymbiotika's reputation remained.

107.   Cymbiotika is informed and believes, and on that basis alleges, that in addition to its social media campaign, Virun and Bromley continue to engage in an active campaign to tarnish Cymbiotika's reputation and continue to seek means to otherwise harm Cymbiotika.  For example, Cymbiotika is informed and believes, and on that basis alleges, that Virun hired Cymbiotika's former head of information technology, Michael Riga, for the sole purposes of "digging up dirt" on Cymbiotika.

108.   Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika.

109.   Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment.

110.   Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

///

///

///

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS
345656\00001\147722615.2

# COUNTERCLAIMS

## FIRST COUNTERCLAIM FOR RELIEF

### FRAUD

111.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

112.   When exploring potential manufacturing partners, Elmi and Jafarieh, as principals of Cymbiotika, approached Bromley in his capacity as a principal of Virun and expressed Cymbiotika's interest in utilizing Virun's manufacturing services.

113.   Virun made a series of false representations to Cymbiotika in order to induce Cymbiotika to select Virun as the manufacturer for its supplement line.  These misrepresentations include, but are not limited to, statements that Virun's most common practice was for its customers to own the formulas Virun developed from ideas given by its customers and that Cymbiotika, too, would own all the formulas Virun developed from ideas Cymbiotika offered to Virun.  After more than a year of doing business together, Virun later claimed that the word "idea" had a special meaning different than its ordinary meaning (*i.e.*, a thought or suggestion as to a possible product) but rather referred to a completed formula ready for production.  Cymbiotika is informed and believes, and thereon alleges, Virun always intended to claim ownership over any formula it collaboratively developed with Cymbiotika but kept these intentions hidden from Cymbiotika until after Cymbiotika had already invested significant time and money developing ideas with Virun with the belief that Cymbiotika would own those formulas.

114.   Virun reiterated the representations that Virun makes to all prospective customers as reflected on its website including that Virun does not produce private label products, but collabulary develops unique products with its customers and that those formulations made with a customer's ideas are the customer's intellectual property.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

115.   Virun's representations were made in writing and orally.  In late 2018, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation. This is the most common scenario. However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.

116.   Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.]  Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client. Our products are developed on a project-by-project basis. Therefore, we do not sell private-label products.

*See* **Exhibit E**.

117.   These representations, which were set forth on Virun's website and reviewed by Cymbiotika in late 2018, caused Cymbiotika to reach out to Virun.

118.   These representations were also expressly reiterated by Virun's principals to induce Cymbiotika to enter into a contractual relationship with Virun. Specifically, on January 8, 2019, Virun's President and its Chief Operating Officer, respectively Bromley and Peter Hoosier, both reiterated to Jafarieh at an in-person meeting that if a customer (such as Cymbiotika) brings an idea to Virun for formulation (such as the ideas Cymbiotika was disclosing), the customer will own the formulation and that this arrangement was the most common practice for Virun.

119.   Bromley and Peter Hoosier, Virun's Chief Operating Officer, similarly reiterated each of the aforementioned misrepresentation to Cymbiotika's Chief Executive Officer, Shahab Elmi, including that it is and was Virun's ordinary practice that Virun's customers own their own formulas and that the most common scenario

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

at Virun was when a customer brings an idea to Virun wherein that customer retains ownership of the formula.

120.    Virun and Bromley – as well as others at Virun, including but not limited to Nina Parker – knew that these ownership statements on the Virun website were false when first published online, and knew that these statements continued to be false in 2018 and 2019, and through the present day.

121.    Virun and Bromley – as well as others at Virun, including but not limited to Nina Parker – knew these representations made to Jafarieh and Cymbiotika were false when made and Virun, Bromley Parker and others  intended that Jafarieh and Cymbiotika rely upon them so that Cymbiotika would hire Virun as its manufacturer.

122.    At the January 8, 2019 meeting, Virun and Bromley knew that rather than being "the most common scenario," Virun had no contracts with any of its customers where the customer owned the formula developed by Virun from the customer's idea.  In fact, Cymbiotika is informed and believes, and on that basis alleges, that Virun believed that it owned all of the formulas it developed based on a customer's idea.   While Virun may now claim what it meant by "idea" was a completed formula, this post hoc rationalization is absurd, and further demonstrates Virun's and Bromley's scienter because (1) such a construction renders the phrase "for development" which follows their use of "idea" meaningless; (2) it was rare rather than "common" for a customer to ask Virun to manufacture a product based on the customer's pre-existing and finalized formula; and (3) Virun shunned manufacturing products based on a customer's existing formulas to avoid potential liability.

123.    Cymbiotika is informed and believes, and on that basis alleges, that Virun and Bromley further intended and/or knew that prospective customers, like Cymbiotika, would read and understand the terms "idea" and "formulation" to have two, completely different meanings as those terms are commonly understood or defined.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

124.    Reasonably relying on Virun's representations, including that "[w]hen a client brings us an idea for development, the client owns that formulation," which was later reiterated and repeated by Bromley and others in 2019, Cymbiotika executed Virun's form Confidentiality Agreement and thereafter entered into a business relationship with Virun, whereby Cymbiotika would bring product development concepts to Virun, Virun would manufacture dietary supplement products for Cymbiotika based on those concepts, and Cymbiotika was induced to believe it would retain intellectual property ownership of the completed product formulations.

125.    Virun's repeated representations regarding formula ownership were critical to inducing Cymbiotika's to work with Virun.  Cymbiotika was interested in working with a manufacturer that would not only permit, but welcome companies to bring their own product and formula ideas to table, and that each company would own the formula. Cymbiotika sought to avoid manufacturers that required its customers to simply choose already existing formulas and slapping their own labels and brand on them (otherwise known as white labeling or private label).  Cymbiotika also wanted to avoid having to enter into a license arrangement for the formula. Cymbiotika's preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

126.    Virun and Bromley intended in 2018 and 2019, and throughout the parties' business relationship, that Cymbiotika rely on these representations.  When Cymbiotika agreed to work with Virun, Cymbiotika did so on a handshake given the representations that Virun had made to Cymbiotika, both online (on Virun's website) and verbally during meetings.

127.    Cymbiotika reasonably relied on the representations of Virun in disclosing its supplement ideas pursuant to a Confidentiality Agreement and ultimately entering into a business relationship with Virun.

34

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

128.   Cymbiotika did not private label a product with Virun.  To the contrary, in accordance with industry custom and practice, when a company "white labels," "private labels" or "licenses" products for another company, that relationship is governed by a written agreement.  Cymbiotika did not have a written agreement with Virun in this regard.

129.   Relying on Virun's representations regarding ownership of the formulas, Cymbiotika entered into a business relationship wo Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  Jamie Bigelow, Cymbiotika's Creative Director, provided Bromley with Cymbiotika's product ideas at the outset of their relationship in a correspondence dated on February 27, 2019 entitled "New Formulations."  **Exhibit B**.  This process, where Jafarieh provided Bigelow with his product concepts and Bigelow transmitted and executed these plans with Virun, became the process underlying Cymbiotika and Virun's working relationship.

130.   Jafarieh and Bigelow consistently communicated with Virun to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name.  Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

131.   All of the products that Virun manufactured for Cymbiotika went through an extensive development process, each of which lasted several months and included extended back and forth discussions between Cymbiotika and Virun in order to obtain unique products geared to Cymbiotika's plant-based preference clientele that could be sold at premium prices.  It would be antithetical and likely damaging to Cymbiotika's business for Cymbiotika to simply slap a label on an existing Virun product concept when the ingredients included did not meet the brand quality standards that customers have grown to trust.

35

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

132.   Cymbiotika has been harmed by its reliance on these representations in an amount to be proved at trial.  Additionally, Cymbiotika will be irreparably harmed to the extent that Virun prevails on its claim that it owns any protectable trade secret in any formulation developed with Cymbiotika, such that money damages could not compensate such harm warranting the imposition of injunctive relief.

133.   Cymbiotika's reliance on Virun' representations were a substantial factor in causing Cymbiotika's harm.

134.   In making these false representations, Virun acted with fraud, malice, and oppression, entitling Cymbiotika to an award of punitive damages.

## SECOND COUNTERCLAIM FOR RELIEF
## NEGLIGENT MISREPRESENTATION

135.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

136.   Virun and Bromley made a series of representations of fact, including, but not limited to, that (1) Virun's customers owned the formulas based on their ideas, (2) Virun's clients' ownership of its own formulas was or is "the most common scenario" in Virun's business; and (3)  that "in some instances companies have asked [Virun] to private label a formula already owned by Virun."; (4) Virun's failure to disclose that it intended for the word "idea" to mean a completed formula, and (5) Virun's hidden intention to claim ownership over any formula it collaboratively developed with Cymbiotika.

137.   Virun's representations were made in writing and orally.  In late 2018, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation.  This is the most common scenario.  However, in some

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS
345656\00001\147722615.2

instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.

138.   Virun also represented on its website, in its FAQ section, that it does not sell private-label products:

[Q.] Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client.  Our products are developed on a project-by-project basis.  Therefore, we do not sell private-label products.

139.   These representations, which were set forth on Virun's website and reviewed by Cymbiotika in late 2018, were reiterated by its principals to induce Cymbiotika to enter into a contractual relationship.  Specifically, on January 8, 2019, Virun's President and its Chief Operating Officer, respectively Bromley and Peter Hoosier, reiterated to Jafarieh at an in-person meeting that if a customer brings an idea to Virun for formulation, the customer owns the formulation and that this arrangement has been the most common practice at Virun.  At that meeting, Virun did not suggest or mention that what it meant by "idea" was a complete turn-key formulation, which is a nonsensical construction since an "idea" would need to be something different from a formula.  Bromley and Hoosier similarly reiterated each of these misrepresentation to Cymbiotika's Chief Executive Officer, Shahab Elmi, that Cymbiotika would own the formula for the products that Virun manufactured for Cymbiotika.

140.   These representations made by Virun to Cymbiotika were false when made.  In particular, since Virun now contends that Virun, and not Cymbiotika, own the formulations that Virun developed with Cymbiotika, the representations Virun made to Cymbiotika were false when made and to the extent Virun prevails on its claim that it owns such formulations the representations were false when made.

141.   Virun's repeated representations regarding formula ownership were critical to inducing Cymbiotika's to work with Virun.  Cymbiotika was interested in

37

working with a manufacturer that would not only permit, but welcome companies to bring their own product and formula ideas to table, and that each company would own the formula.  Cymbiotika sought to avoid manufacturers that required its customers to simply choose already existing formulas and slapping their own labels and brand on them (otherwise known as white labeling or private label).  Cymbiotika also wanted to avoid having to enter into a license arrangement for the formula. Cymbiotika preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

142.   To the extent Virun may have honestly believed that its representations were true when made, Virun still had no reasonable grounds for believing those representations were true when made.  Circumstantial evidence demonstrating that Virun lacked an honest belief in the truth of its statements, as such statements would be understood by a reasonable person, include, but are not limited to, (1) Bromley's subsequent statement that what Virun meant by "ideas" were turn-key formulas already in the possession of the customer that Virun could produce with little or no effort whatsoever, and (2) Statements made to others that a meaningful portion of Virun's value comes from the fact that Virun and not customers most commonly own the formulas Virun manufactures.  Additional evidence that it was not "common practice" for Virun's customers to own the formulas Virun created for them is that Virun never presented Cymbiotika with any draft contracts reflecting customer ownership of their formulas.  Instead, to the extent ownership was addressed in the draft contracts Virun provided, those contracts reflected that Virun ended up owning the specifics of the formula, even where the customer provided the idea to the extent ownership was discussed at all.

143.   Virun intended that Cymbiotika rely on these representations.  When Cymbiotika agreed to work with Virun, Cymbiotika did so on a handshake given the

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

representations that Virun had made to Cymbiotika, both online (on Virun's website) and verbally during meetings.

144.   Cymbiotika did in fact rely on Virun's representations in deciding to execute Virun's form Confidentiality Agreement and thereafter to enter into a business relationship with Virun and such reliance was reasonable.

145.   Cymbiotika did not private label a product with Virun.  To the contrary, in accordance with industry custom and practice, when a company "white labels," "private labels" or "licenses" products for another company, that relationship is governed by a written agreement.  Cymbiotika did not have a written agreement with Virun in this regard.

146.   Relying on Virun's representations regarding ownership of the formulas, Cymbiotika executed the Confidentiality Agreement and thereafter entered into a business relationship wo Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  Jamie Bigelow, Cymbiotika's Creative Director, provided Bromley with Cymbiotika's product ideas at the outset of their relationship in a correspondence dated on February 27, 2019 entitled "New Formulations."  **Exhibit B**.  This process, where Jafarieh provided Bigelow with his product concepts and Bigelow transmitted and executed these plans with Virun, became the process underlying Cymbiotika and Virun's working relationship.

147.   Jafarieh and Bigelow consistently communicated with Virun to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name. Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

148.   Virun and Cymbiotika co-created products from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnesium L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, and Glutathione.  Each of these

39

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

1    were derived from Jafarieh's ideas and specifications.  Cymbiotika understood and
2    expected it owned the formulations developed with Virun, and Virun never suggested
3    otherwise.

4         149.   All of the products that Virun manufactured for Cymbiotika went
5    through an extensive development process, each of which lasted several months and
6    included extended back and forth discussions between Cymbiotika and Virun in order
7    to obtain unique products geared to Cymbiotika's plant-based preference clientele
8    that could be sold at premium prices.  It would be antithetical and likely damaging to
9    Cymbiotika's business for Cymbiotika to simply slap a label on an existing Virun
10   product concept when the ingredients included did not meet the brand quality
11   standards that customers have grown to trust.

12        150.   Cymbiotika has suffered damages in an amount to be proven at trial.

13        151.   Cymbiotika's reliance on Virun's representations were a substantial
14   factor in causing Cymbiotika harm.

15   **THIRD COUNTERCLAIM FOR RELIEF**
16   **BREACH OF CONTRACT**

17        152.   Cymbiotika repeats and realleges the allegations of the preceding
18   paragraphs as if fully set forth herein.

19        153.   In or around January 8, 2019, Cymbiotika and Virun entered into the
20   Formulation and Manufacturing Agreement, which was evidenced by writings,
21   commitments made orally and the parties' course of conduct.   Pursuant to the
22   Formulation and Manufacturing Agreement, Virun and Cymbiotika agreed that
23   Cymbiotika would own any formula that Virun developed based on Cymbiotika's
24   idea.   In consideration for Virun's agreement that Cymbiotika would own the
25   formulas developed based on Cymbiotika's ideas, Cymbiotika agreed that Virun
26   would manufacture product based on such formula for a reasonable time thereafter.
27   This agreement that Virun would manufacture product based on the formula
28   developed from Cymbiotika's idea made sense since Virun contribution to any

40
CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

formula developed from Cymbiotika idea would be to add additional ingredients at specific proportions to optimize a stable liposomal emulsion that could be manufactured using Virun's patented techniques. Further material terms of the Formulation and Manufacturing Agreement were that Virun average lead time on production was 2-3 weeks after receipt of all raw materials. A further material term was that Virun would issue invoices reflecting the price and quantity of the product to be manufactured from a given formula based on Cymbiotika order and that Cymbiotika would pay 50% of the invoice amount at the time of issuance. Cymbiotika further agreed to pay the balance of any invoice reflecting the amount of product produced under any given invoice at the time it took possession of the product produced from Virun.

154. While Cymbiotika requested that the Formulation and Manufacturing Agreement be formalized into an omnibus writing, the parties never even exchanged drafts beyond Virun providing a few irrelevant templates with no follow up. The parties, however, did act in a manner consistent with the above referenced material terms for approximately two years. Additionally, and consistent with the material terms above, each specific order for product based on any formula is evidenced by at least two Virun invoices reflecting the product, price, and quantity, and Cymbiotika paid such invoices consistent with the Formulation and Manufacturing Agreement. Virun's invoices did not alter the material terms of the Formulation and Manufacturing Agreement but did include a separate promised delivery date.

155. Cymbiotika did all, or substantially, all, of the significant things that the Formulation and Manufacturing Agreement required it to do, unless it was otherwise excused from having to do.

156. Virun materially breached the Formulation and Manufacturing Agreement by, among other things, failing to manufacture products consistent with the agreed to lead time, by claiming ownership of the formulas it developed based on

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS
345656\00001\147722615.2

Cymbiotika's ideas and by manufacturing Cymbiotika's formula, or derivatives thereof, for other Virun customers.

157.   Virun consistently delayed fulfilling product orders made pursuant to the Formulation and Manufacturing Agreement and would frequently underdeliver. Often, Virun refused to return phone calls and/or emails for weeks.  Virun ignored many desperate pleas from Cymbiotika for information regarding product fulfillment.   Products ordered pursuant to invoices were often cut short without warning or explanation.

158.   By way of example, Cymbiotika pre-paid for 10,000 units in one invoice with the expectation for the product to be delivered by a certain date.  On that date, Cymbiotika received 6,000 units and was told that the remainder would have to be fulfilled later.  In other instances, purchase orders were never filled, and others simply closed by Virun without explanation.

159.   A material term of the Formulation and Manufacturing Agreement was that typical lead time for Virun to manufacture a good was 2-3 weeks from receipt of all raw materials for production.  This eventually increased over to time to 4-6 and them later, from 8-12 weeks.  Cymbiotika frequently received no communication from Virun throughout the times of delay to explain what was happening internally or what an updated timeframe would look like for each overdue invoice issued pursuant to the Formulation and Manufacturing Agreement.

160.   Each Virun invoice issued from a Cymbiotika order made pursuant to the Formulation and Manufacturing Agreement specified certain unit amounts of products for Virun to manufacture for Cymbiotika.  It is understood in the industry that a variance of 3-5% on a manufacturing purchase order could result in overages or loss in production.  This variance would have been understandable.  However, Virun had an exorbitant amount of loss compared to this normal variance and would often close an invoice issued pursuant to the Formulation and Manufacturing Agreement after shipping a few increments over time without fulfilling the entire

42

order.  When Virun did so, Virun cited having a higher loss in production than the 3-5% variance.  This excuse confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials.  With such high amounts of "loss in production," it became clear that Virun didn't buy enough raw materials to fulfill the exact orders within the acceptable industry-wide variance.

161.   By way of further example, Cymbiotika at one point had placed its D3 and magnesium products offline because Virun could not keep up with the product ordered as reflected in invoices issued by Virun pursuant to the Formulation and Manufacturing Agreement.  These items were Cymbiotika's best-selling products at the time.  When Virun finally responded to our inquiries into these product delays, Cymbiotika received numerous conflicting updates on the magnesium product production.  For example, Cymbiotika was told that the last thing Virun was waiting on to produce magnesium was the magtein raw material to come in from the supplier.  Cymbiotika thereafter directly corresponded with Virun's supplier to gain clarity.  Cymbiotika confirmed that the magtein was in fact available for Virun to pick up, but that Virun failed to arrange a pickup, causing even more delays.

162.   By way of even further example, on April 13, 2020, Cymbiotika placed an order for 5,000 units of Glutathione, paying 50% of the purchase price in advance.  The shipping date on the invoice indicated shipment in full by June 8, 2020, or 8 weeks later.  The shipment, however, was not completed and took over 39 weeks later to reach near completion, with small batches being produced sporadically over the course of a 23-week period. This was wholly insufficient to meet Cymbiotika's needs.

163.   Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.  Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale but also caused a massive amount of churn and countless customer complaints.  Cymbiotika's  customers  (and  employees  alike)  could  not  understand  why

43

1    Cymbiotika continued to have challenges with inventory.  Cymbiotika was
2    consistently running out of stock of various products.

3        164.   Since Cymbiotika utilizes a subscription-based model for a significant
4    portion of its sales, a steady flow and supply of subscribed-to products to customers
5    is required.  Virun's constant delays and inability to deliver on its own invoices issued
6    pursuant to the Formulation and Manufacturing Agreement timely and in full, caused
7    Cymbiotika's business to suffer greatly.   Virun's lack of attentiveness and
8    responsiveness to Cymbiotika's account, simply made matters worse as Virun's
9    representatives would frequently ignore reasonable requests for updates and
10   information on outstanding purchase orders.  Cymbiotika is informed and believes,
11   and on that basis alleges, that Virun many times would blame its own incompetence
12   on delays in receiving raw material from its suppliers needed for particular
13   formulations.  Cymbiotika is further informed and believes, and on that basis alleges,
14   that despite Virun's representations, delays from its raw material suppliers were not
15   the cause of Virun's inability to meet order demands.

16       165.   Virun's material breaches of the Formulation and Manufacturing
17   Agreement discharged any continuing obligation of Cymbiotika to continue to
18   purchase any product from Virun pursuant to the Formulation and Manufacturing
19   Agreement, to the extent such an obligation remained at the time Cymbiotika cased
20   doing business with Virun.

21       166.   As a direct and proximate result of Virun's breaches of Formulation and
22   Manufacturing Agreement, Cymbiotika has suffered damages in an amount to be
23   proven at trial.

24   **<u>FOURTH COUNTERCLAIM FOR RELIEF</u>**
25   **<u>BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING</u>**

26       167.   Cymbiotika repeats and realleges the allegations of the preceding
27   paragraphs as if fully set forth herein.

28

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

168.    In or around January 8, 2019, Cymbiotika and Virun entered into an oral Formulation and Manufacturing Agreement.   Pursuant to the Formulation and Manufacturing Agreement, Virun and Cymbiotika agreed that Cymbiotika would own any formula that Virun developed based on Cymbiotika idea.   In consideration for Virun agreement that Cymbiotika would own the formulas developed based on Cymbiotika's ideas, Cymbiotika agreed that Virun would manufacture product based on such formula for a reasonable time thereafter.   This agreement that Virun would manufacture product based on the formula developed from Cymbiotika's idea made sense since Virun's contribution to any formula developed from Cymbiotika idea would be to add additional ingredients at specific proportions to optimize a stable liposomal emulsion that could be manufactured using Virun's patented techniques. Further material terms of the Formulation and Manufacturing Agreement were that Virun average lead time on production was 2-3 weeks after receipt of all raw materials.  A further material term was that Virun would issue invoices reflecting the price and quantity of the product to be manufactured from a given formula based on Cymbiotika order and that Cymbiotika would pay 50% of the invoice amount at the time of issuance.   Cymbiotika further agreed to pay the balance of any invoice reflecting the amount of product produced under any given invoice at the time it took possession of the product produced from Virun.

169.    While Cymbiotika requested that the Formulation and Manufacturing Agreement be formalized into an omnibus writing, the parties never even exchanged drafts beyond Virun providing a few irrelevant templates with no follow up.  The parties, however, did act in a manner consistent with the above referenced material terms for approximately two years.  Additionally, and consistent with the material terms above, each specific order for product based on any formula is evidenced by at least two Virun invoices reflecting the product, price, and quantity, and Cymbiotika paid such invoices consistent with the Formulation and Manufacturing Agreement. Virun's invoices each included a separate promised delivery date for each order.

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

170. Cymbiotika performed all conditions precedent to demanding performance from Virun on the contract and any subsidiary contract, except for those obligations waived, excused, or prevented by Virun.

171. The contract and the subsidiary contracts include an implied covenant of good faith and fair dealing.

172. Virun consistently delayed fulfilling the invoices Virun issued pursuant to the Formulation and Manufacturing Agreement. Often, Virun refused to return phone calls and/or emails for weeks. Virun ignored many desperate pleas for information regarding product fulfillment. Purchase orders were often cut short without warning or explanation.

173. By way of example, Cymbiotika pre-paid for 10,000 units in one invoice for delivery by a certain date. On that date, Cymbiotika received 6,000 units and was told that the remainder would have to be fulfilled later. In other instances, purchase orders were never filled and others were simply closed by Virun without explanation.

174. The initial lead time for products from Virun was 2-3 weeks from receipt of the raw materials necessary to manufacture to product quantity reflected in the invoice. This eventually increased over to time to 4-6 and them later, from 8-12 weeks. Cymbiotika frequently received no communication from Virun throughout the times of delay to explain what was happening internally or what an updated timeframe would look like for each overdue invoice.

175. Virun's invoices issued pursuant to the Formulation and Manufacturing Agreement specified certain unit amounts of products for Virun to manufacture for Cymbiotika. It is understood in the industry that you have a variance of 3-5% on a manufacturing that could result in overages or loss in production. This variance would have been understandable. However, Virun had an exorbitant amount of loss compared to this normal variance and would often close an invoice after shipping a few increments over time without fulfilling the entire order. When Virun did so, Virun cited having a higher loss in production than the 3-5% variance. This excuse

46

confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials. With such high amounts of "loss in production," it became clear that Virun didn't buy enough raw materials to fulfill the exact orders within the acceptable industry-wide variance.

176. By way of further example, Cymbiotika at one point had placed its D3 and magnesium products offline because Virun could not keep up with the product ordered as reflected in invoices issued by Virun pursuant to the Formulation and Manufacturing Agreement. These items were Cymbiotika's best-selling products at the time. When Virun finally responded to our inquiries into these product delays, Cymbiotika received numerous conflicting updates on the magnesium product production. For example, Cymbiotika was told that the last thing Virun was waiting on to produce magnesium was the magtein raw material to come in from the supplier. Cymbiotika thereafter directly corresponded with Virun's supplier to gain clarity. Cymbiotika confirmed that the magtein was in fact available for Virun to pick up, but that Virun failed to arrange a pickup, causing even more delays.

177. Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products. Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale but also caused a massive amount of churn and countless customer complaints. Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with inventory. Cymbiotika was consistently running out of stock of various products.

178. Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required. Virun's constant delays and inability to deliver on purchase orders timely and in full, caused Cymbiotika's business to suffer greatly. Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for

47

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

updates and information on outstanding purchase orders.  Cymbiotika is informed and believes, and on that basis alleges, that Virun many times would blame its own incompetence on delays in receiving raw material from its suppliers needed for particular formulations.  Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

179.  Virun breached this covenant by, among other things, acting in bad faith and engaging in conduct that frustrated Cymbiotika's rights with respect to the intended benefits and purpose of the contract and subsidiary contracts.  Virun's breach of this covenant implied in the Formulation and Manufacturing Agreement discharged any continuing obligation of Cymbiotika to continue to purchase any product from Virun pursuant to the Formulation and Manufacturing Agreement, to the extent such an obligation remained at the time Cymbiotika cased doing business with Virun.

180.  Virun's repeated inabilities to fulfill its invoices issued pursuant to the Formulation and Manufacturing Agreement in a timely and complete manner, as well as frequent refusals to respond to reasonable requests for order fulfillment statuses, frustrated Cymbiotika's enjoyment of the benefits of the underlying Formulation and Manufacturing Agreement.  Additionally, Virun's assertion that it now owns the formulations developed with Cymbiotika interferes with an intended benefit of this contract.

181.  As a direct and proximate result of Virun's breaches of the implied covenant of good faith and fair dealing, Cymbiotika has suffered damages in an amount to be proven at trial.

**FIFTH COUNTERCLAIM FOR RELIEF**

**FALSE ADVERTISING UNDER THE LANHAM ACT - 15 U.S.C. § 1125(a)**

182.  Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

48

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

183.    Beginning no later than November 2021, Virun engaged in a campaign of making false statement concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

184.    Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic.    These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

185.    By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt."  Exhibit D.  The user stated that:

> This ingredient is in several of CYMBIOTIKA's supplement products and has been shown to cause causer. . . CYMBIOTIKA does not want you to know this – BEWARE, they will delete-comments re anyone who questions them on this.  *Id*.

186.    The user "tagged" a number of Cymbiotika's customers to ensure that they saw the post.

187.    The user "contradiction2u" also posted a screenshot from Cymbiotika's own website, which reflected Cymbiotika's use of sorbic potassium salt in one of Cymbiotika's products.  **Exhibit D**.  Incredibly, the screenshot also which shows the bookmark bar and bookmarks for Bromley's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.



49

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

188.   As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself.  As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations.

189.   At all times relevant to the social media postings, Bromley was the President of Virun.  On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

190.   The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.  Specifically, Cymbiotika saw a meaningful decline in Vitamin C subscriptions concomitant with Bromley's activity.  Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

191.   Attached hereto as **<u>Exhibit D</u>** is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

192.   Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign.  However, the damage to Cymbiotika's reputation remained.

193.   Virun's assertions about the safety and efficacy of Cymbiotika's products are false and plainly untrue.  In particular, Virun have specialized knowledge in the field of nutritional supplements and whether they are or are not known to be carcinogenic.  Further, as Cymbiotika's manufacturer, Virun was uniquely positioned to appreciate the fact that none of the ingredients in Cymbiotika's products were known to be carcinogenic.  Virun was aware of the falsity of the

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

1    statements at the time of their publication.

2        194.   Virun made false assertions about Cymbiotika's products as part of

3    commercial advertisements, including social media posts, for the purpose of

4    influencing consumers to refrain from purchasing Cymbiotika's products and were

5    disseminated sufficiently to the relevant purchasing public on social media.

6        195.   Virun made all such statements in commercial advertising in interstate

7    commerce, including in California, in order to misrepresent the nature,

8    characteristics, and qualities of Cymbiotika's goods and services.

9        196.   Virun's false statements regarding Cymbiotika's products are deceptive

10   and are likely to influence consumers' purchasing decisions.

11       197.   Given its intimate knowledge of Cymbiotika's ingredients and high

12   standards for same, Virun knew that Cymbiotika's new products did not lack the

13   safety and efficacy Counterclaim Defendants publicly asserted.   Virun therefore

14   made the false and disparaging statements willfully and with an intent to deceive

15   consumers.

16       198.   As a direct and proximate result of Virun's false and disparaging

17   publications, Cymbiotika has suffered damages in an amount to be proven at trial.

18   Specifically, advertising that a competitor's Vitamin C supplement contains one or

19   more cancer causing ingredients will obviously cause subscribers of that product to

20   cancel their subscription since it is obvious that no rational person wants to expose

21   themselves to cancer causing substances. Additionally, Cymbiotika saw a meaningful

22   increase in cancellation of customer subscriptions for Vitamin C concomitant with

23   Bromley's advertising activity.   Additionally, any continued false advertising by

24   Virun of the safety or efficacy of Cymbiotika's products will cause Cymbiotika

25   irreparable harm warranting injunctive relief.

26       199.   Virun acted here in a willful and wanton manner and as a result,

27   Cymbiotika is entitled to enhanced damages.

28       200.   Cymbiotika is entitled to an award of attorneys' fees because of the

51

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

1  exceptional nature of Virun's conduct.

2  ## SIXTH COUNTERCLAIM FOR RELIEF

3  ## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

4      201.  Cymbiotika repeats and realleges the allegations of the preceding

5  paragraphs as if fully set forth herein.

6      202.  Cymbiotika has subscription contracts with its customers whereby

7  Cymbiotika supplies its customers with products on a recuring basis.

8      203.  Virun knew of Cymbiotika's subscription-based relationship with its

9  customers.

10      204.  Virun interfered with these subscription contracts by, among other

11  things, making false statements publicly about the safety and efficacy of

12  Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika

13  products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

14      205.  Virun intended their conduct to disrupt these subscription contracts or

15  knew that it was substantially certain that their conduct would disrupt these contracts.

16  Additionally, Virun conduct was independently wrongful because his advertising

17  statement directed to a competitor were false.

18      206.  As a direct and proximate result of Virun's interference, Cymbiotika

19  experienced a marked increase in subscription cancelations for Vitamin C.

20  Cymbiotika has suffered damages in an amount to be proven at trial.

21      207.  Virun acted volitionally with fraud, oppression, and malice entitling

22  Cymbiotika to an award of punitive damage.

23  ## PRAYER FOR RELIEF

24      WHEREFORE, Cymbiotika respectfully request that this Court enter

25  judgment in their favor and against Virun and provide the following relief:

26      a.    Compensatory damages, incidental damages, consequential damages;

27  and disgorgement of any unjust enrichment;

28      b.    Costs of suit, interest, and reasonable attorneys' fees;

52

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

c.    Pre and post-judgment interest;

d.    Punitive damages; and

e.    Such other relief as this Court deems just and equitable.

Dated: August 11, 2023                    FOX ROTHSCHILD LLP

                                          /s/ John Shaeffer

                                          John Shaeffer
                                          Jeffrey H. Grant
                                          Carly Klein
                                          Attorneys for Defendants and
                                          Counterclaimant

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS

345656\00001\147722615.2

1

## DEMAND FOR JURY TRIAL

2          In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by

3   jury on all issues so triable.

4

5   Dated: August 11, 2023                    FOX ROTHSCHILD LLP

6

7                                             */s/ John Shaeffer*

8                                             John Shaeffer
                                              Jeffrey H. Grant
9                                             Carly Klein
                                              Attorneys for Defendants and
10                                            Counterclaimant

11

12

13

14

15      **PURSUANT TO THE COURT'S JULY 21, 2023 ORDER [DKT. 160], A**

16      **"REDLINED" VERSION OF THE AMENDED COUNTERCLAIMS IS**

17                            **ATTACHED AS EXHIBIT F**

18

19

20

21

22

23

24

25

26

27

28

54

CYMBIOTIKA'S THIRD AMENDED COUNTERCLAIMS