JOHN J. SHAEFFER (SBN 138331)
    JShaeffer@FoxRothschild.com
JEFFREY H. GRANT (SBN 218974)
    JGrant@FoxRothschild.com
CARLY KLEIN (SBN 340691)
    CKlein@Foxrothschild.com
FOX ROTHSCHILD LLP
Constellation Place
10250 Constellation Blvd, Suite 900
Los Angeles, CA 90067
Telephone:   310.598.4150
Facsimile:   310.556.9828

Attorneys for Defendant and Cross-
Claimant Cymbiotika, LLC and
Defendants Chervin Jafarieh and
Shahab Elmi

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| VIRUN, INC., <br><br> Plaintiff, <br><br> v. <br><br> CYMBIOTIKA LLC, a limited liability company; CHERVIN JAFARIEH, an individual; SHAHAB ELMI, an individual; and DOES 1 through 10, inclusive, <br><br> Defendants. | Case No. 8:22-CV-00325-WLH-DFM <br><br> Hon. Wesley L. Hsu <br><br> **CYMBIOTIKA LLC'S SECOND AMENDED THIRD-PARTY COMPLAINT AGAINST PHILLIP BROMLEY FOR:** <br><br> **(1) False Advertising under the Lanham Act - 15 U.S.C.; and § 1125(a); and** <br><br> **(2) Tortious Interference with Contractual Relations** |
| CYMBIOTIKA LLC, a limited liability company, <br><br> Counterclaimant, <br><br> v. <br><br> VIRUN, INC. a California Corporation, and Roes 1 to 10 inclusive, <br><br> Counterclaim Defendants. | **DEMAND FOR JURY TRIAL** |
| CONTINUED ON NEXT PAGE | |

1

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

1    CYMBIOTIKA LLC, a limited liability
2    company,

3               Third-Party Complainant,

4       v.

5    PHILLIP BROMLEY, an individual,

6                Third-Party Defendant.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

## INTRODUCTION

1.    When Plaintiff and Counterclaim Defendant Virun Inc. ("Virun") was unable to meet its contractual obligations to Defendant and Counterclaimant Cymbiotika, LLC ("Cymbiotika"), its principals Chervin Jafarieh ("Jafarieh") and Shahab Elmi ("Elmi") were forced to make the risky, expensive, and difficult decision to move the manufacturing of Cymbiotika's dietary supplements from Virun to another manufacturer.[1]  This decision was particularly frustrating because over the course of nearly two years, Cymbiotika had invested millions of dollars working specifically with Virun.  A move to another manufacturer – compelled by Virun's incompetence – could further disrupt Cymbiotika's business, which is predicated upon its subscriber-customers receiving their products on time on a monthly basis. In particular, Cymbiotika knew that the disruption to this monthly cadence would cause subscribers to cancel their subscriptions and get their dietary supplements elsewhere.

2.    Cymbiotika had spent more than a year working hand-in-hand with Virun to develop a line of unique products after being induced by Virun's representation that the formulations Cymbiotika developed with Virun, based on Cymbiotika's ideas, would be Cymbiotika's intellectual property.  Had Virun and its President Third-Party Defendant Phillip Bromley ("Bromley"), not made such representations to Jafarieh and Elmi, Cymbiotika would have never done business with Virun.

3.    Embarrassed by their own ineptitude and jilted as a result of losing Cymbiotika's business and the friendship of Jafarieh, Virun and Bromley lashed out when Cymbiotika took its growing business elsewhere.  Bromley first took to social media to engage in an anonymous, weeks' long smear campaign to disparage Cymbiotika and its products by publishing social media posts – that specifically

---

[1] Together, Cymbiotika and Virun will sometimes be referred to as the "Parties."

3

**CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT**

targeted and tagged actual Cymbiotika customers – alleging that Cymbiotika's new Vitamin C formulation included cancer causing agents. Cymbiotika saw a meaningful uptick in customers canceling their Vitamin C subscriptions during this campaign and received a slew of one-star (1*) reviews on Google, at least one of which repeated the defamatory remarks that Bromley and Virun had made a few weeks prior about the very formulations that Virun now claim Cymbiotika misappropriated.

4.    After Bromley's identity surfaced following what Virun and Bromley believed was a clandestine social media campaign to tarnish Cymbiotika's reputation, they revised their approach.  Virun began systematically sabotaging the production and delivery of Cymbiotika products that Virun remained contractually obligated to deliver.  Specifically, Virun purposefully slowed, or outright prevented, the production of Cymbiotika products knowing that the delay would cause Cymbiotika's customers to cancel their orders and subscriptions.  Cymbiotika suspicions of Virun's systematic sabotage were confirmed when it caught Virun in several lies, including that Virun was unable to complete Cymbiotika's purchase orders because raw materials were not available to Virun when, in fact, they were.

5.    Months after Bromley's smear campaign, Virun changed strategy and claimed for the first time that Cymbiotika's new Vitamin C formulation, along with its other new formulations, were instead actually Virun's proprietary formulations. From this narrative stems Virun's far-fetched allegation that Cymbiotika's use of those formulations constitutes a misappropriation of Virun's trade secrets.  Of course, Virun's original ruse to mount baseless accusations that Cymbiotika's new formulations cause cancer is wholly incompatible with its second scheme to assert that Virun owns those same formulations.

6.    Virun makes these spurious claims despite its own website representing to potential and current clients – including Cymbiotika – that Virun does not make

4

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

private label products, but instead works with each client to develop unique formulations. Virun's website emphatically represents to Virun's prospective clients that the client, not Virun does owns the formulations that Virun manufactures in collaboration with its clients. This and other representations were expressly repeated or reaffirmed throughout the Parties' entire relationship by not only what Virun said – *e.g.*, Virun and Bromley always referring to the products as "Cymbiotika products" or "your products" – but what they didn't say. Not once during the Parties' relationship did Virun ever refer to the products as "Virun's products" or claim ownership over the product formulas. In fact, Virun did not make this claim until months after the relationship was terminated. While Virun now disavows these representations, such a bait-and-switch is not tolerated under the law and constitutes, at the very least, unfair competition.

## THE PARTIES

7.      Cymbiotika is a limited liability company organized and existing under the laws of the State of Nevada, with its principal place of business in San Diego, California.

8.      Upon information and belief, Phillip Bromley is an individual residing in this District and is a principal of Counterclaim Defendant Virun.

## JURISDICTION AND VENUE

9.      This Court has subject matter jurisdiction over the claims alleged herein pursuant to 28 U.S.C. § 1367, which provides that the Court has supplemental subject matter jurisdiction over all claims related to claims in an action within this Court's original jurisdiction. This Third-Party Complaint relates to and forms part of the same case or controversy as Virun's First Amended Complaint ("FAC") (Dkt. No. 92), which alleges misappropriation of trade secrets under the laws of the United States, 18 U.S.C. section 1836 *et. seq*.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

10.    This Court has personal jurisdiction over Bromley, and venue is proper in this District pursuant to 28 U.S.C. § 1391, because, on information and belief, he resides in this district and is a principal of Virun, which invoked the jurisdiction of this Court by filing its FAC in this Court.

## NATURE OF THE ACTION

11.    Cymbiotika seeks damages and injunctive relief for acts of trade liable, tortious interference, and unfair competition engaged in by Bromley in violation of the laws of the United States and the State of California.

## FACTUAL BACKGROUND

### Preliminary Discussions Between Cymbiotika and Virun

12.    Cymbiotika is a popular health supplement company that designs high-end, industry-leading, organic, and original formulations for direct-to-consumer sales, predominantly driven by an online subscription model.  Chervin Jafarieh is a founder and member of Cymbiotika.  Shahab Elmi is a co-founder, member, and CEO of Cymbiotika.

13.    Cymbiotika was a thriving business prior to ever meeting with Virun. Cymbiotika had already developed and marketed an Omega product that was met with success.  During this time, Cymbiotika had spent months conceptualizing, developing, and planning for the sale of additional products that would become the Cymbiotika product line.  It was at this point that Cymbiotika needed to expand and find a manufacturer that could accommodate Cymbiotika's growing product lines and the unique challenges associated with the bespoke formulas that were the cornerstone of Cymbiotika's brand and business plans.

14.    In late 2018, Cymbiotika was looking to develop a liposomal version of its uniquely vegan Omega 3/EPA supplement and began contacting various contract manufacturers of liposomal emulsions.  Cymbiotika researched and was in communications with numerous potential manufacturers.  Algorithm, the Canadian

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

company that manufactured B12 oil for Omega products for Cymbiotika, suggested that Cymbiotika consider Virun, which was also located in Southern California.

15.    In late 2018, Cymbiotika conducted basic due diligence regarding Virun.  For one, Cymbiotika carefully reviewed and considered Virun's website.  At the time, and at all relevant times, Virun's website contained the following representation regarding formula ownership in its frequently-asked questions ("FAQ") section:

[Q.] If Virun develops my product, who owns the formulation?

[A.] When a client brings us an idea for development, the client owns that formulation.  This is the most common scenario.  However, in some instances companies have asked to private label a formula already owned by Virun, and in those cases, Virun retains ownership.[2]

16.    Virun also represented on its website, in its FAQ section, and contrary to the representations that it has made in this case, that it does not sell private-label products and that each formulation it makes for a customer is custom and not some off the shelf formula:

[Q.]  Does Virun sell private-label products?

[A.] No. Every product we create is a custom formulation based on collaboration with our client.  Our products are developed on a project-by-project basis.  Therefore, we do not sell private-label products.[3]

A copy of these representations made on Virun's website is attached hereto as **Exhibit E**.

17.    After Jafarieh and Elmi reviewed Virun's website, including the FAQs, which set forth Virun's policy – that Virun's customers would own the formulas – they discussed the pros and cons of working with Virun.   Elmi and Jafarieh agreed

---

[2]  https://virun.com/faq/, last accessed February 24, 2023.
[3]  https://virun.com/faq/, last accessed February 24, 2023.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

that Virun's policy, *i.e.*, that Cymbiotika would own its own formulas, was critical to Cymbiotika's brand and business model.

18.    Relying on these representations, Cymbiotika reached out to Virun to discuss a potential business relationship.  Virun was simply one of several liposomal formulators/manufacturers that Cymbiotika was considering at the time.

**Confidentiality Agreement and Conception of Formal Business Relationship**

19.    After email exchanges in late 2018, Jafarieh traveled to Virun's facility in Pomona, California on January 8, 2019, and met with Bromley and other Virun employees.  To facilitate frank discussions about commencing a potential vendor-manufacturer relationship, Jafarieh, on behalf of Cymbiotika, and Bromley, on behalf of Virun, executed Virun's form Confidentiality Agreement on January 8, 2019.  A copy of the Confidentiality Agreement is attached hereto as **Exhibit A**.

20.    By its express terms, the Confidentiality Agreement was limited to "discussions concerning a possible future business or research relationship."  To the extent a relationship was forged, and the Parties believed there was a need to cloak an actual business relationship in confidentiality, such a term would need to be negotiated and included in any subsequent manufacturing and/or supply agreement. In fact, Virun provided Cymbiotika with drafts of precisely such agreements during these negotiations that included confidentiality language.  This and many other circumstances demonstrate conclusively that Virun itself knew that the exploratory Confidentiality Agreement was limited to pre-business discussions.

21.    Following the execution of the Confidentiality Agreement, Jafarieh discussed Cymbiotika's business and desires, including the importance that it owned its formulas.

22.    While Virun represented to Cymbiotika that it has some standard formulations of certain dietary supplements, Cymbiotika was not interested in simply repackaging a generic, easily substituted product.  Instead, Cymbiotika specifically

8

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

sought out to hire a manufacturer who would work with Cymbiotika to formulate custom products based around Cymbiotika's ideas that would be consistent with Cymbiotika's brand and business strategies as an innovative leader with the overarching goal to be "first to market" with each of its products. Cymbiotika was drawn to Virun by its representations that it worked with customers to develop custom formulations and that those formulations so jointly developed would be Cymbiotika's – and not Virun's intellectual property.

23.    Bromley and others at this January 8, 2019 meeting confirmed the statements made on Virun's website – that it was Virun's practice, and would continue to be Virun's practice – that formulas developed based on a customer's idea are owned by that customer, and that this was the most common scenario. In fact, Jafarieh would not have traveled to Pomona for this meeting had Bromley not stated that Cymbiotika would own all formulas based on Cymbiotika's ideas if it contracted with Virun. Virun would thereafter repeat these representations to several other Cymbiotika employees during formula development.

24.    Virun's repeated representations both during this January 8, 2019 meeting and subsequently thereafter regarding formula ownership were critical to inducing Cymbiotika to work with Virun. Cymbiotika wanted a manufacturer that would not only allow it to bring its own products and formula ideas to the table, but also to retain ownership over such formulas. Cymbiotika specifically sought to avoid manufacturers that required its customers to choose pre-existing formulas and simply sell those formulas under a different label and brand (otherwise known as "white labeling" or "private labeling"). Cymbiotika also wanted to avoid having to enter into a license arrangement for the formulas. Cymbiotika's preferences are in line with its business model – setting industry standards for scientific innovation, product quality, and consistent research and development to build a high-end line of premium products.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

25. Cymbiotika is informed and believes, and on that basis alleges, that Virun and Bromley knew that the ownership statements that Cymbiotika would own all the formulations developed by Virun based on ideas Cymbiotika brought to Virun for development – including the ownership statements on Virun's website and reiterated verbally by Bromley and others to Cymbiotika – were false when made. Specifically, Cymbiotika is informed and believes, and on that basis alleges, that at the time these representations were made it was not "the most common scenario" that Virun's customers owned their formulas that Virun developed based on the customers' idea. In fact, Cymbiotika is informed and believes, and on that basis alleges, that Virun did not have a single contractual relationship with any of its existing customers where the customer owned its formula developed by Virun based on the customers' idea. Cymbiotika is informed and believes, and on those bases alleges, that at this time when Bromley represented to Jafarieh that Virun's customers owned the formula, Virun and Bromley believed that Virun owned all of the formulas it had developed for customers based on the customers' idea and the only instance where Virun did not own a formula that it manufactured was in the rare instance where a customer brought a completed formula that required no development whatsoever by Virun. Virun's and Bromley's clear intent to defraud Jafarieh and Cymbiotika is further evidenced by Bromley's post-hoc explanation that what Virun meant by "idea" was a fully developed formulation, a justification belied by the plain meaning of Virun's representation: "When a client brings us an idea **for development.**" (emphasis added). Moreover, neither Bromley nor Virun ever disclosed this alternative definition of the word "ideas" to Cymbiotika, never offered a disclaimer on Virun's website, and never explained to Cymbiotika before Cymbiotika agreed to work with Virun that the word "ideas" had a unique meaning different from its ordinary meaning.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

26.     Cymbiotika is further informed and believes, and on that basis alleges, that, even accepting Virun's undisclosed definition of the term "idea," it was not the "most common scenario" since, it was "rare" that a customer would ever bring a completed formula to Virun for production.  Moreover, Cymbiotika is informed and believes, and on those bases alleges, that Virun as a matter of policy would not manufacture a product based on a cusomers' own formulation for fear of liability.

27.     Had Cymbiotika known on January 8, 2019, that (1) it was not in fact Virun's common practice to have its customers own the formulas based on their ideas, (2) what Virun meant by "idea" was actually a completed formula, or (3) Virun intended to claim ownership over any formula it collaborately developed with Cymbiotika, Cymbiotika would have immediately broken off any further discussions with Virun and would have entered into a development and manufacturing relationship with another formulator willing to agree that any formula developed that was based on an idea conceived by Cymbiotika, even if collaboratively developed with the formulator, would be owned by Cymbiotika.

**Cymbiotika's Vendor-Manufacturer Relationship with Virun**

28.     Once Virun confirmed that it encouraged and welcomed Cymbiotika's collaboration and agreed that Cymbiotika would own what Virun formulated, consistent with Virun's past practices, Cymbiotika orally contracted with Virun to develop liposomal formulations of Cymbiotika's supplement ideas that could be manufactured using Virun existing facility.  Obviously, any formulation development would need to be a collaborative process between Cymbiotika and Virun.  While Cymbiotika clearly knew the profile and function of the product it wanted along with the relevant active ingredients, Cymbiotika was not privy to Virun's manufacturing techniques and what additional components would need to be added to a formula or their percentages in order to achieve a stable liposomal emulsion that would achieve maximum bioavailablity.

11

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

29.    Virun, however, told Cymbiotika that it had patented, and thereby publicly disclosed, its manufacturing techniques, which included the raw materials and their percentages.  As such, the Parties agreed that Cymbiotika would bring the supplement idea to Virun, Virun would use its patented techniques to obtain a stable and deliverable supplement, and finally the two would work collaboratively thereafter to achieve the consistence, flavor profile, and color that Cymbiotika wanted for a distinctive, premium supplement product that Cymbiotika's customers would want to purchase.

30.    The Parties further agreed that Cymbiotika would not be charged for formula development, but once Cymbiotika had approved the formula developed Virun, Cymbiotika would thereafter purchase product manufactured and packaged by Virun based on that formula for a reasonable time.

31.    As part of this agreement to purchase product from Virun based on such formulas, Virun represented that its lead time for such production was 2-3 weeks from its receipt of all raw materials.  Cymbiotika additionally agreed to pay 50% of any invoice at the time of ordering and the remaining 50% at the time Cymbiotika received the finished goods from Virun ("Formulation and Manufacturing Agreement").

32.    Virun's representation that Cymbiotika would own all formulas based on Cymbiotika's ideas was inextricably intertwined with the Cymbiotika agreement have Virun manufacture products based on such formula for a reasonable time and thus part of the Parties' overall agreement.

33.    Cymbiotika is informed and believes, and on that basis alleges, that this interrelationship between the formula and manufacturing is further evidenced by the fact that any formula Virun would develop would be optimized for Virun's patented manufacturing practices and techniques, meaning that such formula would not be optimized for another liposomal manufacturer's facility.  Stated more simply, while

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

the general practice of creating a stable emulsion (*e.g.,* oil in water or water in oil) is common, including liposomal emulsions, there are innumerable and varied methods to optimize the practice and different manufacturers have their preferred methods and materials. Thus, the formulas developed for Virun's facility would not be replicated by another manufacturer using different manufacturing methods and processes.

34.    The contract terms relating to both price and quantity of all goods Virun manufactured for Cymbiotika under the Parties' Formula and Manufacturing Agreement are separately and specifically identified in the purchase orders and invoices by and between Cymbiotika and Virun for each batch of a specific supplement that Virun would manufacture. Cymbiotika is informed and believes, and on that basis alleges, that each of these invoices and purchase order are still in the possession, custody, or control of Virun.

35.    After a formula was completed, approved by Cymbiotika, and it passed its stability analysis, Cymbiotika would provide purchase orders for a given number of products based on that formula. In turn, Virun would issue an initial invoice that in addition to stating the price and quantity ordered would include an expected completing date for the invoice, and Cymbiotika would pay 50% of that invoice at the time of issuance.

36.    When production under each invoice was complete, or partially complete such that Cymbiotika could pick up a partial order, Virun would then issue another invoice for the completed product and Cymbiotika would pay the balance of the invoice for the production completed. Virun's invoices did not alter the material terms to the Formulation and Manufacturing Agreement other than the specifics of the amount of product to be made, the dollar amount for the invoice, and provide an expected date by which the invoice would be complete. Cymbiotika timely paid each Virun invoice.

13

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

37.    Virun and Cymbiotika never memorialized this relationship in any global manufacturing agreement of the type.  Such a lack of insistence by Virun underscores the fact that Virun did not take reasonable measures to protect anything that it considered to be its trade secret.  One reason why Virun may have decided against pushing for a manufacturing agreement with Cymbiotika is that any such agreement would also have addressed the ownership of any formulations forged under that relationship.  Cymbiotika expected that it would, and did, own the various formulations it developed with Virun, consistent with the representations on its website, as well as other representations made directly to Cymbiotika.

38.    No later than early April 2019, both Jafarieh and Shahab Elmi, Cymbiotika's CEO, inquired about formalizing Cymbiotika's relationship with Virun in one or more written agreements.  It was not until end of May 2019, that Virun first provided "three different agreements we have the option of entering," which included a manufacturing and supply agreement, a research agreement, and a quality agreement.  Cymbiotika is informed and believes, and on that basis alleges, that these agreements were templates Virun had used with other customers, but none of these templates seemed relevant to Virun's relationship with Cymbiotika.

39.    Cymbiotika is informed and believes, and on that basis alleges, that Virun avoided a written agreement that clarified ownership of the formulations so that Virun could engage in a bait-and-switch wherein it could later claim, as it has done here, that it (rather than Cymbiotika) owns Cymbiotika's formulas.  In other words, by waiting until after Cymbiotika had become heavily invested and reliant on Virun's services, Virun could place Cymbiotika in "golden handcuffs" before Virun claimed ownership of the Cymbiotika formulations.

40.    Cymbiotika is further informed and believes, and on that basis alleges, that Virun has done this with its other customers as well.  For example, more than a year after the Parties had been in business together, Virun sent Cymbiotika a contract

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

Virun had with another customer in which Virun asserted ownership over the specifics of the formula it had developed for that customer based on that customer's ideas, which directly contradicted what Virun represented to the public and to Cymbiotika it would do.  However, by claiming ownership of any formula developed from an idea brought by a customer, Virun effectively prevented that customer from transitioning its products away from Virun.  Simply, any customer who had already agreed to have Virun produce its formulations to the specifications and tastes of its end users was inevitably forced to keep its production with Virun regardless of Virun's ability to timely meet demand because any change in manufacturing would only further delay shipments and would result in unwanted changes to the products (*e.g.*, flavors and consistencies).  This could (and would) result in the loss of customers.

## Cymbiotika Brought Virun the Ideas to Virun to Co-Develop the Formulas

41.    During their January 8, 2019 meeting, Cymbiotika disclosed to Virun the following supplement ideas: (1) Vegan DHA; (2) Sleep Time containing CBD; (3) Sleep Time without CBD; (4) lactoferrin bound glutathione; (5) a mushroom complex; (6) an immune product; (7) a Vitamin D product using a plant-based Vitamin D; and (8) CoQ10 PQQ supplement.

42.    At no time during this meeting did Bromley or anyone affiliated with Virun suggested that Virun already had a "white label" version of any of these products that would fully meet Cymbiotika's needs.  Moreover, Cymbiotika would not have been interested in selling any existing Virun formulas.

43.    After the January 8, 2019 meeting, Bromley reported each of Cymbiotika's ideas to his formulators.

44.    After some discussion, a business relationship was forged, and Virun began working on Cymbiotika's DHA product per Cymbiotika's specifications and visions.  After Virun proved unable to stabilize a liposomal DHA product based on

15

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

Cymbiotika's specifications, and Virun seemed to be frustrated, Jafarieh suggested that the initial products be made simpler. This simpler product was referred to as "low hanging fruit" amongst the Parties.

45.    Among these "low hanging fruit," projects were a sleep formulation and brain formulation that would include ingredient blends developed by Jafarieh and Jamie Bigelow, Cymbiotika's Creative Director.

46.    Cymbiotika is informed and believes, and on that basis alleges, that Virun did not have any existing formulas similar to Cymbiotika's idea for either its sleep formula or brain formula. In fact, once formulated, Bromley himself referred to these formulas as **Cymbiotika's** proprietary formulas. Despite this representation, however, Bromley would later make Cymbiotika's sleep and brain formulas for Virun's other customers, referring to them as Virun's own "low hanging fruit."

47.    Jafarieh and Bigelow consistently communicated with Virun **to have Virun manufacture the products that Cymbiotika conceptualized** and to co-develop Cymbiotika's formulations, providing exact specifications and ingredient combinations for every product that would eventually bear Cymbiotika's name. Bigelow consistently asked Virun questions about the ingredients, combinations, product stability, and manufacturing processes to clarify the details of Cymbiotika's actual and potential products.

## Product Development and Sales

48.    Virun and Cymbiotika co-created products**, based on Cymbiotika's ideas and specifications,** from mid-2019 to late 2021, including Vitamin B12, Vitamin C, Activated Charcoal, Magnesium, L-Threonate, Micelle Mushrooms, Supergreens with Chlorophyll, Glutathione and Red Yeast Rice. Each of these were derived from Jafarieh's ideas and specifications.

49.    Cymbiotika always understood and expected that it would own the formulations developed with Virun, and Virun never suggested otherwise. The fact

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

that nearly five months passed from when Cymbiotika first approached Virun with its ideas and when Virun had completed formulations ready for shipment belies Virun's contention that any of these formulas were pre-existing "white label" formulations since pre-existing formulations would not have taken so long to make.

50.    All of the products that Virun manufactured for Cymbiotika, **based on Cymbiotika's ideas and specifications,** went through an extensive development process that, for each of Cymbiotika's products, began with Cymbiotika, and lasted several months. This process included extensive back and forth discussions between Cymbiotika and Virun, whereby Cymbiotika drove the creative process to make certain that each Cymbiotika product manufactured by Virun were unique and geared towards Cymbiotika's clientele that preferred high-quality, plant-based products that justified premium prices.  Cymbiotika purposefully avoided what would have been the easy route: slapping its labels on existing Virun formulas even though the ingredients in those formulas did not meet Cymbiotika standards or specifications that its customers trust.

51.    **<u>Vitamin B12</u>**:  Vitamin B12 was the first product Cymbiotika ordered from Virun pursuant to a June 13, 2019 purchase order, to which Virun provided an invoice and Cymbiotika paid a 50% deposit at that time.  Cymbiotika dictated the formulation for this Vitamin B12 product.  Jafarieh mandated the addition of fulvic acid complex, adenosyl-cobalamin, B6, and organic flavor terpenes.  Virun did not complete this order until three months later in September 2019, at which point it issued another invoice and Cymbiotika paid the remaining balance on the invoice. Thereafter Cymbiotika would continue to purchase B12 as evidenced by Virun's invoices consistent with the parties' agreements. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

52. **Sleep (Rumi Sleep):** Sleep was the second product that Cymbiotika purchased from Virun after formulation was completed. Cymbiotika identified to Virun all of the active ingredients that it wanted in this product. Cymbiotika was first able to order the sleep formulation once it passed stability in October 2019. Virun provided Cymbiotika an invoice at that time and Cymbiotika paid its 50% deposit. Virun completed this order in December 2019, at which point Cymbiotika paid the remainder of the invoice balance and picked up the product. Thereafter Cymbiotika continued to purchase Sleep, and derivatives thereof, as evidenced by Virun's invoices consistent with the Parties' agreement. Bromley later confirmed in an email that this product was Cymbotika's proprietary formula. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

53. **Brain (Golden Mind):** Virun completed Cymbiotika's Brain formulation contemporaneously with the Sleep formula, which Cymbiotika was to sell under the brand name Golden Mind. Cymbiotika identified all of the active ingredients that it wanted in this product, and, like the Sleep formula, Bromley also identified this product as Cymbotika's proprietary formula. Cymbiotika first purchased Golden Mind from Virun in October 2019 after Virun had completed its formulation and it passed stabilization testing. Cymbiotika made its 50% deposit at that time. Virun, however, did not fulfill this order until late December 2019, at which time Cymbiotika had already paid the remaining balance for the product. Thereafter Cymbiotika would continue to purchase Golden Mind, and derivatives thereof, as evidenced by Virun's invoices consistent with the parties' agreements. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

54. **Vitamin D3/MK7/Ubiquinol:** At its January 8, 2019 meeting with Virun, Cymbiotika identified a vegan vitamin D3 product that contained MK7 and

148197105.2

ubiquinal as one of its product ideas.  While Virun had a non-vegan D3 formula, Cymbiotika wanted a vegan supplement, which Virun did not have at the time. Thereafter Cymbiotika and Virun worked on the formulation to effectuate Cymbiotika's idea.  Cymbiotika first ordered and made a 50% deposit for a supply of this D3 formulation in November 2019, pursuant to an invoice from Virun, after it passed stabilization testing.  At the time, Virun indicated its lead time on the order would take 10-12 weeks, not the 2-3 weeks to which the Parties had agreed.  When the order was finally completed by Virun, Cymbiotika paid the balance of the invoice and picked up the product.  Thereafter, Cymbiotika would continue to purchase Vitamin D3, as evidenced by Virun's invoices consistent with the parties' agreements. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

55.  **Micelle Mushrooms**: At its January 8, 2019 meeting with Virun, Cymbiotika shared its idea for a mushroom supplement.  Virun did not have any similar product to this mushroom blend at the time.  Work on this product did not begin until about October 2019, when Cymbiotika provided more specifics to Virun for its idea, and Cymbiotika leveraged its relationship with a grower in San Diego to create chocolate mushrooms.  *See* **Exhibit C**.  After Cymbiotika paid Virun the 50% deposit on the invoice to get production in queue, Virun began work of this product. By the end of June 2020, Virun completed production for this mushroom supplement after the formulation was able to pass stabilization testing.  Pursuant to the Parties' agreement, Cymbiotika then paid the remaining balance and picked up the production. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

56.  **Glutathione**:  In January 2019, Cymbiotika identified to Virun its idea for a supplement containing glutathione.  Although Virun had a prior glutathione formulation and had a patented method for binding lactoferrin with glutathione to

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

improve its bioavailability, Cymbiotika desired a materially different formula from Virun's pre-existing glutathione formulation.  Cymbiotika proposed the idea of adding the probiotic strain, lactobicullus rhamnosus to a glutathione supplement. Development of Cymbiotika's glutathione product began in or around January 2020. During the course of the Parties' dealings, Bromley referenced the glutathione supplement developed for Cymbiotika as Cymbiotika's glutathione product thereby further reinforcing the Parties' understanding that Cymbiotika, and not Virun, was the owner of that formula.  In April of 2020, Virun provided to Cymbiotika an initial invoice based on Cymbiotika's purchase order for its glutathione supplement after the product had been finally formulated and passed stabilization testing.  Virun, however, would not begin fulfilling this order until August 2020, and continually thereafter had difficulty meeting its contractually agreed upon production demands. Cymbiotika would later sell this product under the brand name ReGenesis.  Virun continued to issue invoices in response to Cymbiotika's orders, at which time Cymbiotika would make a 50% deposit and Virun would then issue a second invoice when production was complete on some or all of an order that was available for Cymbiotika to pick up.  Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

57.  **Activated Charcoal**:  In December of 2019, Jafarieh brought to Virun a formula idea that included activated charcoal and suggested that "[t]his has never been done before."  Virun did not have a private label of a similar product concept. Cymbiotika even offered to source the charcoal for the product for Virun.  Virun issued its first invoice for this charcoal formula in April 2020 after the formula was finalized and the product passed stability testing.  Cymbiotika made a 50% payment on the invoice to start the production process.  At that time, Virun stated that its production lead time would be 6-8 weeks for the products.  Virun completed production on this initial invoice in June of 2020, issued a further invoice on the

20

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

production once completed, and Cymbiotika paid the remaining balance on the invoice for the completed product. Thereafter, Virun would issue additional invoices up receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as was the practice with the production of other formulas. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

58.    **Vitamin C**:  While Cymbiotika and Virun had some discussions about developing a Vitamin C supplement in 2019, actual development did not begin until 2020.  Cymbiotika dictated the formulation for the Vitamin C product.  Beginning in or about January 2020, Cymbiotika co-created a Vitamin C product with Virun that incorporated Cymbiotika's ideas and concepts.  Among other things, Jafarieh insisted on adding bamboo silica. Virun did not issue its first invoice for a Vitamin C supplement to Cymbiotika until March of 2020, following the completion of formulation and stability analysis testing.  Thereafter, Cymbiotika paid 50% of the invoice amount.  Virun completed an initial production based on this invoice the following month, at which point Cymbiotika paid the balance on the invoice for what was produced and picked up the product.  Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbiotika would pay such invoices as was the practice with the production of other formulas. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

59.    **Magnseium L-Threonate**: In 2019, Cymbiotika presented Virun with its idea for a magnesium product.  In April of 2019, Virun asked that Cymbiotika hold the idea because Virun was too busy with the development of Cymbiotika's other products. Then, in June of 2019, Jafarieh sent to Virun his formulation ideas for Cymbiotika's magnesium supplement. Virun did not offer a similar product concept as a private label.  Jafarieh came to Virun to create a formula using a very

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

specific form of brain magnesium Cymbiotika wanted to use.  Jafarieh also specified that this product formula should have a simple vanilla flavor and contain macadamia nut butter.  Development did not commence in earnest on this product, however, until March of 2020.  Virun issued its first invoice for this magnesium supplement to Cymbiotika in September 2020, after the formula was finalized and the product passed stabilization.  At that time, Cymbiotika made a 50% payment on this invoice so that production could begin. While Cymbiotika had hoped for a quicker production, Virun was not able to complete even partial production until the end of October, and Cymbiotika would pay the remaining 50% due on what Virun was able to produce at that time. Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbitika would pay such invoices as was the practice with the production of other formulas.  Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

60.    **Sulforaphane with Chlorophyll**: Cymbiotika began developing its sulforaphane with chlorophyll product in or about June 2020. Jafarieh's idea for this novel product was to create a chlorophyll formula to market to Cymbiotika's predominantly vegan clientele to supplement the lower iron levels that result from a vegan, plant-based diet.  In August 2020, Virun issued an invoice for a quantity of this product and Cymbiotika paid 50% of the invoice amount to get production started.  It took Virun four months to complete this production and Virun issued an invoice reflecting partial completion in December of 2020.  Cymbiotika thereafter paid the balance for what was completed and picked up the product.  From thereon, Virun would issue additional invoices upon receipt of future orders from Cymbiotika and Cymbitika would pay those invoices as was the practice with the production of other formulas. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

61.    **Elderberry:**  In June of 2020, Jafarieh began discussing with Bromley a supplement containing elderberry and Zinc.  While Virun had a supplement formula containing elderberry, Cymbiotika made meaningful modifications to that formula to ensure that it would be a formula Cymbiotika would own under the Parties' agreement.  When Virun completed the formulation and it passed stability testing, Virun issued its first invoice for this product based on Cymbiotika's order late in September of 2020.  Cymbiotika thereafter paid 50% of the invoice amount at the beginning of October so production could commence.  Virun completed a partial production on the Elderberry invoice in November 2020 and issued an invoice for the production.  Cymbiotika paid the remaining 50% balance of the invoice for the product once it was completed.  Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbitika would pay such invoices as was the practice with the production of other formulas. Cymbiotika is informed and believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

62.    **Red Yeast Rice**.  In the summer of 2020, Cymbiotika approached Virun about making a product based on red rice yeast.  Prior to that, Virun did not offer a product predicated on red yeast rice.  Once the supplement was formulated based on Cymbiotika's ideas and after the formulation passed stability, Virun issued an initial invoice in October 2020 based on Cymbiotika order.  That invoice was then revised in November 2020, and Cymbiotika made its 50% down payment on the invoice during the first week of December.  Virun completed production on this initial invoice at the end of January 2021.  At that point, Cymbiotika paid the remaining balance and pick up the inventory.  Thereafter, Virun would issue additional invoices upon receipt of orders from Cymbiotika and Cymbitika would pay such invoices as was the practice with the production of other formulas. Cymbiotika is informed and

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

believes, and thereon alleges, that Virun has possession, custody, or control over these invoices.

63.    With each of the products discussed above, had Virun raised the issue of ownership of the formulations or even suggested that Virun rather than Cymbiotika would own the formulations or that Virun would ever attempt to assert some trade secret protection over the formulas that Cymbiotika understood it jointly developed with Virun, the relationship would have immediately ceased.

64.    Cymbiotika is informed and believes, and on that basis alleges, that Virun clearly understood, and deliberately mislead Cymbiotika to believe, that the formulas identified above were Cymbiotika's and not Virun's property.

65.    Cymbiotika is informed and believes, and on that basis alleges, that Virun did not follow up and document its relationship with Cymbiotika because it did not want to put into writing what Cymbiotika and Virun had orally agreed to – the formulations were Cymbiotika's and not Virun's property.

66.    Cymbiotika is informed and believes, and on that basis alleges, that Virun, at all relevant times, wanted to create some vagaries on ownership because Virun knew that it did not have the capacity or competence to actually manufacture these formulations to meet Cymbiotika needs.

67.    Cymbiotika is informed and believes, and on that basis alleges, that Virun aways intended to engage in this bait-and-switch so that it could force Cymbiotika to continue doing business with Virun despite Virun's incompetence.

68.    Virun repeatedly confirmed that Cymbiotika owned the formulations. In a communication dated August 11, 2020, Bromley told Jafarieh that he (Bromley) could "promote your [Jafarieh] glutathione product on our webinar tomorrow.  I can use prohealth but would prefer yours."

69.    In another communication from Bromley to Jafarieh, Bromley remarked that "[y]ou [Jafarieh] are involved and I respect you and Jamie for that."

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

70.   In a video posted by Bromley on the internet,[4] Bromley remarked that Jafarieh was "educated," "smart," and that he "develop[ed] products."  Bromley repeatedly referred to Cymbiotika's products as "your" – Cymbiotika's – products.

71.   Virun never claimed ownership to any of Cymbiotika's formulas at the time they were being developed.  Indeed, Virun never asserted ownership until after its own mismanagement caused Virun to lose Cymbiotika's business.  Virun's instant ownership claims are driven by remorse, not the facts.

**Virun's Breaches of the Formulation and Manufacturing Agreement Cause Damage to Cymbiotika's Business**

72.   After products had been formulated, Cymbiotika learned early on in their manufacturing relationship that Virun was being mismanaged, was disorganized, and had severe supply chain difficulties.

73.   A material term of the Formulation and Manufacturing Agreement was Virun's representation that its lead time of manufacturing was 2-3 weeks from its receipt of raw materials.  Although the initial lead time for products from Virun was supposed to be 2-3 weeks from purchase order to product delivery, this eventually increased to 4-6 weeks, and then to 8-12 weeks.  Making matters worse, Virun offered no explanations for these delays and would frequently ignore Cymbiotika when asked about them or for an updated timeframe for each overdue purchase order.

74.   Cymbiotika agreed to pay 50% of each invoice amount at the time of order based on Virun's representation that its lead time of manufacturing was 2-3 weeks.  Not only did Virun make this lead time representation at the outset of the relationship, but it also communicated this promise numerous times thereafter.

75.   On each invoice, Virun represented when each order would be shipped to Cymbiotika.  This "ship" date often communicated a time that was often between 8-15 weeks later.  This additional shipping time supposedly took into consideration

_____

[4] https://www.youtube.com/watch?v=boxMr0xDfeU, last accessed February 24, 2023.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

certain COVID-19-related supply chain issues.  However, notwithstanding those COVID-19 supply chain issues, Virun's delays in fulfilling orders far exceeded even the extended dates promised on the invoices.

76.    While there may have been particular instances where delay was not Virun's fault, the repeated, inexcusable, and consistent delays hurt Cymbiotika's business.  For example, Virun's delays made it impossible for Cymbiotika to adequately plan for customer deliveries.  This also created an unreasonable financial burden for Cymbiotika because Cymbiotika was forced pay half of each invoice upfront even when production would be delayed for months.

77.    This caused Cymbiotika irreparable harm because it was unable to meet subscription requirements.  In turn, Cymbiotika faced numerous cancellations from its subscribers due to Virun's inability to meet demand.  Virun's inability to meet its obligations to Cymbiotika started from the outset of its production of products for Cymbiotika and never improved.  In fact, as time went on, things only got worse.

78.    Virun consistently delayed fulfilling purchase orders and would frequently underdeliver.  Often, Virun refused to return phone calls and/or emails for weeks.  Virun ignored many desperate pleas for information regarding product fulfillment.  Purchase orders were often cut short without warning or explanation.

79.    By way of example, Cymbiotika pre-paid for 10,000 units in one purchase order for delivery by a certain date.  On that date, Cymbiotika received 6,000 units and was told that the remainder would have to be fulfilled later.  In other instances, purchase orders were never filled, and others were simply closed by Virun without explanation.

80.    By way of further example, on April 13, 2020, Cymbiotika placed an order for 5,000 units of Glutathione, paying 50% of the purchase price in advance.  The shipping date on the invoice indicated shipment in full by June 8, 2020, or 8 weeks later.  The shipment, however, was not completed and took over 39 weeks

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

later to reach near completion, with small batches being produced sporadically over the course of a 23-week period.  This was wholly insufficient given Cymbiotika's subscription service business model.

81.    Cymbiotika's purchase orders with Virun specified certain unit amounts of products for Virun to manufacture for Cymbiotika.  It is understood in the industry that there might exist a variance of 3-5% on a manufacturing purchase order that could result in overages or loss in production.  Such a variance would have been within the expectations of the Parties and was understood by Cymbiotika to be part of the agreement.  However, Virun's purchase orders had an exorbitant amount of loss compared to this normal variance and Virun would often close a purchase order out after shipping a few increments over time without fulfilling the entire order.

82.    When this would occur, Virun claimed that having a higher loss in production than the 3-5% variance justified its breaches to Cymbiotika.  This excuse confounded Cymbiotika because Cymbiotika had always provided Virun with 50% deposit to cover raw materials.  With such high amounts of "loss in production," it became clear that Virun was ill-prepared to perform on its promises to Cymbiotika and failed to purchase enough raw materials to fulfill the orders within the acceptable industry-wide variance.

83.    By way of further example, Cymbiotika, at one point, was forced to take its D3 and magnesium products offline because Virun could not keep up with the purchase orders that Cymbiotika needed fulfilled.  Cymbiotika, had empty shelves on these products as a result.  These items were Cymbiotika's best-selling products at the time.

84.    When Virun finally responded to Cymbiotika's inquiries into these product delays, Cymbiotika received numerous conflicting reports from Virun.  For example, Virun told Cymbiotika a delay with its magnesium production was caused by Virun's supplier, who was, according to Virun, slow to deliver the raw magtein

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

materials needed for the magnesium production.  Cymbiotika, however, learned that this was false after it contacted Virun's supplier to gain clarity.  As it turned out, the magtein was readily available for Virun to pick up, but Virun had failed to arrange a pickup, causing even more delays.

85.    These material breaches directly harmed Cymbiotika. For example, Cymbiotika's frustrated customers took notice of the constant "out of stock" messages and notifications while awaiting their purchased products.  Virun's delays and shortcomings not only restricted Cymbiotika's growth and ability to scale, but also caused a massive amount of churn and countless customer complaints. Cymbiotika's customers (and employees alike) could not understand why Cymbiotika continued to have challenges with its inventory and complained that Cymbiotika was consistently running out of stock of various products.

86.    Since Cymbiotika utilizes a subscription-based model for a significant portion of its sales, a steady flow and supply of subscribed-to products to customers is required.

87.    Virun's constant delays and inability to deliver on purchase orders, timely and in full, caused Cymbiotika's business to suffer greatly.

88.    Virun's lack of attentiveness and responsiveness to Cymbiotika's account, simply made matters worse as Virun's representatives would frequently ignore reasonable requests for updates and information on outstanding purchase orders.

89.    Cymbiotika is informed and believes, and on that basis alleges, that Virun would blame its own incompetence and failures on its suppliers, claiming that its suppliers were the cause of Virun's delays by falsely claiming that the suppliers were late to deliver the raw materials Virun needed for particular formulations.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

90.     Cymbiotika is further informed and believes, and on that basis alleges, that despite Virun's representations, delays from its raw material suppliers were not the cause of Virun's inability to meet order demands.

91.     Still, Cymbiotika forged ahead out of deep respect for their partnership and the sense of family that had been formed between Jafarieh and Bromley.

92.     Disappointingly, it became clear in late 2021 that Virun's inability to timely deliver on purchase orders constituted an existential threat to Cymbiotika. Cymbiotika had to transition to a manufacturer who could meet its rising demand.

### **Virun's Social Media Smear Campaign**

93.     Cymbiotika shifted operations away from Virun in late 2021, and began utilizing new, and unfortunately more expensive, manufacturing partners.

94.     Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an "anonymous" social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic.

95.     These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

96.     By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt." *See* **Exhibit D**. The user stated:

> This ingredient is in several of CYMBIOTIKA's supplement products and has been shown to cause cancer. . . CYMBIOTIKA does not want you to know this – BEWARE, they will delete-comments re anyone who questions them on this.

97.     The user specifically "tagged" a number of Cymbiotika's known customers to ensure that they saw the post.

29

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

98.    The user "contradiction2u" also posted a screenshot from Cymbtioka's own website, which reflected Cymbtioka's use of sorbic potassium salt in one of Cymbtioka's products. *See* **Exhibit D**.

99.    Incredibly, the screenshot also shows the bookmark bar and bookmarks for Bromley's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.



100.    As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself.

101.    As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations intentionally to hurt Cymbiotika's business.

102.    At all times relevant to the social media postings, Bromley was the President of Virun.  On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

103.    Cymbiotika saw a noticeable uptick in subscription cancellations for its Vitamin C product (with sorbic acid potassium salt) in connection with Bromley's smear campaign and saw a noticeable downturn in orders and new subscriptions for this product during that same time.

104.    The baseless and damaging lies spread by the "anonymous" assailant includuding "contradiction2u," resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation.  Bromley had once again created an existential threat to Cymbiotika.  Cymbiotika was forced to involve its

30

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

105.   Attached hereto as **Exhibit D** is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

106.   Following the delivery of the cease-and-desist letter, Bromley ceased his social media smear campaign.  However, the damage caused to Cymbiotika's reputation remained.

107.   Cymbiotika is informed and believes, and on that basis alleges, that in addition to its social media campaign, Virun and Bromley continue to engage in an active campaign to tarnish Cymbiotika's reputation and continue to seek means to otherwise harm Cymbiotika.  For example, Cymbiotika is informed and believes, and on that basis alleges, that Virun hired Cymbiotika's former head of information technology, Michael Riga, for the sole purposes of "digging up dirt" on Cymbiotika.

108.   Cymbiotika is informed and believes, and on that basis alleges, that under the guise of new employment, Virun and Bromley cajoled and coerced this new employee to disclose to Virun confidential information about Cymbiotika's business that it could use as a sword against Cymbiotika.

109.   Virun and Bromley did so despite the fact that this former Cymbiotika employee had a confidentiality agreement with Cymbiotika that continued post-employment.

110.   Cymbiotika is further informed and believes, and on that basis alleges, that Virun terminated the employment of this former Cymbiotika employee following the filing of its motion for preliminary injunction and after receiving declarations from this former employee in support of that motion out of fear that

31

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

Cymbiotika would sue Virun for misappropriation of trade secrets stemming from the disclosures this former employee made to Virun.

## CLAIMS

### FIRST CLAIM FOR RELIEF

### FALSE ADVERTISING UNDER THE LANHAM ACT 15 U.S.C. § 1125(a)

111. Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

112. Beginning no later than November 2021, Bromley engaged in a campaign of making false statement concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

113. Shortly after Cymbiotika began distributing products based on new formulations with an alternative manufacturer, Cymbiotika fell victim to an anonymous social media campaign in which multiple anonymous accounts across social media platforms asserted – falsely – that Cymbiotika's new formulations were carcinogenic. These accounts tagged Cymbiotika customers in the posts and communicated with those customers, publishing further falsehoods in comments and replies to comments from concerned customers.

114. By way of example, the user "contradiction2u" posted on Instagram that Cymbiotika's products contained "Sorbic Acid Potassium Salt." **Exhibit D.** The user stated that:

> This ingredient is in several of CYMBIOTIKA's supplement products and has been shown to cause causer. . . CYMBIOTIKA does not want you to know this – BEWARE, they will delete-comments re anyone who questions them on this. *Id*.

115. The user "tagged" a number of Cymbiotika's customers to ensure that they saw the post.

116.    The user "contradiction2u" also posted a screenshot from Cymbtioka's own website, which reflected Cymbtioka's use of sorbic potassium salt in one of Cymbtioka's products.    **Exhibit D**.   Incredibly, the screenshot also which shows the bookmark bar and bookmarks for Bromley's work email, philip.bromley@virun.com as well as a bookmark for Virun itself.



117.    As such, it is apparent that the user "contradiction2u" was, in fact, Bromley himself.   As established above, Bromley was behind some, if not all, of these clandestine attacks, and he intentionally disparaged the quality of Cymbiotika's new product formulations.

118.    At all times relevant to the social media postings, Bromley was the President of Virun.   On behalf of Virun, Bromley knowingly published these falsehoods about Cymbiotika's products out of spite following the failed partnership between the Virun and Cymbiotika.

119.    The baseless and damaging lies spread by the anonymous assailant resulted in numerous customer complaints and lasting damage to Cymbiotika's business and reputation. Specifically, Cymbiotika saw a meaningful decline in Vitamin C subscriptions concomitant with Bromley's activity.   Bromley had once again created an existential threat to Cymbiotika.   Cymbiotika was forced to involve its litigation counsel and deliver Bromley a cease-and-desist letter in order to stop the attacks.

120.    Attached hereto as **Exhibit D** is a copy of the cease-and-desist letter that counsel for Cymbiotika delivered to Bromley on November 30, 2021, ordering him to cease-and-desist from continuing his "campaign to defame, disparage, and harm

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

Cymbiotika by knowingly making false claims about Cymbiotika products and its business via social media."

121.   Following the delivery of the cease-and-desist letter, Bromley ceased the social media smear campaign.  However, the damage to Cymbiotika's reputation remained.

122.   Bromley's assertions about the safety and efficacy of Cymbiotika's products are false and plainly untrue.  Bromley was aware of the falsity of the statements at the time of their publication.  In particular, Bromley has specialized knowledge in the field of nutritional supplements and whether they are or are not known to be carcinogenic.  Further, as the principal for Cymbiotika's manufacturer, Bromley was uniquely positioned to appreciate the fact that none of the ingredients in Cymbiotika's products were known to be carcinogenic.  Bromley was aware of the falsity of the statements at the time of their publication.

123.   Bromley made these false assertions about Cymbiotika's products as part of commercial advertisements, including social media posts, for the purpose of influencing consumers to refrain from purchasing Cymbiotika's products and were disseminated sufficiently to the relevant purchasing public on social media.

124.   Bromley made all such statements in commercial advertising in interstate commerce, including in California, in order to misrepresent the nature, characteristics, and qualities of Cymbiotika's goods and services.

125.   Bromley's false statements regarding Cymbiotika's products are deceptive and are likely to influence consumers' purchasing decisions.

126.   Given his intimate knowledge of Cymbiotika's ingredients and high standards for same, Bromley knew that Cymbiotika's new products did not lack the safety and efficacy Bromley publicly asserted.  Bromley therefore made the false and disparaging statements willfully and with an intent to deceive consumers.

127.   As a direct and proximate result of Bromley's false and disparaging

publications, Cymbiotika has suffered damages in an amount to be proven at trial. Specifically, advertising that a competitor's Vitamin C supplement contains one or more cancer causing ingredients will obviously cause subscribers of that product to cancel their subscription since it is obvious that no rational person wants to expose themselves to cancer causing substances.   Additionally, Cymbiotika saw a meaningful increase in cancellation of customer subscriptions for Vitamin C concomitant with Bromley's advertising activity.  Additionally, any continued false advertising by Bromley of the safety or efficacy of Cymbiotika's products will cause Cymbiotika irreparable harm warranting injunctive relief.

128.   Bromley acted here in a willful and wanton manner and as a result, Cymbiotika is entitled to enhanced damages.

129.   Cymbiotika is entitled to an award of attorneys' fees because of the exceptional nature of Bromley's conduct.

## SECOND CLAIM FOR RELIEF

## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS

130.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

131.   Cymbiotika has subscription contract with its customers whereby Cymbiotika supplies its customers with products on a recuring basis.

132.   Bromley knew of Cymbiotika's subscription-based relationship with its customers.

133.   Bromley interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions.

134.   Bromley intended his conduct to disrupt these subscription contracts or knew that it was substantially certain that their conduct would disrupt these contracts.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

Additionally, Bromley's conduct was independently wrongful because his advertising statement directed to a competitor were false.

135.   As a direct and proximate result of Bromley's interference, Cymbiotika experienced a marked increase in subscription cancelations for Vitamin C. Cymbiotika has suffered damages in an amount to be proven at trial.

136.   Bromley acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## THIRD CLAIM FOR TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

137.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

138.   Cymbiotika has an economic relationship with its non-subscription-based customers, as well as potential customers who would be interested in the products that it sells that probably would have resulted in an economic benefit Cymbiotika.

139.   Bromley knew of Cymbiotika's customers, as well as potential customers who may be interested in Cymbiotika's products.

140.   Bromley interfered with these subscription contracts by, among other things, making false statements publicly about the safety and efficacy of Cymbiotika's products, and intentionally failing and refusing to deliver Cymbiotika products so that Cymbiotika could not fulfill its customers' orders and subscriptions. This interference is independently wrongful because the statement made were false and independently support a claim for trade liable and false advertising.

141.   Bromley intended his conduct to disrupt these economic relationships or knew that it was substantially certain that their conduct would disrupt these relationships.

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

142.   As a direct and proximate result of Bromley's interference, Cymbiotika has suffered damages in an amount to be proven at trial.

143.   Counterclaim Defendants acted volitionally with fraud, oppression, and malice entitling Cymbiotika to an award of punitive damage.

## FOURTH CLAIM FOR UNFAIR COMPETITION UNDER CALIFORNIA BUSINESS AND PROFESSIONS CODE SECTION 17200

144.   Cymbiotika repeats and realleges the allegations of the preceding paragraphs as if fully set forth herein.

145.   Bromley engaged in unlawful, unfair, or fraudulent business practices in violation of Section 17200 of the California Business and Professions Code ("Section 17200"), by among other things, engaging in a campaign of making false statements concerning the safety and efficacy of products sold by Cymbiotika since it ceased purchasing products from Virun, including posting on social media.

146.   Bromley's unlawful, unfair, or fraudulent business practices in violation of Section 17200 proximately caused actual injury to Cymbiotika by harming its competitive standing and hindering its prospective contractual relations.

147.   As a direct and proximate result of Bromley's unlawful, unfair, or fraudulent business practices in violation of Section 17200, Cymbiotika has been harmed in an amount to be proven at trial.  Additionally, Bromley's conduct, to the extent it continues, will cause irreparable harm warranting injunctive relief.

## PRAYER FOR RELIEF

WHEREFORE, Cymbiotika respectfully request that this Court enter judgment in their favor and against Bromley and provide the following relief:

a.    Compensatory damages, incidental damages and consequential damages;

b.    Costs of suit, interest, and reasonable attorneys' fees;

c.    Pre and post-judgment interest;

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

1        d.      Punitive damages; and

2        e.      Such other relief as this Court deems just and equitable.

3

4    Dated: August 11, 2023              **FOX ROTHSCHILD LLP**

5                                     */s/ John Shaeffer*

6                                       John Shaeffer
                                   Jeffrey H. Grant

7                                       Carly Klein
                                   Attorneys for Defendants and

8                                       Counterclaimant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2

1

## DEMAND FOR JURY TRIAL

2          In accordance with Fed. R. Civ. P. 38(b), Cymbiotika hereby demand trial by

3 jury on all issues so triable.

4

5 Dated: August 11, 2023                      FOX ROTHSCHILD LLP

6

7                               */s/ John Shaeffer*

8                               John Shaeffer

9                               Jeffrey H. Grant
Carly Klein

10                               Attorneys for Defendants and
Counterclaimant

11

12     ## PURSUANT TO THE COURT'S JULY 21, 2023 ORDER [DKT. 160], A

13     ## "REDLINED" VERSION OF THE AMENDED THIRD PARTY

14     ## COMPLAINT IS ATTACHED AS EXHIBIT F

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CYMBIOTIKA'S SECOND AMENDED THIRD-PARTY COMPLAINT

148197105.2